UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                              :
In the Matter of the Arbitration of                           :
                                                              :
SECURITY INSURANCE COMPANY OF HARTFORD                        :   Docket No. 07 CV 3277(Vm)
Itself and as Successor in Interest to                         :
THE FIRE AND CASUALTY INSURANCE COMPANY                       :
OF CONNECTICUT and THE CONNECTICUT                            :
INDEMNITY COMPANY,                                            :
                                                              :
                              Petitioner,                     :
                                                              :   **DECLARATION OF**
                  -against-                                   :   **MICHELE L. JACOBSON IN**
                                                              :   **SUPPORT OF PETITION**
COMMERCIAL RISK REINSURANCE COMPANY                           :   **FOR ORDER COMPELLING**
LIMITED (BERMUDA) and COMMERCIAL RISK RE-                     :   **ARBITRATION**
INSURANCE COMPANY (VERMONT),                                  :
                                                              :
                              Respondents.                    :
                                                              :
                                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

     **MICHELE L. JACOBSON,** hereby declares under penalty of perjury that the following

is true and correct:

     1.    I am a member of the firm of Stroock & Stroock & Lavan LLP, attorneys for

Petitioner Security Insurance Company of Hartford, Itself and as Successor in Interest to the Fire

and Casualty Insurance Company of Connecticut ("SICH"). I submit this Declaration in support

of Petitioner's motion to compel Respondents Commercial Risk Reinsurance Company Limited

(Bermuda) ("Commercial Risk Bermuda") and Commercial Risk Re-Insurance Company

(Vermont) ("Commercial Risk Vermont", together, "Commercial Risk") to arbitrate the disputes

arising under five Quota Share Reinsurance Contracts (the "Treaties") pertaining to three

insurance programs, which were consolidated by agreement of the parties, with the Umpire who

was duly selected by Commercial Risk and SICH in accordance with the terms of those Treaties, and on June 25-29, 2007 – the dates agreed upon by the parties and the Panel.

2.　　　In particular, I submit this Declaration to provide the Court with the documents and facts upon which this motion is based.  As counsel for SICH, I have personal knowledge of the facts set forth herein.

3.　　　Annexed hereto as Exhibit 1 is a true, complete, and correct copy of the Quota Share Reinsurance Contract incepting May 1, 2000 between SICH, Commercial Risk Bermuda and Commercial Risk Vermont, pursuant to which Commercial Risk Bermuda and Commercial Risk Vermont agreed to take a 90% and 10% quota share respectively of losses arising out of the HPP Workers Compensation Program, in accordance with the schedule of liabilities attached thereto as Exhibit A.

4.　　　Annexed hereto as Exhibit 2 is a true, complete, and correct copy of the Quota Share Reinsurance Contract incepting May 1, 2001 between SICH, Commercial Risk Bermuda and Commercial Risk Vermont, pursuant to which Commercial Risk Bermuda and Commercial Risk Vermont agreed to take a 90% and 10% quota share respectively of losses arising out of the HPP Workers Compensation Program, in accordance with the schedule of liabilities attached thereto as Exhibit A (together with Exhibit 1 hereto, the "HPP Treaties").

5.　　　Annexed hereto as Exhibit 3 is a true, complete, and correct copy of the Quota Share Reinsurance Contract incepting March 15, 2000 between SICH, Commercial Risk Bermuda and Commercial Risk Vermont pursuant to which Commercial Risk Bermuda and Commercial Risk Vermont agreed to take an 80% and 20% quota share respectively of the losses arising out of the NHE Workers Compensation Program, in accordance with the schedule of liabilities attached thereto as Exhibit A.

2

6.      Annexed hereto as Exhibit 4 is a true, complete, and correct copy of the Quota Share Reinsurance Contract incepting March 15, 2001 between SICH, Commercial Risk Bermuda and Commercial Risk Vermont pursuant to which Commercial Risk Bermuda and Commercial Risk Vermont agreed to take an 80% and 20% quota share respectively of the losses arising out of the NHE Workers Compensation Program, in accordance with the schedule of liabilities attached thereto as Exhibit A (together with Exhibit 3 hereto, the "NHE Treaties").

7.      Annexed hereto as Exhibit 5 is a true, complete, and correct copy of the Quota Share Reinsurance Contract incepting September 1, 2001 between SICH, Commercial Risk Bermuda and Commercial Risk Vermont pursuant to which Commercial Risk Bermuda and Commercial Risk Vermont agreed to take a 80% and 20% quota share respectively of the losses arising out of the ORS Workers Compensation Program, in accordance with the schedule of liabilities attached thereto as Exhibit A (the "ORS Treaty").

8.      The Treaties are identical in all material respects other than program name, quota share percentage, limits and inception date.  The Arbitration Clause in the Treaties (Article 32) provides:

> As a condition precedent to any right of action hereunder, any dispute or difference between the Company [SICH] and any Reinsurer [Commercial Risk] relating to the interpretation or performance of this Contract, including its formation or validity, or any transaction under this Contract, whether arising before or after termination, shall be submitted to arbitration.
>
> * * *
>
> Upon written request of any party, each party shall choose an arbitrator and the two chosen shall select a third arbitrator.  If either party refuses or neglects to appoint an arbitrator within thirty (30) days after receipt of the written request for arbitration, the requesting party may appoint a second arbitrator.
>
> * * *

3

All arbitrators shall be active or retired officers of insurance or reinsurance companies, or Lloyd's London Underwriters, and disinterested in the outcome of the arbitration.

\* \* \*

The decision in writing of a majority of the arbitrators shall be final and binding upon both parties.

See Exhibits 1-2 at 18-19, Exhibits 3-4 at 16-17, Exhibit 5 at 22-23.

9.      In August 2005, SICH served Commercial Risk Bermuda and Commercial Risk Vermont with separate Demands for Arbitration under the HPP Treaties, the NHE Treaties and the ORS Treaty (the "Arbitration Demands") as a result of Commercial Risk's failure to pay amounts due to SICH under the Treaties.  Copies of the Arbitration Demands are annexed hereto collectively as Exhibit 6.

10.      In accordance with the terms of the Treaties, in the Arbitration Demands, SICH identified Martin Haber, the former Chief Legal Officer of the Continental Corporation (now CNA), as its party appointed arbitrator for each of the disputes, and requested that Commercial Risk appoint an arbitrator.  In the cover letters transmitting the Arbitration Demands, SICH advised Commercial Risk that it would consent to consolidation of the three disputes if Commercial Risk so consented.  A copy of one those cover letters (for NHE) is annexed hereto as Exhibit 7.

11.      By letter dated September 15, 2005, counsel for Commercial Risk appointed Theodor Dielmann, a former officer of Hannover Reinsurance Company, as its party appointed arbitrator for each of the disputes.  A copy of the September 15, 2005 letter is annexed hereto as Exhibit 8.  In mid-November, 2005, counsel for SICH and Commercial Risk agreed to consolidate the three disputes into one arbitration.  A copy of the November 18, 2005 letter from SICH's counsel to Commercial Risk's counsel reflecting, inter alia, SICH's agreement to

4

consolidation is annexed hereto as Exhibit 9. A copy of the November 21, 2005 correspondence from Commercial Risk's counsel to SICH's counsel reflecting Commercial Risk's agreement to, inter alia, consolidation is annexed hereto as Exhibit 10.

12.    In accordance with the procedure agreed upon by the parties and both Messrs. Haber and Dielmann, and as commonly done in the reinsurance industry, the parties exchanged lists of acceptable Umpire candidates, which were narrowed to one mutually acceptable Umpire candidate per party. See Exhibit 9 ("the parties will exchange lists of umpire candidates in an expeditious fashion in the Consolidated Arbitration") and Exhibit 10 ("We confirm the procedural points raised [in your letter of November 18, 2005]"). The Umpire was to be chosen from the list of the party who successfully predicted whether the last digit of the Dow Jones index on a selected day was odd or even. As part of this process, counsel for SICH and Commercial Risk jointly sent out questionnaires to all of the proposed Umpire candidates in order to ascertain whether any of them had conflicts or scheduling issues. Copies of these letters and the questionnaire are annexed as Exhibit 11.

13.    Based on this agreed-upon process, on or about March 1, 2006, Mr. David Thirkill was selected to be the Umpire in this dispute.[1] A copy of Mr. Thirkill's email correspondence dated March 1, 2006 accepting the appointment and attempting to schedule an organizational meeting for later in the month is annexed hereto as Exhibit 12.

14.    At the March 28, 2006 organizational meeting for the Arbitration, the party appointed arbitrators, Mr. Haber and Mr. Dielmann, and the jointly selected Umpire, Mr. Thirkill, disclosed their contacts with the parties, counsel and potential witnesses by referencing

---

[1]    The Treaties also provide that "[t]he parties hereby waive all objections to the method of selection of the arbitrators, it being the intention of both sides that all the arbitrators be chosen from those submitted by the parties." Exhibits 1-2 at 19, Exhibits 3-4 at 16, Exhibit 5 at 23.

their disclosures in a simultaneously pending arbitration between the parties in which the same

Arbitrators had been selected. See Transcript of March 28, 2006 Organizational Meeting,

annexed hereto as Exhibit 13 at 3-4 and Excerpt of Transcript of the February 22, 2006

Organizational Meeting for the "DIG Arbitration", annexed hereto as Exhibit 14 at 4-17.[2]  To

distinguish between the two simultaneously pending arbitration proceedings, the parties

denominated this Arbitration as the "Non-DIG Arbitration" and the other Arbitration as the "DIG

Arbitration." Several months earlier, the DIG Arbitration had been scheduled for a Hearing

during the week of December 11, 2006.

15.     After the panel members completed their disclosures, the parties formally

accepted the panel on the record in the Non-DIG Arbitration. See Exhibit 13 at 4. The parties

also executed a Hold Harmless Agreement, in which they stipulated that the arbitrators had been

appointed, that they found the arbitrators to be without conflicts and that they accepted the Panel.

A copy of the executed Hold Harmless Agreement is annexed hereto as Exhibit 15. After

consultation with the parties, the Panel scheduled the Non-DIG Arbitration Hearing for the week

of March 5, 2007. Thus, as of March 2006, the Panel in this Arbitration, as well as the DIG

Arbitration, consisted of Messrs. Haber, Dielmann, and Thirkill.

16.     Immediately following the Organizational Meeting for the Non-DIG Arbitration,

the Panel heard oral argument on SICH's motion for pre-hearing security in both the DIG and

Non-DIG Arbitrations. The Panel issued a single oral decision resolving both motions and

awarding pre-hearing security in the amount of the claim (less security already held by SICH),

---

[2]     Through the same process used by the parties in connection with this Arbitration, the
identical Panel had been selected previously to preside over the DIG Arbitration between the
parties under two Quota Share Reinsurance Contracts relating to the DIG Workers Compensation
Program.

without interest, in favor of SICH.  The Panel followed up its oral ruling with separate pre-hearing security awards in each of the Arbitrations.

17.     In November 2006, SICH was advised that, due to the illness of Commercial Risk's party arbitrator, the DIG Arbitration Hearing would have to be postponed from the December 2006 date.  The parties and the Panel thereafter agreed to conduct the DIG Arbitration Hearing during the March 2007 week originally scheduled for the Non-DIG Arbitration Hearing and re-schedule the Non-DIG Arbitration Hearing to the week of June 25, 2007.  Email correspondence regarding the agreed scheduling change, which include a December 5, 2006 email to the panel, a December 29, 2006 email from the Umpire to the parties, and a January 29, 2007 email from the Umpire to the parties, are annexed hereto collectively as Exhibit 16.

18.     The DIG Arbitration Hearing proceeded as re-scheduled on March 5, 2007.  On March 11, 2007, a majority of the Panel issued an Award in the amount of $20,754,990 plus interest in the amount of $1,300,000, in favor of SICH (the "DIG Award").  A copy of the DIG Award is annexed hereto as Exhibit 17.

19.     On March 20, 2007, Commercial Risk's party arbitrator, Theodor Dielmann, sent an email to the parties and the other Panel members advising that "[a]fter in-depth deliberation, I wish to withdraw as arbitrator from both the Non-DIG and DIG arbitrations (the Panel of the latter having remained constituted until all parts of the Order have been fully performed)."  A copy of Mr. Dielmann's email is annexed hereto as Exhibit 18.

20.     Later that day, on behalf of the remaining panel members, the Panel's Umpire, Mr. Thirkill, acknowledged Mr. Dielmann's withdrawal as party-appointed arbitrator for Commercial Risk and requested that "Commercial Risk appoint a replacement as soon as possible."  Mr. Thirkill also noted that since the Non-DIG Hearing was not scheduled to start for

7

over three months, there would be no need for a postponement unless the parties agreed otherwise. A copy of Mr. Thirkill's email is annexed hereto as Exhibit 19.

21.      Both parties responded to Mr. Thirkill's email on March 20, 2007. SICH's counsel advised that it "[did] not agree to a postponement of the hearing dates, and . . . [had] informed [Commercial Risk's counsel] Mr. Higgins that [it] fully expect[ed] that those hearing dates [would] hold firm." A copy of the March 20, 2007 email from SICH's counsel in response is included as part of Exhibit 19. Commercial Risk's counsel responded, "Thanks for this, which we have noted." A copy of the March 20, 2007 email from Commercial Risk's counsel in response is annexed hereto as Exhibit 20.

22.      Particularly in light of Mr. Dielmann's reference to "in depth deliberation" (see Exhibit 18), by letter of the same date, SICH's counsel requested that Commercial Risk's counsel disclose "the details of any information that either [it] or [its] client have, or any conversations that either [it] or [its] client have had with Mr. Dielmann concerning his actions." A copy of the March 20, 2007 letter from SICH's counsel to Commercial Risk's counsel is annexed hereto as Exhibit 21.

23.      Shortly thereafter, Commercial Risk's counsel advised SICH's counsel by letter as follows: "We will not be responding in any way to the request for information [about communications with Mr. Dielmann regarding his withdrawal]. We note your expectation and commitment to the non-DIG hearing dates." A copy of the letter dated March 20, 2007 from Commercial Risk's counsel to SICH's counsel is annexed hereto as Exhibit 22.

24.      By letter dated March 27, 2007, SICH's counsel inquired regarding the status of Commercial Risk's appointment of a replacement arbitrator, stating:

> To date, Commercial Risk Reinsurance Company Limited
> (Bermuda) and Commercial Risk Re-Insurance Company

8

> (Vermont) (collectively "Commercial Risk") have not appointed a
> replacement arbitrator who is available to serve on a panel during
> the week of June 25, 2007, nor have you advised us of Commercial
> Risk's intent to do so.
>
> Please be advised that if we do not receive within ten (10) days,
> notice of appointment of a replacement arbitrator who satisfies all
> applicable requirements and is available for a hearing during the
> week of June 25, 2007, we will seek court appointment of a
> replacement arbitrator.

A copy of the March 27, 2007 letter from SICH's counsel to Commercial Risk's counsel is

annexed hereto as Exhibit 23.

25.     On April 1, 2007, Umpire David Thirkill wrote to Commercial Risk's counsel,

noting:

> although there is still some time to go until the hearing, Mr. Haber
> and I are of the opinion that the replacement for Mr. Dielmann
> should be made as soon as possible. You should, by now, have
> had the opportunity of discussing the matter with Commercial
> Risk. Would you kindly advise us by Wednesday of this week
> [April 4, 2007] as to the replacement.

A copy of Mr. Thirkill's April 1, 2007 email to Commercial Risk's counsel, which was copied to

SICH's counsel and Mr. Haber, is annexed hereto as Exhibit 24.

26.     On April 4, 2007, Commercial Risk's counsel advised SICH's counsel by email

that "[it would] have a letter in [their] hands tomorrow on an arbitrator for non-DIG." A copy of

the April 4, 2007 email from Commercial Risk's counsel to SICH's counsel is annexed hereto as

Exhibit 25.

27.     By letter dated April 5, 2007, Commercial Risk advised SICH that it had

appointed Peter Gentile as arbitrator for the Non-DIG Arbitration. Despite the fact that there was

a constituted Panel, including SICH's party appointed arbitrator Martin Haber and a jointly

selected Umpire, David Thirkill – both of whom had been accepted by the parties – Commercial

Risk requested that SICH confirm its selection of Mr. Haber as its party appointed arbitrator and

advised that, upon such confirmation, Mr. Gentile would contact Mr. Haber to undertake selection of a new Umpire. A copy of the April 5, 2007 letter from Commercial Risk's counsel to SICH's counsel, which was copied to Mr. Haber and Mr. Thirkill, is annexed hereto as Exhibit 26.

28.    On that same date, Commercial Risk filed a Petition in this Court in connection with the DIG Arbitration, seeking to vacate the Panel's award. Commercial Risk also filed an Order to Show Cause for a Preliminary Injunction to prevent SICH from drawing down on the pre-hearing security posted by Commercial Risk in order to satisfy a portion of the DIG Award. This Court scheduled oral argument on the Preliminary Injunction Motion for April 9, 2007.

29.    After considering papers submitted by Commercial Risk and SICH, and hearing oral argument on Commercial Risk's Motion for a Preliminary Injunction to restrain SICH from drawing down on pre-hearing security to partially satisfy the DIG Award, on April 9, 2007, this Court ruled from the bench that Commercial Risk had not satisfied any of the requirements for injunctive relief and denied Commercial Risk's motion. The Court held that:

> In view of what is at stake -- which is essentially a money dispute -
> - the money dispute is literally resolvable by the party that may
> win on the merits ultimately paying back what may have been
> improperly drawn down, if in fact the plaintiffs were to prevail on
> the merits. I don't see where that irreparable harm comes in.
> Plaintiffs indicate that their view of the irreparable harm enters in
> the issue of what they characterize as the improper or abuse of the
> process. Again, I'm not persuaded that that is the case here. Under
> the applicable doctrine, the arbitrators have a fairly extensive
> latitude to interpret the scope of arbitration and make appropriate
> rulings concerning on that scope. Those determinations ordinarily
> are entitled to substantial deference by the Court except as has
> been indicated in the cases of clear abuse of legal acts or illegal
> acts or other forms of impropriety.
>
> I don't believe that there is sufficient evidence that the standard has
> been met here. On those grounds, the issue of whether or not the
> arbitrators improperly excluded evidence, in my view, has not been
> compellingly demonstrated to the point warranting the

10

> extraordinary remedy not only of denial of the confirmation of
> [the] arbitration award but also of granting of preliminary
> injunctive relief.
>
> I also do not believe that the plaintiffs are likely to succeed on the
> merits given the language of the contract that is at issue here, the
> parties' agreements, and I also am not persuaded that there are
> sufficient issues going to the merits as to make the plaintiff's
> claims later on for litigation and the balance of equities tilting
> decidedly in the plaintiff's favor because the Court believes that in
> the reading of the contract that there is sufficient support in the
> underlying agreements for the posting of the letter of credit and for
> the draw down of the letter of credit absent a confirmation award.

See Exhibit 27 (Transcript of Argument and Oral Ruling on Motion for a Preliminary Injunction

in DIG matter) at 25-26. On April 11, 2007, the Court issued a written Order on the Preliminary

Injunction Motion, a copy of which is annexed hereto as Exhibit 28.

    30.    By email dated April 9, 2007, SICH's counsel wrote to Commercial Risk's

proposed replacement arbitrator, Mr. Gentile, and requested that he complete an attached

questionnaire designed to elicit information which would determine whether he was qualified to

be an arbitrator under the terms of the Treaties. This questionnaire was in the same format as

had been previously used by the parties in connection with Umpire selection. A copy of the

April 9, 2007 email from SICH to Mr. Gentile, which was copied to Commercial Risk's counsel,

Mr. Haber and Mr. Thirkill, is annexed hereto as Exhibit 29.

    31.    On April 10, 2007, Commercial Risk's counsel wrote to SICH's counsel advising

that Mr. Gentile would not fill out the questionnaire and provide the requested information at that

time, because "[such disclosure] should await the complete constitution of the new panel."

Acknowledging that SICH had previously appointed an arbitrator in accordance with the

Treaties' terms in its Arbitration Demand, while ignoring that an Umpire had been duly selected

in accordance with the terms of the Treaties, Commercial Risk noted that it had "asked Mr.

Gentile to contact Mr. Haber about third arbitrator selection under the treaty." Commercial

11

Risk's counsel also intimated that it was reneging on its previous agreement to the June 25-29, 2007 Hearing date, stating, "[t]he hearing dates you indicate would appear to be most unlikely." A copy of the April 10, 2007 email from Commercial Risk's counsel to SICH's counsel is annexed hereto as Exhibit 30.

32.     The following day, SICH's counsel reiterated its request to Mr. Gentile that he complete the questionnaire and, in light of the statement by Commercial Risk's counsel that the "hearing dates would appear to be most unlikely," queried his availability for a hearing on the June 25-29, 2007 dates. A copy of the April 11, 2007 email from SICH's counsel to Mr. Gentile, which was copied to Commercial Risk's counsel, Mr. Haber and Mr. Thirkill, is annexed hereto as part of Exhibit 30.

33.     On April 12, 2007, Mr. Gentile responded to SICH's counsel by email, advising that he would "disclose any potential conflicts at the appropriate time." Mr. Gentile also stated that Commercial Risk had directed him to contact Mr. Haber to "agree on a process for selecting the third arbitrator" and that "[w]hen a third Arbitrator is selected, this Panel will meet with counsel to select a mutually convenient date for the Arbitration Hearing." A copy of the April 12, 2007 email from Mr. Gentile is annexed hereto as Exhibit 31.

34.     Within an hour of Mr. Gentile's response, Commercial Risk's counsel wrote to SICH's counsel demanding that SICH appoint an arbitrator within thirty (30) days, despite the fact that, as Commercial Risk was well aware, SICH had appointed Mr. Haber in its Arbitration Demand and neither Mr. Haber nor SICH had taken any action that would suggest that he had withdrawn. A copy of the April 12, 2007 email from Commercial Risk's counsel to SICH's counsel is annexed hereto as Exhibit 32.

35.     Given that SICH has already designated Mr. Haber as its Arbitrator in accordance with the provisions of the Treaties, and the parties selected Mr. Thirkill in accordance with the provisions of the Treaties, there is no legal or factual basis for Commercial Risk's refusal to proceed with the Non-DIG Arbitration, with the existing, duly selected and agreed-upon Umpire on the June 25-29, 2007 dates previously agreed to by the parties and the Panel.

36.     Commercial Risk should not be permitted to further delay payment of its long delinquent obligations to SICH by orchestrating the recommencement of this Arbitration ab initio.  Since the Panel ordered Commercial Risk to post security in March 2006, it has neither heard nor considered any motions.  At the time of Mr. Dielmann's withdrawal, there were no matters sub judice before the Panel and, to date, the Panel has not been presented with any evidence.  There would be no prejudice to Commercial Risk by virtue of its proceeding with the Non-DIG Arbitration with Mr. Gentile as its substitute party appointed arbitrator.[3]

37.     In contrast, SICH would be prejudiced by the further delay caused by Commercial Risk's strategy to insist on re-appointment of existing Arbitrators.  Indeed, this Arbitration was already postponed for nearly four months from its originally scheduled hearing date to accommodate the schedule of Commercial Risk's initially appointed arbitrator, Mr. Dielmann.

38.     Commercial Risk should not be given the opportunity to re-start the Arbitration process anew.  For all the foregoing reasons, and the reasons set forth in the Petition, the Affidavit of Eugene Wollan and the accompanying Memorandum of Law, SICH respectfully

---

[3]     As SICH has not been provided with disclosures by Mr. Gentile at this time (despite its request therefor), it is not able to accept him presently without qualification.  However, in the event, and assuming for the purposes of this application, that Mr. Gentile is conflict free and can proceed in an unbiased fashion, SICH would proceed with a Panel consisting of Mr. Haber, Mr. Gentile and Mr. Thirkill.

requests that this Court issue an Order compelling Commercial Risk to arbitrate this matter with

Mr. Thirkill as the Umpire at a Hearing to commence on June 25, 2007.

Dated: New York, New York
      April 24, 2007

                                        MICHELE L. JACOBSON

# EXHIBIT 1

20000081

# QUOTA SHARE REINSURANCE CONTRACT

**ARTICLE I**
**REINSURED**
**PROGRAM:**                  HPP Workers' Compensation Program

**ARTICLE II**
**COMPANY:**                  Security Insurance Company of Hartford
                             The Fire and Casualty Insurance Company of Connecticut
                             The Connecticut Indemnity Company

**ARTICLE III**
**SUBSCRIBING**
**REINSURERS:**               Identified in the INTEREST AND LIABILITIES
                             AGREEMENTS attached to and forming a part of this Contract.

**ARTICLE IV**
**TYPE:**                     Quota Share Treaty Reinsurance Contract providing prospective
                             coverage as set forth herein.

**ARTICLE V**
**CONTRACT PERIOD:**          The Contract shall apply to Policies that incept on or between
                             12:01 A.M. Eastern Standard Time May 1, 2000 (the "Inception
                             Date") and 12:01 A.M. Eastern Standard Time April 30, 2001.
                             This Contract shall continue until terminated pursuant to Article
                             XX herein.

                             In the event either party terminates this Contract in accordance
                             with such Article XX, the Reinsurer shall continue to reinsure
                             policies ceded within the terms of this Contract pursuant to the
                             terms stated below. In the event of the termination of this
                             Contract, at the Company's option:

                             A.  The Reinsurer shall remain liable for all policies ceded within
                             the terms of this Contract which have inception dates prior to
                             the Contract termination date until the natural expiration date or
                             cancellation date of such policies, whichever occurs first. The
                             Reinsurer shall continue to be liable for its proportionate share of
                             all outstanding losses (reported or unreported) which occur prior
                             to such policy natural expiration date or cancellation date,
                             whichever occurs first; or

                             B.  The Reinsurer shall be relieved of all liability hereunder for
                             losses occurring subsequent to the Contract termination date.
                             The Reinsurer shall continue to be liable for its proportionate
                             share of all outstanding losses (reported or unreported) which
                             occur prior to the Contract termination date.

1

The Reinsurer shall refund to the Company the unearned Net Ceded Premium, if any, (as such term is defined in Article XVI herein) applicable to the unexpired liability (calculated on a pro rata basis), at conclusion of the runoff if option A. above is elected, or at termination if option B. above is elected.

**ARTICLE VI**
**BUSINESS COVERED:**

Business with respect to risks of the Reinsured Program indicated in Article I herein only classified as Workers' Compensation and Employers' Liability under those certain insurance policies issued by the Company to the Original Insureds pursuant to and in accordance with the Underwriting Guidelines (as defined in Article XVI herein), as set forth below (the "Covered Policies"). Coverage hereunder is on an Occurrence Basis.

The Covered Policies with respect to which the Reinsurer shall indemnify the Company shall include policies (including renewals thereof) with inception dates pursuant to Article V herein, and identified as policies issued under the HPP Workers' Compensation Program, pursuant to and in accordance with the Underwriting Guidelines (as defined in Article XVI herein). This Contract shall continue until terminated pursuant to Article XIX herein.

**ARTICLE VII**
**REINSURING CLAUSE:**

With respect to losses arising from Workers' Compensation and Employers' Liability Accidents and Diseases during the Contract Period, the Reinsurer will indemnify the Company, subject to the limitations set forth herein, for Ultimate Net Loss, Loss Adjustment Expenses, Extra Contractual Obligations and Losses in Excess of Original Policy Limits pursuant to Articles XVI, XVII, XVIII and XIX and Exhibit A attached hereto and forming a part of this Contact. The Reinsurer shall indemnify the Company up to amounts Per Accident and Each Employee for Disease indicated in such Exhibit A, subject always to the Reinsurer's Aggregate Limit of Liability indicated in such Exhibit A and the other limitations herein specified.

For purposes of this Article, the terms "Accident", "Disease", "Ultimate Net Loss", "Loss Adjustment Expenses", "Extra Contractual Obligations" and "Losses in Excess of Original Policy Limits" are defined in Articles XVI, XVII, XVIII and XIX and Exhibit A attached to and forming a part of this Contract.

**ARTICLE VIII**
**TERRITORY:**

The territorial limits of this Contract shall be identical with those of the Covered Policies, issued pursuant to and in accordance

2

with the Underwriting Guidelines (as defined in Article XVI herein.)

**ARTICLE IX**
**EXCLUSIONS:**

This Contract does not apply to:

A. Any losses, or liability for losses excluded under the Covered Policies; and

B. Any losses, or liability for losses arising from:

1. Professional sports teams;
   Federal Acts, including Jones Act except where estimated payroll in respect of any one risk is less than 20% of total estimated payroll of such risk;
3. Radioactive contamination;
4. Loss or damage directly or indirectly occasioned by, happening through, or in consequence of war, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation or nationalization or requisition or destruction of or damage to property by or under the order of any government or public or local authority;
   Loss or damage occasioned by war, invasion, revolution, bombardment, hostilities, acts of foreign enemies, civil war, rebellion, insurrection, military or usurped power, martial law, or confiscation by order of any government or public authority, but not excluding loss or damage which would be covered under a standard form or policy containing a standard war exclusion clause.
5. Loss or liability excluded by the Nuclear Incident Exclusion Clause – Liability – Reinsurance – U.S.A. (NMA 1590) attached to this Agreement (Exhibit D).
6. All liability of the Company arising, by contract, operation of law, or otherwise, from its participation or membership, whether voluntary or involuntary, in any insolvency fund. "Insolvency Fund" includes any guaranty fund, plan, pool, association, fund or other arrangement, howsoever denominated, established or governed, which provides for any assessment of or payment or assumption by the Company of part or all of any claim, debt, charge, fee or other obligation of any insurer, or its successors or assigns, which has been declared by any competent authority to be insolvent, or which is otherwise deemed unable to meet any claim, debt, charge, fee or other obligation in whole or in part;
7. The Company's liability as participant, member, subscriber or reinsurer of any pool, syndicate or association;

3

8.  Assumed reinsurance, except as specially accepted;
9.  Industrial Aid Aircraft;
10. Pollution – Absolute; and
11.  11.  Financial Guarantee, Insolvency, Title
     Insurance, Auto Warranty business and credit
     insurances.
12. All Hazard Group IV Class Codes
13. All Airline/Aircraft operations (except for ground
    crew)
14. All Asbestos exposures and related operations
15. Accident and Health Business, when written as such
16. Wrap-Ups/OCJP's/CCJP's
17. Professional Sports Teams
18. Mining Operations
19. Logging/Lumbering/Sawmills
20. Amusement Parks/Carnivals/Circus, except for
    ZOOs
21. Explosive or Ammunition Manufacturing
22. Jones Act, USL&H, Admiralty Act, All Maritime
    related Coverages
23. Employee Leasing/Temporary Staffing
24. Twenty-Four Hour Convenience and/or Liquor
    Stores
25. Chemical Manufacturing

**ARTICLE X**
**REINSURANCE**
**PREMIUM:**                    The Company will cede to the Reinsurer its proportionate share
                               of premiums under the Covered Policies, pursuant to Articles
                               XIII and XVI herein.

**ARTICLE XI**
**CEDING COMMISSION:**          The Reinsurer will allow the Company a thirty-six and twenty-six
                               hundredths percent (36.26%) ceding commission for the
                               2000/2001 Program Year (as such term is defined in Note #3.b.)
                               under Exhibit A attached to and forming a part of this Contract.
                               Such ceding commission will apply to the difference between (i) the
                               audited Gross Written Premium (as such term is defined in Article
                               XVI herein) with respect to all Covered Policies which comprise
                               the 2000/2001 Program Year and (ii) the premiums for excess
                               and aggregate reinsurances for such Program Year that inure
                               to the benefit of this Agreement and that have been approved
                               by the Reinsurer.

**ARTICLE XII**
**CURRENCY (BRMA 12A):**        Whenever the word "Dollars" or the "$" sign appears in this
                               Contract, they shall be construed to mean United States Dollars
                               and all transactions under this Contract shall be in United States
                               Dollars.

4

Amounts paid or received by the Company in any other currency shall be converted to United States Dollars at the rate of exchange at the date such transaction is entered on the books of the Company.

**ARTICLE XIII**
**PREMIUM, ACCOUNTS**
**AND REMITTANCES:**

**A.    Premiums**

1.    Within sixty (60) days following the end of each calendar month during the term of this Contract, the Company will render to the Reinsurer a statement showing the Net Ceded Premium (as defined in Article XVI), if any, due the Reinsurer for such month which is defined and calculated in accordance with Section C of this Article XIII. The Company will remit such Net Ceded Premium payment to the Reinsurer, pursuant to the terms of this Article XIII.

2.    Upon early termination of the Policies, the earned premium will be computed in accordance with the applicable rules, rates, rating plans, premiums and minimum premiums. If the earned premium less any uncollected premium, as finally determined, is different from the premium that was utilized to establish the reinsurance premium hereunder, prior payments made under this Contract will be recalculated by the Company utilizing the actual earned premium or the actual premium tax, and notice of such recalculation shall be provided to the Reinsurer within thirty (30) days of such termination. If the recalculation indicates that the Reinsurer owes money to the Company, the Reinsurer will pay that money within ten (10) days of the Reinsurer's receipt of such notice thereof from the Company. If the recalculation indicates that the Company owes money to the Reinsurer, the Company will pay that money at the time the recalculation is delivered to the Reinsurer.

**B.    Claims**

1.    The Company will, with funds provided by the Reinsurer (from funds withheld from Net Ceded Premium or other sources), establish an interest bearing bank account (hereinafter the "Loss Payment Fund Account") for the Company's benefit which shall be for use in payment of the Reinsurer's liabilities under this Contract. The Company and its authorized Third Party Claims Administrator (hereinafter the "TPA") will have the right to withdraw funds from the Loss Payment Fund Account to make payment of claims that are payable under the terms and conditions of the Covered Policies and this Contract. The authority of the TPA to withdraw funds from the Loss Payment Fund Account may be revoked at anytime by the Company upon written notice to all parties. The Company may deposit, from time to time, funds which are in

5

excess of the Reinsurer's Reinsurance Limits of Liability (as stated in Exhibit A attached to this Contract) for the purpose of paying claims which are in excess of such Reinsurance Limits of Liability.

The Company will pay interest to the Reinsurer on any Loss Payment Fund Account amounts. Interest will begin accruing on the date such excess funds are available and will continue until all such excess funds are returned to the Reinsurer. Such interest may be paid monthly to the Reinsurer, or at the Reinsurer's election may be retained by the Company as excess amounts in the Loss Payment Fund Account to fund for future reinsurance obligations under this Contract.

The initial required amount of the Loss Payment Fund Account will be $25,000. Thereafter, the required balance of the Loss Payment Fund Account will be equal to two (2) times the monthly average of the sum of: (a) the current and previous (2) months' worth of paid Ultimate Net Losses (as such term is defined in Article XVI herein) within the Reinsurance Limits of Liability plus (b) Reinsurer's share of associated Loss Adjustment Expenses (as such term is defined in Article XVI herein). The Company and the Reinsurer agree that claim payment information provided by the TPA shall be used for the purpose of this calculation. The TPA shall be authorized to make payments out of the Loss Payment Fund Account in the amount of the Reinsurer's liabilities hereunder. The Reinsurer will provide the Company each month with sufficient funds to replenish the Loss Payment Fund Account within thirty (30) days after Reinsurer receives notice of the balance due pursuant to Section C. of this Article XIII. The Company may also review the adequacy of the account at any other time and the Reinsurer will send the Company funds to increase the account within five (5) working days of the Company's written request. If the Reinsurer fails to make any payment to the Company within the time required by this Contract, the Company will have the option to change the foregoing formula for replenishing the Loss Payment Fund Account by increasing the number of months used to estimate the required balance.

2.   Payments that may be withdrawn from the Loss Payment Fund Account will be for paid Ultimate Net Losses and Loss Adjustment Expenses within Reinsurer's Reinsurance Limits of Liability under this Contract with respect to the Covered Policies. Payments may also be withdrawn from funds made available by the Company pursuant to paragraph 1. above.

3.   In the event that the Company becomes obligated for paid Ultimate Net Loss and Loss Adjustment Expenses that exceed the amount of the Loss Payment Fund Account balance for amounts

6

representing the Reinsurer's liability under this Contract, the Reinsurer will, within five (5) working days after receipt of a written demand and documentation by the Company or the TPA on the Company's behalf, forward funds to the Company sufficient to cover such amounts that are greater than the then current Loss Payment Fund Account balance.

4.    Should payment due from the Reinsurer exceed $100,000 as respects any one Ultimate Net Loss, the Company may give the Reinsurer notice of payment made or its intention to make payment on a certain date. If the Company has paid the loss, payment will be made by the Reinsurer immediately. If the Company intends to pay the loss by a certain date and has submitted a satisfactory proof of loss or similar document, payment will be due from the Reinsurer twenty-four (24) hours prior to that date, provided the Reinsurer has a period of five (5) working days after receipt of said notice to dispatch the payment. Cash loss amounts specifically remitted by the Reinsurer as set forth herein will be credited to its next monthly account.

C.    Premium Reporting

Within sixty (60) calendar days following the end of each calendar month during the term of this Contract, the Company shall render to the Reinsurer a report showing the following, in arrears for such calendar month:

| | | |
|---|---|---|
| a. | Gross Ceded Premium | $. |
| | less | |
| b. | Ceding Commission (pursuant to Article XI herein) | $. |
| | equals | |
| c. | Net Ceded Premium | $. |
| | less | |
| d. | Additional Loss Payment Fund amount (pursuant to Section B.1 of this Article XIII) | $. |
| | less | |
| e. | Reinsurance Ultimate Net Losses and Loss Adjustment Expenses paid by the Company but not recovered from the Reinsurer (pursuant to Section B. of this Article XIII) | $. |

7

equals

f.   Balance Due to (or from) Reinsurer

Any balance due to the Reinsurer shall be remitted with the report indicated above. Any balance due to the Company shall be settled within thirty (30) days after the Reinsurer receives the report indicated above.

In addition, the Company shall report to the Reinsurer under each calendar monthly bordereaux the following:

1.   Policy Number;
2.   Policy Effective and Expiration Dates;
3.   Subject Business (pursuant to Exhibit A attached to this Contract);
4.   Risk State;
5.   Claims Number;
6.   Date of Loss;
7.   Claimant Name;
8.   Outstanding Reserves for Ultimate Net Loss; and
9.   Gross Ceded Unearned Premium Reserve.

For purposes of this Article XIII, the terms "Ultimate Net Loss" "Loss Adjustment Expenses," "Gross Ceded Premium," and "Net Ceded Premium" are defined in Article XVI.

**ARTICLE XIV**
**TAXES, ASSESSMENTS**
**AND DIVIDENDS:**

The Company shall pay all taxes and dividends on premiums (except Federal Excise Tax which is described in Article XXVIII herein, or as, otherwise, provided herein) reported to the Reinsurer. In the event that this Contract is terminated, the provisions of this Article shall continue to apply for as long as the Company is required to accept assignments and/or assessments (including credits) because of the business reinsured hereunder.

**ARTICLE XV**
**SECURITY:**

In the event that the Company would be unable to take credit for the reinsurance provided by the Reinsurer hereunder because the Reinsurer is unauthorized or is not accredited, the Reinsurer will provide the Company with (i) a Security Trust Fund which is acceptable to the appropriate insurance authorities and meets all applicable regulatory requirements including 11 NYCRR 126 (Regulation 114), or (ii) a clean, irrevocable and unconditional letter of credit which is acceptable to the appropriate insurance authorities, meets all applicable regulatory requirements including 11NYCCRR79 (Regulation 133), is in the form of Exhibit B attached hereto and forming a part of this Contract, is issued by a

8

bank acceptable to the regulatory authorities having jurisdiction over the Company's reserves. In each case, the Company shall be the beneficiary. Such trust account and/or letter(s) of credit are hereinafter referred to as the "Security".

The Reinsurer and the Company agree that the Security will be established and maintained in an amount equal to:

1.  the Ultimate Net Loss and Loss Adjustment Expense paid by or on behalf of the Company but not recovered from Reinsurer, plus
2.  Case Reserves for Ultimate Net Loss, Reserves for Ultimate Net Loss and Loss Adjustment Expense with respect to IBNR, plus
3.  Reserves for Loss Adjustment Expenses, and Unearned Premium Reserves, less
4.  the amount on deposit in the Loss Payment Fund Account; pursuant to Article XII herein.

The amount calculated in 1. through 4. above is hereinafter referred to as the "Unauthorized Reinsurer's Obligation".

At quarterly intervals, or more frequently as determined by the Company, but never more frequently than monthly, the Company shall prepare a specific statement showing the change in the Unauthorized Reinsurer's Obligation as of the date of such statement, as well as showing the changes in the Gross Ceded Premium (as such term is defined in Article XVI herein) as of the date of such statement, for the sole purpose of determining the required amount of Security.

In the event that the amount of Unauthorized Reinsurer's Obligation, as of the date of the above indicated Company's statement, exceeds the amount of the Security actually held in favor of the Company hereunder, the Company will provide prompt written notice of such event, and the Reinsurer shall increase the Security to the amount of the Unauthorized Reinsurer's Obligation within thirty (30) days following the receipt of such notice. In the event that the amount of the Security held in favor of the Company exceeds the Unauthorized Reinsurer's Obligation, the Company will provide prompt written notice of such event, and shall authorize a withdrawal or reduction of Security in the amount of such difference. Each such calculation and adjustment by the Company shall be binding and conclusive for purposes of this Contract absent bad faith or manifest error.

If the Security provided is in the form of letter(s) of credit, each letter of credit will be irrevocable, clean and unconditional, issued for a term of at least twelve (12) months and will be, by its

9

terms, subject to any unlimited number of automatic renewals thereafter for additional twelve (12) month terms, unless the issuing bank advises the Company in writing at least sixty (60) days prior to the next expiration date of the bank's intention not to have the letter of credit be considered renewed.  The Reinsurer will deliver or cause to be delivered to the Company at least thirty (30) days prior to the expiration date of the letter of credit which is about to non-renew, a replacement letter of credit establishing credit in the Reinsurer's favor in the same amount as the letter of credit which it replaces, unless such amount is to be otherwise adjusted as provided for herein.  Upon timely receipt of the replacement letter of credit, the Company will immediately cancel the original letter of credit by notation and return it to the Reinsurer postage prepaid, registered mail, however, if the Reinsurer is located outside the continental United States, such return shall be made by an internationally recognized overnight courier service.

The Reinsurer shall ensure that the required amount of Security remains in force throughout the term of this Contract and thereafter until all covered claims under the Policies have been closed, or until otherwise agreed.  The Company shall release any Security or proceeds therefrom to the issuer of the Security when the Company determines that all obligations under this Contract, finally developed, have been paid.  The Company shall make such a determination on a reasonable actuarial basis in good faith.

<u>Special Provisions for Letters of Credit</u>

With respect to any Security, the Reinsurer and the Company agree that the Company (or any successor of the Company by operation of law, including, without limitation, any liquidator, rehabilitator, receiver or conservator of the Company as indicated in a letter(s) of credit) may draw upon such letter of credit and use the proceeds thereof for the following purposes only:

(1)  Any Security is not replaced or increased as required by this Contract;

(2)  The Reinsurer fails to discharge its payment of the Unauthorized Reinsurer's Obligation under this Contract; and

(3)  The Reinsurer fails to cure such default under (1), or (2) above within ten (10) days of receiving notice of such default from the Company; and/or

(4)  Any other reason for draw-down as described in a Security Trust Fund Agreement.

10

The Company may draw the full amount of such Security in the case of the preceding clause (1), but only the amount due from the Reinsurer in the case of the preceding clause (2). The Reinsurer and the Company agree that the proceeds of the Security provided by the Reinsurer pursuant to the provisions of this Contact may be utilized by the Company to pay or reimburse the Company for amounts due with respect to the Unauthorized Reinsurer's Obligation from the Reinsurer hereunder; or to fund an account with the Company for the Unauthorized Reinsurer's Obligation with respect to the Covered Policies. Such cash deposit shall be held in an interest bearing account separate from the Company's other assets.

All of the foregoing shall be applied without diminution because of insolvency on the Reinsurer's part. The Company will pay interest to the Reinsurer on any funds drawn by the Company and held pursuant to the preceding paragraph. Interest will begin accruing on the date such funds are drawn and will continue to accrue until such funds are paid out in satisfaction of the Unauthorized Reinsurer's Obligation hereunder or are returned to the Reinsurer. At the Reinsurer's discretion, such interest may be paid monthly to the Reinsurer or may be retained by the Company and added to the funds held by the Company hereunder. Such interest will be equal to the interest actually earned by the Company from the investment of such funds. Such funds, and any amounts held in an account established as set forth in the preceding paragraph, shall be held by the Company in its sole possession, custody and control as security for the prompt payment and performance when due with respect to the Unauthorized Reinsurer's Obligation of the Reinsurer hereunder, and by the Reinsurer's execution of this Contract, the Reinsurer irrevocably transfers, assigns and pledges such funds, and all accounts, instruments and securities in which such funds may from time to time be held or invested, to the Company for the purposes herein described. In the event of a drawing-down of the Security pursuant to clause (1) or (2) above, and such failure or event has been cured, the Company will return to the Reinsurer any funds held by the Company upon receipt of Security satisfying the requirements of this Contract.

The bank chosen as the issuer of any letter of credit or as the depository of cash representing collateral hereunder will have no responsibility whatsoever in connection with the propriety of drawings or withdrawals made by the Company or the disposition of funds drawn or withdrawn, except to ensure that drawings or withdrawals are made only upon the order of the Company's properly authorized representatives.

**ARTICLE XVI**
**DEFINITIONS:**                    For purposes of this Contract:

11

A.    The term "Ultimate Net Loss" shall mean the Company's gross liability for loss settlement (inclusive of Loss Adjustment Expenses, Extra Contractual Obligations and Excess of Original Policy Limit amounts as such terms are defined in Articles XVI, XVIII and XIX herein, and any amounts paid as Punitive and Exemplary Damages) paid on all Covered Policies and remaining after any deduction of any and all inuring reinsurance.

B.    The term "Loss Adjustment Expenses" shall mean expenses assignable to the investigation, appraisal, negotiation, adjustment, settlement, litigation, defense and/or appeal of specific claims, regardless of how such expenses are classified for statutory reporting purposes. Loss Adjustment Expenses shall include, but not be limited to, pre- and post- judgement interest, expenses of outside adjusters and counsel, court costs, and declaratory judgment expenses or other legal expenses and costs incurred in connection with coverage questions and legal actions connected thereto, but shall not include office expenses or salaries of the Company's regular employees. The Reinsurer's shared Loss Adjustment Expenses are indicated under section D.5. of Exhibit A attached hereto.

C.    The term "Gross Written Premium" means the total premium charged to the Original Insureds under the Covered Policies, plus additional premiums and/or less return premiums arising from subsequent premium transactions including cancellations and premium audits.

D.    The term "Gross Ceded Premium" means Gross Written Premium, as such term is defined herein, less Gross Retained Premium, as such term is defined herein.

E.    The term "Gross Retained Premium" means nine percent (9.0%) of the Gross Written Premium, as such term is defined herein, as the premium for the total limits retained by the Company under the Covered Policies and the expenses of the Company for issuing and administering the Covered Policies.

F.    The term "Net Ceded Premium" means Gross Ceded Premium, as such term is defined herein, less the Ceding Commission as described in Article XI herein.

G.    The term "Accident" shall be given the same meaning under the Covered Policies.

H.    The term "Disease" shall be given the same meaning under the Covered Policies.

12

I.     The term "Underwriting Guidelines" means those underwriting, pricing and administration requirements (including any amendments thereto) in connection with the HPP Workers' Compensation Program, as mutually agreed to by the parties, and duplicate copies of which are on file with the Reinsurer and the Company.

J.     The term "Unearned Premium Reserve(s)" means the pro rata portion of the premium represented by the unexpired portion of a Covered Policy in force as of any specified date using a daily amortization method.

K.     The term "IBNR" means a reserve for liability for future payment on losses which have already occurred but have not yet been reported to the Company and will also include expected future development on Case Reserves.

L.     The term "Case Reserves" means losses reported to the Company under the Covered Policies which have been reserved but unpaid as of any specified date.

**ARTICLE XVII
LOSS ADJUSTMENT
EXPENSES:**

The Reinsurer will indemnify the Company for a portion of Loss Adjustment Expenses, as defined in Article XVI herein and in accordance with Item D.5. of Exhibit A attached to and forming a part of this Contract.

**ARTICLE XVIII
EXTRA CONTRACTUAL
OBLIGATIONS:**

Subject to the Specific Reinsurance Limits indicated in Item D.3. of Exhibit A (attached to and forming a part of this Contract), the term "Extra Contractual Obligations" means those liabilities not covered under any other provision of this Contract or under the Covered Policies and which arise from the handling of any claim on business covered hereunder, such liabilities arising because of, but not limited to, the following: failure by the Company to settle within the policy limit, or by reason of alleged or actual negligence, fraud, or bad faith in rejecting an offer of settlement or in the preparation of the defense or in the trial of any action against its insured or reinsured or in the preparation or prosecution of an appeal consequent upon such action.  The date on which any Extra Contractual Obligation is incurred by the Company shall be deemed, in all circumstances, to be the date of the original disaster and/or casualty.  However, this definition shall not apply where the loss has been incurred due to fraud by a member of the Board of Directors or a corporate officer of the Company acting individually or collectively or in collusion with any individual or corporation or any other organization or party involved in the presentation, defense or

13

settlement of any claim covered hereunder.

**ARTICLE XIX
LOSS IN EXCESS OF
ORIGINAL POLICY LIMITS:** Subject to the Specific Reinsurance Limits indicated in Item D.4. of Exhibit A (attached to and forming a part of this Contract), the term "Loss in Excess of Original Policy Limits" means a loss in excess of the original policy limits which occurs because of the failure by the Company to settle within the policy limit or by reason of alleged or actual negligence, fraud, or bad faith in rejecting an offer of settlement or in the preparation of the defense or in the trial of any action against its Original Insured or reinsured or in the preparation or prosecution of an appeal consequent upon such action. However, this definition shall not apply where the loss has been incurred due to fraud by a member of the Board of Directors or a corporate officer of the Company acting individually or collectively or in collusion with any individual or corporation or any other organization or party involved in the presentation, defense or settlement of any claim covered. For the purpose of this Article, the word "loss" shall mean any amounts for which the Company would have been contractually liable had it not been for the limit of the original Covered Policy.

**ARTICLE XX
TERMINATION:** This Contract may be cancelled by either the Reinsurer or the Company upon ninety (90) days prior written notice delivered by the party canceling this Contract to the other party. Further, this Contract shall be cancelable by the Reinsurer for non-payment of any amount of Reinsurance Premium which is due pursuant to Article X herein. In the event of any such non-payment, the Reinsurer may transmit written notice of cancellation to the Company by telecopier or overnight courier and the Company shall have until the tenth business day following the delivery of such notice to pay the delinquent amount. In the event that the delinquent amount shall not be received by the Reinsurer prior to the close of business on such tenth day, the cancellation shall be deemed to be effective at 11:59:59 p.m. on the day preceding the date on which the delinquent amount of the Reinsurance Premium was due.

**ARTICLE XXI
INSPECTION AND AUDIT
OF BOOKS AND RECORDS:** The Company shall allow the Reinsurer to inspect and copy, at reasonable times during normal business hours of the Company, the books, records and claims files of the Company or its representatives or agents relevant to the business reinsured hereunder, including the Company's or its representatives' or agents' files concerning claims, losses or legal proceedings.

14

The Reinsurer shall be entitled to conduct an audit of the Company and its business insofar as it may be necessary, in the sole opinion of the Reinsurer, to determine the Company's compliance with the terms and conditions of this Contract, provided such audit shall be limited to matters which are relevant to the business reinsured hereunder, and the proper operation of the terms and conditions of, this Contract.

The Company and its representatives and agents shall cooperate in every respect with the Reinsurer and any representative or auditor of the Reinsurer insofar as implementing the requirements of this Article XXI.

**ARTICLE XXII**
**ERRORS AND OMISSIONS**

Any inadvertent delay, error or accidental omission of either party shall not be held to relieve either party hereto from any liability which would attach to it hereunder if such delay, omission or error had not been made, provided such delay, omission or error is rectified upon discovery.

**ARTICLE XXIII**
**ORIGINAL CONDITIONS:**

Except as otherwise provided under Article IX herein, all reinsurance under this Contract shall be subject to the same rates, terms, conditions, waivers and to the same modifications, alterations and interpretations as the Covered Policies of the Company, and the liability of the Reinsurer shall follow that of the Company in every case, subject to the terms, conditions and limitations of this Contract. It is the intent of the parties hereto that the Reinsurer shall follow the fortunes of the Company in all matters falling under this Contract.

**ARTICLE XXIV**
**LOSS SETTLEMENTS:**

Except as otherwise provided under Article IX herein, all loss settlements made by the Company under the terms and conditions of the Covered Policies shall be binding upon the Reinsurer, and the Reinsurer agrees to pay or allow, as the case may be, its share of each such settlement in accordance with this Contract.

All loss settlements shall mean individual payments made by the Company in accordance with its obligations under the Covered Policies.

Nothing in this Article XXIV shall be construed as meaning that loss settlements are not recoverable hereunder until the final loss to the Company has been ascertained.

The date of loss as defined in the Covered Policies shall apply as respects any losses reported under this Contract.

15

Notwithstanding anything stated in this Contract to the contrary, should the expiration date of any Policy be extended as the result of any statute or regulation, the Reinsurer's liability will apply to all losses occurring during such policy period extension.

**ARTICLE XXV**
**SALVAGE AND**
**SUBROGATION:**

The Reinsurer shall be credited with its proportionate share of salvage or subrogation recoveries (i.e., reimbursement obtained or recovery made by the Company, less the actual cost, excluding salaries of officials and employees of the Company, of obtaining such reimbursement or making such recovery) on account of claims and settlements involving reinsurance hereunder. The Reinsurer shall be subrogated to the rights of the Company to the extent of its loss payments to the Company. The Company agrees to enforce its rights of salvage, subrogation, and its rights against other insurers or to assign these rights to the Reinsurer.

**ARTICLE XXVI**
**OFFSET (BRMA 36D):**

The Company and the Reinsurer, each at its option, may offset any balance or balances, whether on account of premiums, claims and losses, loss expenses or salvages due from one party to the other under this Contract; provided, however, that in the event of the insolvency of a party hereto, offsets shall only be allowed in accordance with applicable statutes and regulations.

**ARTICLE XXVII**
**INSOLVENCY:**

In the event of the insolvency of the Company, this reinsurance shall be payable immediately upon demand directly to the Company, or to its liquidator, receiver, conservator or statutory successor on the basis of the liability of the Company without diminution because of the insolvency of the Company or because the liquidator, receiver, conservator or statutory successor of the Company has failed to pay all or a portion of any claim. Such payments by the Reinsurer will be made directly to the Company or the Company's liquidator, receiver, or statutory successor except as provided by applicable law or separate contract. It is agreed, however, that the liquidator, receiver, conservator or statutory successor of the Company shall give written notice to the Reinsurer of the pendency of a claim against the Company indicating the Policy reinsured which claim would involve a possible liability on the part of the Reinsurer within a reasonable time after such claim is filed in the insolvency proceeding, and that during the pendency of such claim, the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claim is to be adjudicated, any defense or defenses that it may deem available to the Company or its liquidator, receiver, conservator or statutory successor. The expense thus incurred by the Reinsurer shall be chargeable, subject to the approval of the court, against the Company as part

16

of the expense of liquidation to the extent of a pro rata share of the benefit which may accrue to the Company solely as a result of the defense undertaken by the Reinsurer. Should the Company be placed into liquidation or should a receiver be appointed, the Reinsurer will be entitled to set off mutual debts or mutual credits as provided under applicable law. The maximum amount recoverable, the maximum amount retained and total premium due under this Contract will not be increased by application of the above provision.

Where two or more Reinsurers are involved in the same claim and a majority in interest elect to interpose a defense to such claim, the expense shall be apportioned in accordance with the terms of this Contract as though such expense had been incurred by the insolvent Company.

ARTICLE XXVIII
FEDERAL EXCISE TAX:

To the extent that any reinsurance hereunder shall be subject to Federal Excise Tax by virtue of reinsurance premiums being paid to a non-U.S. reinsurer, and there shall be no applicable exemption therefrom, the Company is authorized to deduct, for the purpose of paying such tax, the applicable percentage of the Reinsurance Premium payable as provided under Section 4371 of the Internal Revenue Code from the Reinsurance Premium payable to the non-U.S. Reinsurer with respect to the reinsurance subject to such tax. The Company shall allow such Reinsurer a credit for any such amount deducted in the event that any return premiums are paid to the Company and the Company or its agent should take steps to recover the tax from the United States Government.

ARTICLE XXIX
SERVICE OF SUIT
(BRMA 49D):

(This Article only applies to reinsurers domiciled outside of the United States and/or unauthorized in any state, territory, or district of the United States where authorization is required by insurance regulatory authorities).

It is agreed that in the event the Reinsurer fails to pay any amount claimed to be due hereunder, the Reinsurer, at the request of the Company, will submit to the jurisdiction of a court of competent jurisdiction within the United States. Nothing in this Article constitutes or should be understood to constitute a waiver of the Reinsurer's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States.

17

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Reinsurer hereby designates Primmer & Piper of 100 East State Street, P.O. Box 1309, Montpelier, Vermont, 05601-1309, U.S.A, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Company or any beneficiary hereunder arising out of this Contract.

**ARTICLE XXX**
**THIRD PARTY RIGHTS**
**(BRMA 52B):**

This Contract is solely between the Company and the Reinsurer, and in no instance shall any other party have any rights under this Contract except as expressly provided otherwise herein.

**ARTICLE XXXI**
**LEGALITY:**

If any law or regulation of the federal, state, or local government of the United States or the rulings of officials having supervision over insurance companies should render illegal the undertaking of this Contact, then with regard to business within the jurisdiction of such authority, the Company may upon written notice to the Reinsurer suspend, abrogate, or amend this Contract insofar as it relates to business within the jurisdiction of such authority, to the extent as may be necessary to comply with such law, regulation or ruling. Such suspension, abrogation, or amendment of a portion of this Contract shall in no way affect any other portion thereof.

**ARTICLE XXXII**
**ARBITRATION:**

As a condition precedent to any right of action hereunder, any dispute or difference between the Company and any Reinsurer relating to the interpretation or performance of this Contract, including its formation or validity, or any transaction under this Contract, whether arising before or after termination, shall be submitted to arbitration.

If more than one reinsurer is involved in the same dispute, all such reinsurers shall constitute and act as one party for purposes of this clause provided that communication shall be made by the Company to each of the reinsurers constituting the one party, and provided, however, that nothing therein shall impair the rights of such reinsurers to assert several, rather than joint, defenses or claims, nor be construed as changing the liability of the Reinsurer under the terms of this Contract from several to joint.

Upon written request of any party, each party shall choose an arbitrator and the two chosen shall select a third arbitrator. If either party refuses or neglects to appoint an arbitrator within thirty (30) days after receipt of the written request for arbitration,

18

the requesting party may appoint a second arbitrator. If the two arbitrators fail to agree on the selection of a third arbitrator within thirty (30) days of their appointment, the Company shall petition the American Arbitration Association to appoint the third arbitrator. If the American Arbitration Association fails to appoint the third arbitrator within thirty (30) days after it has been requested to do so, either party may request a justice of a Court of general jurisdiction of the state in which the arbitration is to be held to appoint the third arbitrator. All arbitrators shall be active or retired officers of insurance or reinsurance companies, or Lloyd's London Underwriters, and disinterested in the outcome of the arbitration. Each party shall submit its case to the arbitrators within thirty (30) days of the appointment of the third arbitrator.

The parties hereby waive all objections to the method of selection of the arbitrators, it being the intention of both sides that all the arbitrators be chosen from those submitted by the parties.

The arbitrators shall have the power to determine all procedural rules for the holding of the arbitration including but not limited to inspection of documents, examination of witnesses and any other matter relating to the conduct of the arbitration. The arbitrators shall interpret this Contract as an honorable engagement and not as merely a legal obligation; they are relieved of all judicial formalities and may abstain from following the strict rules of law. The arbitrators may award interest and costs. Each party shall bear the expense of its own arbitrator and shall share equally with the other party the expenses of the third arbitrator and of the arbitration.

The decision in writing of the majority of the arbitrators shall be final and binding upon both parties. Judgment may be entered upon the final decision of the arbitrators in any court having jurisdiction.

The arbitration shall take place in the city where the Company's principal office is located, unless otherwise mutually agreed between the Company and the Reinsurer.

This article shall remain in full force and effect in the event any other provision of this Contract shall be found invalid or non-binding.

Should the Company and the Reinsurer mutually agree to an alternative remedy to resolve a dispute under this Contract, such agreement shall be made in writing and executed by duly authorized representatives of both the Company and the Reinsurer.

HPP Workers' Compensation Program
PRINTED: 1 March 2001; 5:00 PM

**ARTICLE XXXIII**
**AGENCY AGREEMENT:**

Security Insurance Company of Hartford, Farmington, Connecticut shall be deemed the agent of the other reinsured companies for the purposes of sending or receiving notices required by the terms and conditions of this Contract, and for the purposes of remitting or receiving any monies due any party.

**ARTICLE XXXIV**
**MISCELLANEOUS**
**PROVISIONS:**

A.    This Contract and the rights, duties and obligations of the parties hereto shall not be assignable by either party hereto without the prior written consent of the other party and any purported assignment in the absence of such consent shall be void.

B.    Each party shall execute and deliver all further instruments, documents and papers, and shall perform any and all acts necessary, to give full force and effect to all of the terms and provisions of this Contract.

C.    If any provision of this Contract, as applied to any party or to any circumstance, shall be found by a court of competent jurisdiction to be void, invalid or unenforceable, the same shall in no way affect any other provision of this Agreement, the application of any such provision in any other circumstance, or the validity or enforceability of this Contract.

D.    A waiver by any party of any of the terms and conditions of this Contract in any one instance shall not be deemed or construed to be a waiver of such term or condition for the future, or of any subsequent breach thereof, nor shall it be deemed a waiver of performance of any other obligation hereunder.

E.    This Contract contains the entire understanding of the parties hereto relating to the subject matter hereof and supersedes all prior and collateral agreements, understandings, statements and negotiations of the parties, oral or written. Each party acknowledges that no representations, inducements, promises or agreements, oral or written, with reference to the subject matter of this Contract have been made other than as expressly set forth herein.

F.    In all matters of interpretation, whenever necessary to give effect to any provision of this Contract, each gender shall include the other, the singular shall include the plural and the plural shall include the singular. In addition, the titles of the Articles and subparagraphs of this Contract are for convenience only and

20

shall not in any way affect the interpretation of any provision or condition of this Contract.

G.     Except as may be expressly set forth herein, the parties hereto do not intend to confer any rights or remedies upon any person other than the parties hereto and nothing in this Contract shall in any manner create any obligations or establish any rights against the Company or the Reinsurer in favor of any persons or third parties who are not parties to this Contract.

H.     This Contract may not be amended except by a written endorsement signed by both parties.

I.     This Contract may be executed in counterparts, each of which shall be an original and all of which, taken together, shall constitute the whole of the Contract between the parties.

21

EXHIBIT A

SCHEDULE OF LIABILITIES

| | A. Subject Business | B. Company's Policy Limits of Liability (Per Policy) | C. Company's Retained Limits of Liability (Per Policy) | D. Reinsurer's Specific Limits of Liability (Per Policy) | E. Reinsurer's Aggregate Limit (Combined for all Policies) |
|---|---|---|---|---|---|
| 1. | Workers' Compensation | Part 1: Statutory WC | Part 1: Statutory in Excess of First $150,000 Each Accident (BI by Accident) | Part 1: First $150,000 Each Accident (BI by Accident) | Included. See Note # 3 below. |
| | | | Part 1: Statutory in Excess of First $150,000 Each Employee (BI by Disease) | Part 1: First $150,000 Each Employee (BI by Disease) | Included. See Note # 3 below. |
| 2. | Employers' Liability | Part 2: $1,000,000 BI by Accident Each Accident | Part 2: $850,000 in excess of First $150,000 Each Accident (BI by Accident) | Part 2: First $150,000 Each Accident (BI by Accident) | Included. See Note # 3 below. |
| | | $1,000,000 BI by Disease Each Employee $1,000,000 Disease Policy Limit | Part 2: $850,000 in excess of First $150,000 Each Employee (BI by Disease) | Part 2: First $150,000 Each Employee (BI by Disease) | Included. See Note # 3 below. |
| 3. | Extra Contractual Obligations (ECO) | 100% (In addition to Policy Limits) | ECO amounts in excess of the Reinsurer's ECO indemnity amounts in D. | 90% of each ECO claim, subject to the applicable First $150,000 Specific Reinsurance Limit in Item 1. or 2. above, whichever is applicable. | Included. See Note # 3 below. |
| 4. | Loss in Excess of Original Policy Limits (XPL) | 100% (In addition to Policy Limits) | XPL amounts in excess of the Reinsurer's XPL indemnity amounts in D. | 90% of each ECO claim, subject to the applicable First $150,000 Specific Reinsurance Limit in Item 1. or 2. above, whichever is applicable. | Included. See Note # 3 below. |
| 5. | Loss Adjustment Expense (ALAE) | 100% (In addition to Policy Limits) | See Note #2 below. | See Note #2 below. | Included. See Note # 3 below. |

22

**EXHIBIT A (Continued)**

Notes:

1. The Company's Policy Limits of Liability indicated in Items B.1. and 2. under this Exhibit A apply on a "per policy" basis and apply to Ultimate Net Loss only.

2. The Reinsurer's Specific Limits (first $150,000) indicated in Items D.1. and 2. under this Exhibit A apply on a "per policy" basis and are combined for Each Accident or Each Employee for Disease with respect to the sum of:

   a. Ultimate Net Loss,
   b. Loss Adjustment Expense, and
   c. 90% of each ECO or XPL claim, pursuant to Items D.3. and 4. under this Exhibit A.

3. a. Subject to the Reinsurer's Specific Limits of Liability reinsurance, the Reinsurer's Aggregate Limit indicated in 3.b. below is:

   (1) Combined for all reinsurance indemnity amounts indicated in D. under this Exhibit A,
   (2) Combined for all Covered Policies, and
   (3) Exhausted by the Reinsurer's share of Ultimate Net Loss, Loss Adjustment Expenses, Extra Contractual Obligations and Loss in Excess of Original Policy Limits pursuant to Note 2. above.

   b. The Reinsurer's Aggregate Limit with respect to the 2000/2001 Program Year equals 77% of the audited Gross Written Premium (as defined in Article XVI) generated from all Covered Policies included in such Program Year. The 2000/2001 Program Year is defined to be comprised of all Covered Policies that incept on or between 12:01 A.M. Eastern Standard Time May 1, 2000 and 12:01 A.M. Eastern Standard Time April 30, 2001.

23

EXHIBIT B

LETTER OF CREDIT WORDING

To Beneficiary:                                                Date
                                                              Letter of Credit No._____

Security Insurance Company of Hartford,
for and on behalf of itself or
(Other Writing Company 1 or
Other Writing Company 2 or                                    Applicant
Other Writing Company 3)                                      Name
C/O Alternative Risk Transfer Insurance Strategies            Address
100 Northfield Drive, 1st Floor
Windsor, CT 06095
Attn: ARTIS – Financial Manager

Applicants Name:

Dear Sirs:

We, (the bank), hereby establish this Clean, Irrevocable and Unconditional Letter of Credit No._____ in your favor as beneficiary by order and for account of (applicant name) for drawings up to an aggregate amount of _____(amount written out) effective _____. This Letter of Credit is issued, presentable and payable by (the bank) at any time at our office located at _____(or to such other address as shall be designated by us under written notice to you) and expires with our close of business on _____or any automatically extended expiry date. Except when the amount of this Letter of Credit is increased, this Credit cannot be modified or revoked without your consent.

The term "Beneficiary" includes any successor or assign by operation of law of the named Beneficiary including without limitation any liquidator, rehabilitator, receiver or conservator. Drawings by any liquidator, rehabilitator, receiver or conservator shall be for the benefit of all the beneficiary's policyholders. This Letter of Credit is transferable, in whole or in part, to your successors or assigns which transfer shall be effective upon receipt by (the bank) of an executed instrument effecting such transfer or assignment, and the successor, assignee or transferee shall be entitled to all the benefits and rights under this Letter of Credit

We hereby undertake to promptly honor your sight draft(s) drawn on us in immediately available funds, indicating our Letter of Credit No. _____, for all or any part of this Credit upon proper presentation of your sight draft drawn on us at our office specified in paragraph one on or before the expiration date hereof or any automatically extended expiry date.

24

_Except as expressly stated herein, this undertaking is not subject to any other agreement, requirement or qualification. The obligation of (the bank) under this Letter of Credit is the individual obligation of (the bank) and is in no way contingent upon reimbursement with respect thereto, or upon our ability to perfect any lien, security interest or any other reimbursement.

It is a condition of this Credit that it shall automatically be extended without amendment for additional periods of one year from the present expiration date, or any future expiration date, unless at least sixty (60) days prior to any such date, we shall send you notice in writing, by registered mail, return receipt requested, that we elect not to renew this Credit for any additional period.

This Letter of Credit is subject to and governed by the Laws of the State of New York, including but not limited to the Uniform Commercial Code of New York, and the 1993 Revision of the Uniform Customs and Practice for the Documentary Credits of the International Chamber of Commerce, Publication No. 500 and in the event of any conflict, the Laws of the State of New York will control. If this credit expires during an interruption of business as described in Article 17 of said Publication 500, (the bank) specifically agrees to effect payment if this Credit is drawn against within 30 days after resumption of business.

Very truly yours,

(Signature)

(Title)

(Bank)

25

## INTERESTS AND LIABILITIES AGREEMENT

to the
Reinsurance Contract
("Contract")

between

Security Insurance Company of Hartford
The Fire & Casualty Insurance Company of Connecticut
The Connecticut Indemnity Company
(each individually and collectively the "Company")

and

Commercial Risk Reinsurance Company Limited
Hamilton, Bermuda

Under the terms of the Contract which is attached to this Agreement, the Reinsurer agrees to participate in a ninety percent (90.0%) share of the interests and liabilities of the Company as described therein.

IN WITNESS WHEREOF, the parties have signed this Interests and Liabilities Agreement effective as of the Inception Date set forth in the Contract.

**Security Insurance Company of Hartford**
**for and on behalf of the other above-named ceding companies**

By _____
Name: Stephen M. Mulready
Title: Vice President

**Commercial Risk Reinsurance Company Limited**

By _____
Christopher D. Sposato
Senior Vice President and General Counsel

26

## INTERESTS AND LIABILITIES AGREEMENT

to the
Reinsurance Contract
("Contract")

between
Security Insurance Company of Hartford
The Fire & Casualty Insurance Company of Connecticut
The Connecticut Indemnity Company
(each individually and collectively the "Company")

and

Commercial Risk Re-Insurance Company
South Burlington, Vermont

Under the terms of the Contract which is attached to this Agreement, the Reinsurer agrees to participate in a ten percent (10.0%) share of the interests and liabilities of the Company as described therein.

IN WITNESS WHEREOF, the parties have signed this Interests and Liabilities Agreement effective as of the Inception Date set forth in the Contract.

**Security Insurance Company of Hartford**
**for and on behalf of the other above-named ceding companies**

By _____
Name: Stephen M. Mulready
Title Vice President

**Commercial Risk Re-Insurance Company**

By _____
Michael Lipkin
Senior Vice President

27

# EXHIBIT 2

# QUOTA SHARE REINSURANCE CONTRACT

**ARTICLE I**
**REINSURED**
**PROGRAM:**  HPP Workers' Compensation Program

**ARTICLE II**
**COMPANY:**  Security Insurance Company of Hartford
The Fire and Casualty Insurance Company of Connecticut
The Connecticut Indemnity Company

**ARTICLE III**
**SUBSCRIBING**
**REINSURERS:**  Identified in the INTEREST AND LIABILITIES
AGREEMENTS attached to and forming a part of this Contract.

**ARTICLE IV**
**TYPE:**  Quota Share Treaty Reinsurance Contract providing prospective
coverage as set forth herein.

**ARTICLE V**
**CONTRACT PERIOD:**  The Contract shall apply to Policies that incept on or between
12:01 A.M. Eastern Standard Time May 1, 2001 (the "Inception
Date") and 12:01 A.M. Eastern Standard Time April 30, 2002.
This Contract shall continue until terminated pursuant to Article
XX herein.

In the event either party terminates this Contract in accordance
with such Article XX, the Reinsurer shall continue to reinsure
policies ceded within the terms of this Contract pursuant to the
terms stated below. In the event of the termination of this
Contract, at the Company's option:

A. The Reinsurer shall remain liable for all policies ceded within
the terms of this Contract which have inception dates prior to
the Contract termination date until the natural expiration date or
cancellation date of such policies, whichever occurs first. The
Reinsurer shall continue to be liable for its proportionate share of
all outstanding losses (reported or unreported) which occur prior
to such policy natural expiration date or cancellation date,
whichever occurs first; or

B. The Reinsurer shall be relieved of all liability hereunder for
losses occurring subsequent to the Contract termination date.
The Reinsurer shall continue to be liable for its proportionate
share of all outstanding losses (reported or unreported) which
occur prior to the Contract termination date.

1

The Reinsurer shall refund to the Company the unearned Net Ceded Premium, if any, (as such term is defined in Article XVI herein) applicable to the unexpired liability (calculated on a pro rata basis), at conclusion of the runoff if option A. above is elected, or at termination if option B. above is elected.

**ARTICLE VI**
**BUSINESS COVERED:**

Business with respect to risks of the Reinsured Program indicated in Article I herein only classified as Workers' Compensation and Employers' Liability under those certain insurance policies issued by the Company to the Original Insureds pursuant to and in accordance with the Underwriting Guidelines (as defined in Article XVI herein), as set forth below (the "Covered Policies"). Coverage hereunder is on an Occurrence Basis.

The Covered Policies with respect to which the Reinsurer shall indemnify the Company shall include policies (including renewals thereof) with inception dates pursuant to Article V herein, and identified as policies issued under the HPP Workers' Compensation Program, pursuant to and in accordance with the Underwriting Guidelines (as defined in Article XVI herein). This Contract shall continue until terminated pursuant to Article XIX herein.

**ARTICLE VII**
**REINSURING CLAUSE:**

With respect to losses arising from Workers' Compensation and Employers' Liability Accidents and Diseases during the Contract Period, the Reinsurer will indemnify the Company, subject to the limitations set forth herein, for Ultimate Net Loss, Loss Adjustment Expenses, Extra Contractual Obligations and Losses in Excess of Original Policy Limits pursuant to Articles XVI, XVII, XVIII and XIX and Exhibit A attached hereto and forming a part of this Contact. The Reinsurer shall indemnify the Company up to amounts Per Accident and Each Employee for Disease indicated in such Exhibit A, subject always to the Reinsurer's Aggregate Limit of Liability indicated in such Exhibit A and the other limitations herein specified.

For purposes of this Article, the terms "Accident", "Disease", "Ultimate Net Loss", "Loss Adjustment Expenses", "Extra Contractual Obligations" and "Losses in Excess of Original Policy Limits" are defined in Articles XVI, XVII, XVIII and XIX and Exhibit A attached to and forming a part of this Contract.

**ARTICLE VIII**
**TERRITORY:**

The territorial limits of this Contract shall be identical with those of the Covered Policies, issued pursuant to and in accordance

2

with the Underwriting Guidelines (as defined in Article XVI herein.)

**ARTICLE IX**
**EXCLUSIONS:**

This Contract does not apply to:

A. Any losses, or liability for losses excluded under the Covered Policies; and

B. Any losses, or liability for losses arising from:

1. Professional sports teams;
   Federal Acts, including Jones Act except where estimated payroll in respect of any one risk is less than 20% of total estimated payroll of such risk;
3. Radioactive contamination;
4. Loss or damage directly or indirectly occasioned by, happening through, or in consequence of war, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation or nationalization or requisition or destruction of or damage to property by or under the order of any government or public or local authority;
   Loss or damage occasioned by war, invasion, revolution, bombardment, hostilities, acts of foreign enemies, civil war, rebellion, insurrection, military or usurped power, martial law, or confiscation by order of any government or public authority, but not excluding loss or damage which would be covered under a standard form or policy containing a standard war exclusion clause.
5. Loss or liability excluded by the Nuclear Incident Exclusion Clause – Liability – Reinsurance – U.S.A. (NMA 1590) attached to this Agreement (Exhibit D).
6. All liability of the Company arising, by contract, operation of law, or otherwise, from its participation or membership, whether voluntary or involuntary, in any insolvency fund. "Insolvency Fund" includes any guaranty fund, plan, pool, association, fund or other arrangement, howsoever denominated, established or governed, which provides for any assessment of or payment or assumption by the Company of part or all of any claim, debt, charge, fee or other obligation of any insurer, or its successors or assigns, which has been declared by any competent authority to be insolvent, or which is otherwise deemed unable to meet any claim, debt, charge, fee or other obligation in whole or in part;
7. The Company's liability as participant, member, subscriber or reinsurer of any pool, syndicate or association;

3

8.  Assumed reinsurance, except as specially accepted;
9.  Industrial Aid Aircraft;
10. Pollution – Absolute; and
11. Financial Guarantee, Insolvency, Title Insurance, Auto Warranty business and credit insurances.
12. All Hazard Group IV Class Codes
13. All Airline/Aircraft operations (except for ground crew)
14. All Asbestos exposures and related operations
15. Accident and Health Business, when written as such
16. Wrap-Ups/OCIP's/CCIP's
17. Professional Sports Teams
18. Mining Operations
19. Logging/Lumbering/Sawmills
20. Amusement Parks/Carnivals/Circus, except for ZOOs
21. Explosive or Ammunition Manufacturing
22. Jones Act, USL&H, Admiralty Act, All Maritime related Coverages
23. Employee Leasing/Temporary Staffing
24. Twenty-Four Hour Convenience and/or Liquor Stores
25. Chemical Manufacturing

**ARTICLE X**
**REINSURANCE**
**PREMIUM:**       The Company will cede to the Reinsurer its proportionate share of premiums under the Covered Policies, pursuant to Articles XIII and XVI herein.

**ARTICLE XI**
**CEDING COMMISSION:**   The Reinsurer will allow the Company a thirty and eighty-six hundredths percent (30.86%) ceding commission for the 2001/2002 Program Year (as such term is defined in Note #3.b. under Exhibit A attached to and forming a part of this Contract. Such ceding commission will apply to the difference between (i) the audited Gross Written Premium (as such term is defined in Article XVI herein) with respect to all Covered Policies which comprise the 2001/2002 Program Year and (ii) the Gross Retained Premium (as such term is defined in Article XVI herein), which refers to the premiums for excess and aggregate reinsurances for such Program Year that inure to the benefit of this Agreement and that have been approved by the Reinsurer.

**ARTICLE XII**
**CURRENCY (BRMA 12A):**   Whenever the word "Dollars" or the "$" sign appears in this Contract, they shall be construed to mean United States Dollars and all transactions under this Contract shall be in United States Dollars.

4

Amounts paid or received by the Company in any other currency shall be converted to United States Dollars at the rate of exchange at the date such transaction is entered on the books of the Company.

**ARTICLE XIII**
**PREMIUM, ACCOUNTS**
**AND REMITTANCES:**

**A.    Premiums**

1.    Within sixty (60) days following the end of each calendar month during the term of this Contract, the Company will render to the Reinsurer a statement showing the Net Ceded Premium (as defined in Article XVI), if any, due the Reinsurer for such month which is defined and calculated in accordance with Section C of this Article XIII. The Company will remit such Net Ceded Premium payment to the Reinsurer, pursuant to the terms of this Article XIII.

2.    Upon early termination of the Policies, the earned premium will be computed in accordance with the applicable rules, rates, rating plans, premiums and minimum premiums. If the earned premium less any uncollected premium, as finally determined, is different from the premium that was utilized to establish the reinsurance premium hereunder, prior payments made under this Contract will be recalculated by the Company utilizing the actual earned premium or the actual premium tax, and notice of such recalculation shall be provided to the Reinsurer within thirty (30) days of such termination. If the recalculation indicates that the Reinsurer owes money to the Company, the Reinsurer will pay that money within ten (10) days of the Reinsurer's receipt of such notice thereof from the Company. If the recalculation indicates that the Company owes money to the Reinsurer, the Company will pay that money at the time the recalculation is delivered to the Reinsurer.

**B.    Claims**

1.    The Company will, with funds provided by the Reinsurer (from funds withheld from Net Ceded Premium or other sources), establish an interest bearing bank account (hereinafter the "Loss Payment Fund Account") for the Company's benefit which shall be for use in payment of the Reinsurer's liabilities under this Contact. The Company and its authorized Third Party Claims Administrator (hereinafter the "TPA") will have the right to withdraw funds from the Loss Payment Fund Account to make payment of claims that are payable under the terms and conditions of the Covered Policies and this Contract. The authority of the TPA to withdraw funds from the Loss Payment Fund Account may be revoked at anytime by the Company upon written notice to all parties. The Company may deposit, from time to time, funds which are in

5

excess of the Reinsurer's Reinsurance Limits of Liability (as stated in Exhibit A attached to this Contract) for the purpose of paying claims which are in excess of such Reinsurance Limits of Liability.

The Company will pay interest to the Reinsurer on any Loss Payment Fund Account amounts. Interest will begin accruing on the date such excess funds are available and will continue until all such excess funds are returned to the Reinsurer. Such interest may be paid monthly to the Reinsurer, or at the Reinsurer's election may be retained by the Company as excess amounts in the Loss Payment Fund Account to fund for future reinsurance obligations under this Contract.

The initial required amount of the Loss Payment Fund Account will be $25,000. Thereafter, the required balance of the Loss Payment Fund Account will be equal to two (2) times the monthly average of the sum of: (a) the current and previous (2) months' worth of paid Ultimate Net Losses (as such term is defined in Article XVI herein) within the Reinsurance Limits of Liability plus (b) Reinsurer's share of associated Loss Adjustment Expenses (as such term is defined in Article XVI herein). The Company and the Reinsurer agree that claim payment information provided by the TPA shall be used for the purpose of this calculation. The TPA shall be authorized to make payments out of the Loss Payment Fund Account in the amount of the Reinsurer's liabilities hereunder. The Reinsurer will provide the Company each month with sufficient funds to replenish the Loss Payment Fund Account within thirty (30) days after Reinsurer receives notice of the balance due pursuant to Section C. of this Article XIII. The Company may also review the adequacy of the account at any other time and the Reinsurer will send the Company funds to increase the account within five (5) working days of the Company's written request. If the Reinsurer fails to make any payment to the Company within the time required by this Contract, the Company will have the option to change the foregoing formula for replenishing the Loss Payment Fund Account by increasing the number of months used to estimate the required balance.

2.    Payments that may be withdrawn from the Loss Payment Fund Account will be for paid Ultimate Net Losses and Loss Adjustment Expenses within Reinsurer's Reinsurance Limits of Liability under this Contract with respect to the Covered Policies. Payments may also be withdrawn from funds made available by the Company pursuant to paragraph 1. above.

3.    In the event that the Company becomes obligated for paid Ultimate Net Loss and Loss Adjustment Expenses that exceed the amount of the Loss Payment Fund Account balance for amounts

6

representing the Reinsurer's liability under this Contract, the Reinsurer will, within five (5) working days after receipt of a written demand and documentation by the Company or the TPA on the Company's behalf, forward funds to the Company sufficient to cover such amounts that are greater than the then current Loss Payment Fund Account balance.

4.      Should payment due from the Reinsurer exceed $100,000 as respects any one Ultimate Net Loss, the Company may give the Reinsurer notice of payment made or its intention to make payment on a certain date. If the Company has paid the loss, payment will be made by the Reinsurer immediately. If the Company intends to pay the loss by a certain date and has submitted a satisfactory proof of loss or similar document, payment will be due from the Reinsurer twenty-four (24) hours prior to that date, provided the Reinsurer has a period of five (5) working days after receipt of said notice to dispatch the payment. Cash loss amounts specifically remitted by the Reinsurer as set forth herein will be credited to its next monthly account.

C.    Premium Reporting

Within sixty (60) calendar days following the end of each calendar month during the term of this Contract, the Company shall render to the Reinsurer a report showing the following, in arrears for such calendar month:

a.      Gross Ceded Premium                                    $.

        less

b.      Ceding Commission (pursuant
        to Article XI herein)                                  $.

        equals

c.      Net Ceded Premium                                      $.

        less

d.      Additional Loss Payment Fund amount
        (pursuant to Section B.1 of this Article XIII)         $.

        less

e.      Reinsurance Ultimate Net Losses and Loss
        Adjustment Expenses paid by the Company
        but not recovered from the Reinsurer
        (pursuant to Section B. of this Article XIII)          $.

7

equals

f.    Balance Due to (or from) Reinsurer                                    $.

Any balance due to the Reinsurer shall be remitted with the
report indicated above.  Any balance due to the Company shall
be settled within thirty (30) days after the Reinsurer receives the
report indicated above.

In addition, the Company shall report to the Reinsurer under
each calendar monthly bordereaux the following:

|      |      |
|------|------|
| 1.   | Policy Number; |
| 2.   | Policy Effective and Expiration Dates; |
| 3.   | Subject Business (pursuant to Exhibit A attached to this Contract); |
| 4.   | Risk State; |
| 5.   | Claims Number; |
| 6.   | Date of Loss; |
| 7.   | Claimant Name; |
| 8.   | Outstanding Reserves for Ultimate Net Loss; and |
| 9.   | Gross Ceded Unearned Premium Reserve. |

For purposes of this Article XIII, the terms "Ultimate Net Loss"
"Loss Adjustment Expenses," "Gross Ceded Premium," and
"Net Ceded Premium" are defined in Article XVI.

**ARTICLE XIV**
**TAXES, ASSESSMENTS**
**AND DIVIDENDS:**

The Company shall pay all taxes and dividends on premiums
(except Federal Excise Tax which is described in Article XXVIII
herein, or as, otherwise, provided herein) reported to the
Reinsurer.  In the event that this Contract is terminated, the
provisions of this Article shall continue to apply for as long as
the Company is required to accept assignments and/or
assessments (including credits) because of the business reinsured
hereunder.

**ARTICLE XV**
**SECURITY:**

In the event that the Company would be unable to take credit for
the reinsurance provided by the Reinsurer hereunder because the
Reinsurer is unauthorized or is not accredited, the Reinsurer will
provide the Company with (i) a Security Trust Fund which is
acceptable to the appropriate insurance authorities and meets all
applicable regulatory requirements including 11 NYCRR 126
(Regulation 114), or (ii) a clean, irrevocable and unconditional
letter of credit which is acceptable to the appropriate insurance
authorities, meets all applicable regulatory requirements including
11NYCCRR79 (Regulation 133), is in the form of Exhibit B
attached hereto and forming a part of this Contract, is issued by a

8

bank acceptable to the regulatory authorities having jurisdiction over the Company's reserves. In each case, the Company shall be the beneficiary. Such trust account and/or letter(s) of credit are hereinafter referred to as the "Security".

The Reinsurer and the Company agree that the Security will be established and maintained in an amount equal to:

1. the Ultimate Net Loss and Loss Adjustment Expense paid by or on behalf of the Company but not recovered from Reinsurer, plus
2. Case Reserves for Ultimate Net Loss, Reserves for Ultimate Net Loss and Loss Adjustment Expense with respect to IBNR, plus
3. Reserves for Loss Adjustment Expenses, and Unearned Premium Reserves, less
4. the amount on deposit in the Loss Payment Fund Account, pursuant to Article XII herein.

The amount calculated in 1. through 4. above is hereinafter referred to as the "Unauthorized Reinsurer's Obligation".

At quarterly intervals, or more frequently as determined by the Company, but never more frequently than monthly, the Company shall prepare a specific statement showing the change in the Unauthorized Reinsurer's Obligation as of the date of such statement, as well as showing the changes in the Gross Ceded Premium (as such term is defined in Article XVI herein) as of the date of such statement, for the sole purpose of determining the required amount of Security.

In the event that the amount of Unauthorized Reinsurer's Obligation, as of the date of the above indicated Company's statement, exceeds the amount of the Security actually held in favor of the Company hereunder, the Company will provide prompt written notice of such event, and the Reinsurer shall increase the Security to the amount of the Unauthorized Reinsurer's Obligation within thirty (30) days following the receipt of such notice. In the event that the amount of the Security held in favor of the Company exceeds the Unauthorized Reinsurer's Obligation, the Company will provide prompt written notice of such event, and shall authorize a withdrawal or reduction of Security in the amount of such difference. Each such calculation and adjustment by the Company shall be binding and conclusive for purposes of this Contract absent bad faith or manifest error.

If the Security provided is in the form of letter(s) of credit, each letter of credit will be irrevocable, clean and unconditional, issued for a term of at least twelve (12) months and will be, by its

9

terms, subject to any unlimited number of automatic renewals thereafter for additional twelve (12) month terms, unless the issuing bank advises the Company in writing at least sixty (60) days prior to the next expiration date of the bank's intention not to have the letter of credit be considered renewed. The Reinsurer will deliver or cause to be delivered to the Company at least thirty (30) days prior to the expiration date of the letter of credit which is about to non-renew, a replacement letter of credit establishing credit in the Reinsurer's favor in the same amount as the letter of credit which it replaces, unless such amount is to be otherwise adjusted as provided for herein. Upon timely receipt of the replacement letter of credit, the Company will immediately cancel the original letter of credit by notation and return it to the Reinsurer postage prepaid, registered mail, however, if the Reinsurer is located outside the continental United States, such return shall be made by an internationally recognized overnight courier service.

The Reinsurer shall ensure that the required amount of Security remains in force throughout the term of this Contract and thereafter until all covered claims under the Policies have been closed, or until otherwise agreed. The Company shall release any Security or proceeds therefrom to the issuer of the Security when the Company determines that all obligations under this Contract, finally developed, have been paid. The Company shall make such a determination on a reasonable actuarial basis in good faith.

## Special Provisions for Letters of Credit

With respect to any Security, the Reinsurer and the Company agree that the Company (or any successor of the Company by operation of law, including, without limitation, any liquidator, rehabilitator, receiver or conservator of the Company as indicated in a letter(s) of credit) may draw upon such letter of credit and use the proceeds thereof for the following purposes only:

(1) Any Security is not replaced or increased as required by this Contract;

(2) The Reinsurer fails to discharge its payment of the Unauthorized Reinsurer's Obligation under this Contract; and

(3) The Reinsurer fails to cure such default under (1), or (2) above within ten (10) days of receiving notice of such default from the Company; and/or

(4) Any other reason for draw-down as described in a Security Trust Fund Agreement.

10

The Company may draw the full amount of such Security in the case of the preceding clause (1), but only the amount due from the Reinsurer in the case of the preceding clause (2). The Reinsurer and the Company agree that the proceeds of the Security provided by the Reinsurer pursuant to the provisions of this Contact may be utilized by the Company to pay or reimburse the Company for amounts due with respect to the Unauthorized Reinsurer's Obligation from the Reinsurer hereunder, or to fund an account with the Company for the Unauthorized Reinsurer's Obligation with respect to the Covered Policies. Such cash deposit shall be held in an interest bearing account separate from the Company's other assets.

All of the foregoing shall be applied without diminution because of insolvency on the Reinsurer's part. The Company will pay interest to the Reinsurer on any funds drawn by the Company and held pursuant to the preceding paragraph. Interest will begin accruing on the date such funds are drawn and will continue to accrue until such funds are paid out in satisfaction of the Unauthorized Reinsurer's Obligation hereunder or are returned to the Reinsurer. At the Reinsurer's discretion, such interest may be paid monthly to the Reinsurer or may be retained by the Company and added to the funds held by the Company hereunder. Such interest will be equal to the interest actually earned by the Company from the investment of such funds. Such funds, and any amounts held in an account established as set forth in the preceding paragraph, shall be held by the Company in its sole possession, custody and control as security for the prompt payment and performance when due with respect to the Unauthorized Reinsurer's Obligation of the Reinsurer hereunder, and by the Reinsurer's execution of this Contract, the Reinsurer irrevocably transfers, assigns and pledges such funds, and all accounts, instruments and securities in which such funds may from time to time be held or invested, to the Company for the purposes herein described. In the event of a drawing-down of the Security pursuant to clause (1) or (2) above, and such failure or event has been cured, the Company will return to the Reinsurer any funds held by the Company upon receipt of Security satisfying the requirements of this Contract.

The bank chosen as the issuer of any letter of credit or as the depository of cash representing collateral hereunder will have no responsibility whatsoever in connection with the propriety of drawings or withdrawals made by the Company or the disposition of funds drawn or withdrawn, except to ensure that drawings or withdrawals are made only upon the order of the Company's properly authorized representatives.

**ARTICLE XVI**
**DEFINITIONS:**                    For purposes of this Contract:

11

A.    The term "Ultimate Net Loss" shall mean the Company's gross liability for loss settlement (inclusive of Loss Adjustment Expenses, Extra Contractual Obligations and Excess of Original Policy Limit amounts as such terms are defined in Articles XVI, XVIII and XIX herein, and any amounts paid as Punitive and Exemplary Damages) paid on all Covered Policies and remaining after any deduction of any and all inuring reinsurance.

B.    The term "Loss Adjustment Expenses" shall mean expenses assignable to the investigation, appraisal, negotiation, adjustment, settlement, litigation, defense and/or appeal of specific claims, regardless of how such expenses are classified for statutory reporting purposes.  Loss Adjustment Expenses shall include, but not be limited to, pre- and post- judgement interest, expenses of outside adjusters and counsel, court costs, and declaratory judgment expenses or other legal expenses and costs incurred in connection with coverage questions and legal actions connected thereto, but shall not include office expenses or salaries of the Company's regular employees. The Reinsurer's shared Loss Adjustment Expenses are indicated under section D.5. of Exhibit A attached hereto.

C.    The term "Gross Written Premium" means the total premium charged to the Original Insureds under the Covered Policies, plus additional premiums and/or less return premiums arising from subsequent premium transactions including cancellations and premium audits.

D.    The term "Gross Ceded Premium" means Gross Written Premium, as such term is defined herein, less Gross Retained Premium, as such term is defined herein.

E.    The term "Gross Retained Premium" means nineteen percent (19.0%) of the Gross Written Premium, as such term is defined herein, as the premium for the total limits retained by the Company under the Covered Policies and the expenses of the Company for issuing and administering the Covered Policies.

F.    The term "Net Ceded Premium" means Gross Ceded Premium, as such term is defined herein, less the Ceding Commission as described in Article XI herein.

G.    The term "Accident" shall be given the same meaning under the Covered Policies.

H.    The term "Disease" shall be given the same meaning under the Covered Policies.

12

I.    The term "Underwriting Guidelines" means those underwriting, pricing and administration requirements (including any amendments thereto) in connection with the HPP Workers' Compensation Program, as mutually agreed to by the parties, and duplicate copies of which are on file with the Reinsurer and the Company.

J.    The term "Unearned Premium Reserve(s)" means the pro rata portion of the premium represented by the unexpired portion of a Covered Policy in force as of any specified date using a daily amortization method.

K.    The term "IBNR" means a reserve for liability for future payment on losses which have already occurred but have not yet been reported to the Company and will also include expected future development on Case Reserves.

L.    The term "Case Reserves" means losses reported to the Company under the Covered Policies which have been reserved but unpaid as of any specified date.

**ARTICLE XVII**
**LOSS ADJUSTMENT**
**EXPENSES:**

The Reinsurer will indemnify the Company for a portion of Loss Adjustment Expenses, as defined in Article XVI herein and in accordance with Item D.5. of Exhibit A attached to and forming a part of this Contract.

**ARTICLE XVIII**
**EXTRA CONTRACTUAL**
**OBLIGATIONS:**

Subject to the Specific Reinsurance Limits indicated in Item D.3. of Exhibit A (attached to and forming a part of this Contract), the term "Extra Contractual Obligations" means those liabilities not covered under any other provision of this Contract or under the Covered Policies and which arise from the handling of any claim on business covered hereunder, such liabilities arising because of, but not limited to, the following: failure by the Company to settle within the policy limit, or by reason of alleged or actual negligence, fraud, or bad faith in rejecting an offer of settlement or in the preparation of the defense or in the trial of any action against its insured or reinsured or in the preparation or prosecution of an appeal consequent upon such action. The date on which any Extra Contractual Obligation is incurred by the Company shall be deemed, in all circumstances, to be the date of the original disaster and/or casualty. However, this definition shall not apply where the loss has been incurred due to fraud by a member of the Board of Directors or a corporate officer of the Company acting individually or collectively or in collusion with any individual or corporation or any other organization or party involved in the presentation, defense or

13

settlement of any claim covered hereunder.

**ARTICLE XIX**
**LOSS IN EXCESS OF**
**ORIGINAL POLICY LIMITS:**     Subject to the Specific Reinsurance Limits indicated in Item D.4. of Exhibit A (attached to and forming a part of this Contract), the term "Loss in Excess of Original Policy Limits" means a loss in excess of the original policy limits which occurs because of the failure by the Company to settle within the policy limit or by reason of alleged or actual negligence, fraud, or bad faith in rejecting an offer of settlement or in the preparation of the defense or in the trial of any action against its Original Insured or reinsured or in the preparation or prosecution of an appeal consequent upon such action. However, this definition shall not apply where the loss has been incurred due to fraud by a member of the Board of Directors or a corporate officer of the Company acting individually or collectively or in collusion with any individual or corporation or any other organization or party involved in the presentation, defense or settlement of any claim covered. For the purpose of this Article, the word "loss" shall mean any amounts for which the Company would have been contractually liable had it not been for the limit of the original Covered Policy.

**ARTICLE XX**
**TERMINATION:**     This Contract may be cancelled by either the Reinsurer or the Company upon ninety (90) days prior written notice delivered by the party canceling this Contract to the other party. Further, this Contract shall be cancelable by the Reinsurer for non-payment of any amount of Reinsurance Premium which is due pursuant to Article X herein. In the event of any such non-payment, the Reinsurer may transmit written notice of cancellation to the Company by telecopier or overnight courier and the Company shall have until the tenth business day following the delivery of such notice to pay the delinquent amount. In the event that the delinquent amount shall not be received by the Reinsurer prior to the close of business on such tenth day, the cancellation shall be deemed to be effective at 11:59:59 p.m. on the day preceding the date on which the delinquent amount of the Reinsurance Premium was due.

**ARTICLE XXI**
**INSPECTION AND AUDIT**
**OF BOOKS AND RECORDS:**     The Company shall allow the Reinsurer to inspect and copy, at reasonable times during normal business hours of the Company, the books, records and claims files of the Company or its representatives or agents relevant to the business reinsured hereunder, including the Company's or its representatives' or agents' files concerning claims, losses or legal proceedings.

14

The Reinsurer shall be entitled to conduct an audit of the Company and its business insofar as it may be necessary, in the sole opinion of the Reinsurer, to determine the Company's compliance with the terms and conditions of this Contract, provided such audit shall be limited to matters which are relevant to the business reinsured hereunder, and the proper operation of the terms and conditions of, this Contract.

The Company and its representatives and agents shall cooperate in every respect with the Reinsurer and any representative or auditor of the Reinsurer insofar as implementing the requirements of this Article XXI.

**ARTICLE XXII**
**ERRORS AND OMISSIONS**

Any inadvertent delay, error or accidental omission of either party shall not be held to relieve either party hereto from any liability which would attach to it hereunder if such delay, omission or error had not been made, provided such delay, omission or error is rectified upon discovery.

**ARTICLE XXIII**
**ORIGINAL CONDITIONS:**

Except as otherwise provided under Article IX herein, all reinsurance under this Contract shall be subject to the same rates, terms, conditions, waivers and to the same modifications, alterations and interpretations as the Covered Policies of the Company, and the liability of the Reinsurer shall follow that of the Company in every case, subject to the terms, conditions and limitations of this Contract. It is the intent of the parties hereto that the Reinsurer shall follow the fortunes of the Company in all matters falling under this Contract.

**ARTICLE XXIV**
**LOSS SETTLEMENTS:**

Except as otherwise provided under Article IX herein, all loss settlements made by the Company under the terms and conditions of the Covered Policies shall be binding upon the Reinsurer, and the Reinsurer agrees to pay or allow, as the case may be, its share of each such settlement in accordance with this Contract.

All loss settlements shall mean individual payments made by the Company in accordance with its obligations under the Covered Policies.

Nothing in this Article XXIV shall be construed as meaning that loss settlements are not recoverable hereunder until the final loss to the Company has been ascertained.

The date of loss as defined in the Covered Policies shall apply as respects any losses reported under this Contract.

15

Notwithstanding anything stated in this Contract to the contrary, should the expiration date of any Policy be extended as the result of any statute or regulation, the Reinsurer's liability will apply to all losses occurring during such policy period extension.

**ARTICLE XXV**
**SALVAGE AND**
**SUBROGATION:**

The Reinsurer shall be credited with its proportionate share of salvage or subrogation recoveries (i.e., reimbursement obtained or recovery made by the Company, less the actual cost, excluding salaries of officials and employees of the Company, of obtaining such reimbursement or making such recovery) on account of claims and settlements involving reinsurance hereunder. The Reinsurer shall be subrogated to the rights of the Company to the extent of its loss payments to the Company. The Company agrees to enforce its rights of salvage, subrogation, and its rights against other insurers or to assign these rights to the Reinsurer.

**ARTICLE XXVI**
**OFFSET (BRMA 36D):**

The Company and the Reinsurer, each at its option, may offset any balance or balances, whether on account of premiums, claims and losses, loss expenses or salvages due from one party to the other under this Contract; provided, however, that in the event of the insolvency of a party hereto, offsets shall only be allowed in accordance with applicable statutes and regulations.

**ARTICLE XXVII**
**INSOLVENCY:**

In the event of the insolvency of the Company, this reinsurance shall be payable immediately upon demand directly to the Company, or to its liquidator, receiver, conservator or statutory successor on the basis of the liability of the Company without diminution because of the insolvency of the Company or because the liquidator, receiver, conservator or statutory successor of the Company has failed to pay all or a portion of any claim. Such payments by the Reinsurer will be made directly to the Company or the Company's liquidator, receiver, or statutory successor except as provided by applicable law or separate contract. It is agreed, however, that the liquidator, receiver, conservator or statutory successor of the Company shall give written notice to the Reinsurer of the pendency of a claim against the Company indicating the Policy reinsured which claim would involve a possible liability on the part of the Reinsurer within a reasonable time after such claim is filed in the insolvency proceeding, and that during the pendency of such claim, the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claim is to be adjudicated, any defense or defenses that it may deem available to the Company or its liquidator, receiver, conservator or statutory successor. The expense thus incurred by the Reinsurer shall be chargeable, subject to the approval of the court, against the Company as part

16

of the expense of liquidation to the extent of a pro rata share of the benefit which may accrue to the Company solely as a result of the defense undertaken by the Reinsurer. Should the Company be placed into liquidation or should a receiver be appointed, the Reinsurer will be entitled to set off mutual debts or mutual credits as provided under applicable law. The maximum amount recoverable, the maximum amount retained and total premium due under this Contract will not be increased by application of the above provision.

Where two or more Reinsurers are involved in the same claim and a majority in interest elect to interpose a defense to such claim, the expense shall be apportioned in accordance with the terms of this Contract as though such expense had been incurred by the insolvent Company.

**ARTICLE XXVIII**
**FEDERAL EXCISE TAX:**

To the extent that any reinsurance hereunder shall be subject to Federal Excise Tax by virtue of reinsurance premiums being paid to a non-U.S. reinsurer, and there shall be no applicable exemption therefrom, the Company is authorized to deduct, for the purpose of paying such tax, the applicable percentage of the Reinsurance Premium payable as provided under Section 4371 of the Internal Revenue Code from the Reinsurance Premium payable to the non-U.S. Reinsurer with respect to the reinsurance subject to such tax. The Company shall allow such Reinsurer a credit for any such amount deducted in the event that any return premiums are paid to the Company and the Company or its agent should take steps to recover the tax from the United States Government.

**ARTICLE XXIX**
**SERVICE OF SUIT**
**(BRMA 49D):**

(This Article only applies to reinsurers domiciled outside of the United States and/or unauthorized in any state, territory, or district of the United States where authorization is required by insurance regulatory authorities).

It is agreed that in the event the Reinsurer fails to pay any amount claimed to be due hereunder, the Reinsurer, at the request of the Company, will submit to the jurisdiction of a court of competent jurisdiction within the United States. Nothing in this Article constitutes or should be understood to constitute a waiver of the Reinsurer's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States.

17

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Reinsurer hereby designates Primmer & Piper of 100 East State Street, P.O. Box 1309, Montpelier, Vermont, 05601-1309, U.S.A, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Company or any beneficiary hereunder arising out of this Contract.

**ARTICLE XXX
THIRD PARTY RIGHTS
(BRMA 52B):**

This Contract is solely between the Company and the Reinsurer, and in no instance shall any other party have any rights under this Contract except as expressly provided otherwise herein.

**ARTICLE XXXI
LEGALITY:**

If any law or regulation of the federal, state, or local government of the United States or the rulings of officials having supervision over insurance companies should render illegal the undertaking of this Contact, then with regard to business within the jurisdiction of such authority, the Company may upon written notice to the Reinsurer suspend, abrogate, or amend this Contract insofar as it relates to business within the jurisdiction of such authority, to the extent as may be necessary to comply with such law, regulation or ruling. Such suspension, abrogation, or amendment of a portion of this Contract shall in no way affect any other portion thereof.

**ARTICLE XXXII
ARBITRATION:**

As a condition precedent to any right of action hereunder, any dispute or difference between the Company and any Reinsurer relating to the interpretation or performance of this Contract, including its formation or validity, or any transaction under this Contract, whether arising before or after termination, shall be submitted to arbitration.

If more than one reinsurer is involved in the same dispute, all such reinsurers shall constitute and act as one party for purposes of this clause provided that communication shall be made by the Company to each of the reinsurers constituting the one party, and provided, however, that nothing therein shall impair the rights of such reinsurers to assert several, rather than joint, defenses or claims, nor be construed as changing the liability of the Reinsurer under the terms of this Contract from several to joint.

Upon written request of any party, each party shall choose an arbitrator and the two chosen shall select a third arbitrator. If either party refuses or neglects to appoint an arbitrator within thirty (30) days after receipt of the written request for arbitration,

18

the requesting party may appoint a second arbitrator. If the two arbitrators fail to agree on the selection of a third arbitrator within thirty (30) days of their appointment, the Company shall petition the American Arbitration Association to appoint the third arbitrator. If the American Arbitration Association fails to appoint the third arbitrator within thirty (30) days after it has been requested to do so, either party may request a justice of a Court of general jurisdiction of the state in which the arbitration is to be held to appoint the third arbitrator. All arbitrators shall be active or retired officers of insurance or reinsurance companies, or Lloyd's London Underwriters, and disinterested in the outcome of the arbitration. Each party shall submit its case to the arbitrators within thirty (30) days of the appointment of the third arbitrator.

The parties hereby waive all objections to the method of selection of the arbitrators, it being the intention of both sides that all the arbitrators be chosen from those submitted by the parties.

The arbitrators shall have the power to determine all procedural rules for the holding of the arbitration including but not limited to inspection of documents, examination of witnesses and any other matter relating to the conduct of the arbitration. The arbitrators shall interpret this Contract as an honorable engagement and not as merely a legal obligation; they are relieved of all judicial formalities and may abstain from following the strict rules of law. The arbitrators may award interest and costs. Each party shall bear the expense of its own arbitrator and shall share equally with the other party the expenses of the third arbitrator and of the arbitration.

The decision in writing of the majority of the arbitrators shall be final and binding upon both parties. Judgment may be entered upon the final decision of the arbitrators in any court having jurisdiction.

The arbitration shall take place in the city where the Company's principal office is located, unless otherwise mutually agreed between the Company and the Reinsurer.

This article shall remain in full force and effect in the event any other provision of this Contract shall be found invalid or non-binding.

Should the Company and the Reinsurer mutually agree to an alternative remedy to resolve a dispute under this Contract, such agreement shall be made in writing and executed by duly authorized representatives of both the Company and the Reinsurer.

19

**ARTICLE XXXIII**
**AGENCY AGREEMENT:**       Security Insurance Company of Hartford, Farmington, Connecticut shall be deemed the agent of the other reinsured companies for the purposes of sending or receiving notices required by the terms and conditions of this Contract, and for the purposes of remitting or receiving any monies due any party.

**ARTICLE XXXIV**
**MISCELLANEOUS**
**PROVISIONS:**

A.    This Contract and the rights, duties and obligations of the parties hereto shall not be assignable by either party hereto without the prior written consent of the other party and any purported assignment in the absence of such consent shall be void.

B.    Each party shall execute and deliver all further instruments, documents and papers, and shall perform any and all acts necessary, to give full force and effect to all of the terms and provisions of this Contract.

C.    If any provision of this Contract, as applied to any party or to any circumstance, shall be found by a court of competent jurisdiction to be void, invalid or unenforceable, the same shall in no way affect any other provision of this Agreement, the application of any such provision in any other circumstance, or the validity or enforceability of this Contract.

D.    A waiver by any party of any of the terms and conditions of this Contract in any one instance shall not be deemed or construed to be a waiver of such term or condition for the future, or of any subsequent breach thereof, nor shall it be deemed a waiver of performance of any other obligation hereunder.

E.    This Contract contains the entire understanding of the parties hereto relating to the subject matter hereof and supersedes all prior and collateral agreements, understandings, statements and negotiations of the parties, oral or written. Each party acknowledges that no representations, inducements, promises or agreements, oral or written, with reference to the subject matter of this Contract have been made other than as expressly set forth herein.

F.    In all matters of interpretation, whenever necessary to give effect to any provision of this Contract, each gender shall include the other, the singular shall include the plural and the plural shall include the singular. In addition, the titles of the Articles and subparagraphs of this Contract are for convenience only and

20

shall not in any way affect the interpretation of any provision or condition of this Contract.

G.     Except as may be expressly set forth herein, the parties hereto do not intend to confer any rights or remedies upon any person other than the parties hereto and nothing in this Contract shall in any manner create any obligations or establish any rights against the Company or the Reinsurer in favor of any persons or third parties who are not parties to this Contract.

H.     This Contract may not be amended except by a written endorsement signed by both parties.

I.     This Contract may be executed in counterparts, each of which shall be an original and all of which, taken together, shall constitute the whole of the Contract between the parties.

21

EXHIBIT A

SCHEDULE OF LIABILITIES

| | A. Subject Business | B. Company's Policy Limits of Liability (Per Policy) | C. Company's Retained Limits of Liability (Per Policy) | D. Reinsurer's Specific Limits of Liability (Per Policy) | E. Reinsurer's Aggregate Limit (Combined for all Policies) |
|---|---|---|---|---|---|
| 1. | Workers' Compensation | Part 1: Statutory WC | Part 1: Statutory in Excess of First $150,000 Each Accident (BI by Accident) | Part 1: First $150,000 Each Accident (BI by Accident) | Included.  See Note # 3 below. |
| | | | Part 1: Statutory in Excess of First $150,000 Each Employee. (BI by Disease) | Part 1: First $150,000 Each Employee (BI by Disease) | Included.  See Note # 3 below. |
| 2. | Employers' Liability | Part 2: $1,000,000 BI by Accident Each Accident | Part 2: $850,000 in excess of First $150,000 Each Accident (BI by Accident) | Part 2: First $150,000 Each Accident (BI by Accident) | Included.  See Note # 3 below. |
| | | $1,000,000 BI by Disease Each Employee $1,000,000 Disease Policy Limit | Part 2: $850,000 in excess of First $150,000 Each Employee (BI by Disease) | Part 2: First $150,000 Each Employee (BI by Disease) | Included.  See Note # 3 below. |
| 3. | Extra Contractual Obligations (ECO) | 100% (In addition to Policy Limits) | ECO amounts in excess of the Reinsurer's ECO indemnity amounts in D. | 90% of each ECO claim, subject to the applicable First $150,000 Specific Reinsurance Limit in Item 1. or 2. above, whichever is applicable. | Included.  See Note # 3 below. |
| 4. | Loss in Excess of Original Policy Limits (XPL) | 100% (In addition to Policy Limits) | XPL amounts in excess of the Reinsurer's XPL indemnity amounts in D. | 90% of each ECO claim, subject to the applicable First $150,000 Specific Reinsurance Limit in Item 1. or 2. above, whichever is applicable. | Included.  See Note # 3 below. |
| 5. | Loss Adjustment Expense (ALAE) | 100% (In addition to Policy Limits) | See Note #2. below. | See Note #2 below. | Included.  See Note # 3 below. |

22

# EXHIBIT A (Continued)

Notes:

1.  The Company's Policy Limits of Liability indicated in Items B.1. and 2. under this Exhibit A apply on a "per policy" basis and apply to Ultimate Net Loss only.

2.  The Reinsurer's Specific Limits (first $150,000) indicated in Items D.1. and 2. under this Exhibit A apply on a "per policy" basis and are combined for Each Accident or Each Employee for Disease with respect to the sum of:

    a.  Ultimate Net Loss,
    b.  Loss Adjustment Expense, and
    c.  90% of each ECO or XPL claim, pursuant to Items D.3. and 4. under this Exhibit A.

3.  a.  Subject to the Reinsurer's Specific Limits of Liability reinsurance, the Reinsurer's Aggregate Limit indicated in 3.b. below is:

    (1)  Combined for all reinsurance indemnity amounts indicated in D. under this Exhibit A,
    (2)  Combined for all Covered Policies, and
    (3)  Exhausted by the Reinsurer's share of Ultimate Net Loss, Loss Adjustment Expenses, Extra Contractual Obligations and Loss in Excess of Original Policy Limits pursuant to Note 2. above.

    b.  Subject to the provisions below, the Reinsurer's Aggregate Limit with respect to the 2001/2002 Program Year equals 77% of the audited Gross Written Premium (as defined in Article XVI) generated from all Covered Policies included in such Program Year, provided, however the Reinsurer shall not pay more than $11,550,000 under any circumstances. The 2001/2002 Program Year is defined to be comprised of all Covered Policies that incept on or between 12:01 A.M. Eastern Standard Time May 1, 2001 and 12:01 A.M. Eastern Standard Time April 30, 2002.

23

**EXHIBIT B**

**LETTER OF CREDIT WORDING**

To Beneficiary:                                              Date
                                                            Letter of Credit No._____

Security Insurance Company of Hartford,
for and on behalf of itself or
(Other Writing Company 1 or
Other Writing Company 2                                     Applicant
Other Writing Company 3)                                    Name
C/O Alternative Risk Transfer Insurance Strategies          Address
100 Northfield Drive, 1st Floor
Windsor, CT 06095
Attn: ARTIS – Financial Manager

Applicants Name:

Dear Sirs:

We, (the bank), hereby establish this Clean, Irrevocable and Unconditional Letter of Credit No._____ in your favor as beneficiary by order and for account of (applicant name) for drawings up to an aggregate amount of _____(amount written out) effective _____. This Letter of Credit is issued, presentable and payable by (the bank) at any time at our office located at _____(or to such other address as shall be designated by us under written notice to you) and expires with our close of business on _____or any automatically extended expiry date. Except when the amount of this Letter of Credit is increased, this Credit cannot be modified or revoked without your consent.

The term "Beneficiary" includes any successor or assign by operation of law of the named Beneficiary including without limitation any liquidator, rehabilitator, receiver or conservator. Drawings by any liquidator, rehabilitator, receiver or conservator shall be for the benefit of all the beneficiary's policyholders. This Letter of Credit is transferable, in whole or in part, to your successors or assigns which transfer shall be effective upon receipt by (the bank) of an executed instrument effecting such transfer or assignment, and the successor, assignee or transferee shall be entitled to all the benefits and rights under this Letter of Credit.

We hereby undertake to promptly honor your sight draft(s) drawn on us in immediately available funds, indicating our Letter of Credit No. _____, for all or any part of this Credit upon proper presentation of your sight draft drawn on us at our office specified in paragraph one on or before the expiration date hereof or any automatically extended expiry date.

24



Except as expressly stated herein, this undertaking is not subject to any other agreement, requirement or qualification. The obligation of (the bank) under this Letter of Credit is the individual obligation of (the bank) and is in no way contingent upon reimbursement with respect thereto, or upon our ability to perfect any lien, security interest or any other reimbursement.

It is a condition of this Credit that it shall automatically be extended without amendment for additional periods of one year from the present expiration date, or any future expiration date, unless at least sixty (60) days prior to any such date, we shall send you notice in writing, by registered mail, return receipt requested, that we elect not to renew this Credit for any additional period.

This Letter of Credit is subject to and governed by the Laws of the State of New York, including but not limited to the Uniform Commercial Code of New York, and the 1993 Revision of the Uniform Customs and Practice for the Documentary Credits of the International Chamber of Commerce, Publication No. 500 and in the event of any conflict, the Laws of the State of New York will control. If this credit expires during an interruption of business as described in Article 17 of said Publication 500, (the bank) specifically agrees to effect payment if this Credit is drawn against within 30 days after resumption of business.

Very truly yours,


(Signature)

(Title)

(Bank)

HPP Workers' Compensation Program
Printed: 9/24/2001

## INTERESTS AND LIABILITIES AGREEMENT

to the
Reinsurance Contract
("Contract")

between

Security Insurance Company of Hartford
The Fire & Casualty Insurance Company of Connecticut
The Connecticut Indemnity Company
(each individually and collectively the "Company")

and

Commercial Risk Reinsurance Company Limited
Hamilton, Bermuda

Under the terms of the Contract which is attached to this Agreement, the Reinsurer agrees to participate in a ninety percent (90.0%) share of the interests and liabilities of the Company as described therein.

IN WITNESS WHEREOF, the parties have signed this Interests and Liabilities Agreement effective as of the Inception Date set forth in the Contract.

**Security Insurance Company of Hartford**
**for and on behalf of the other above-named ceding companies**

By _RD Schull_

Name: Robert D. Schulz

Title Authorized Signatory

**Commercial Risk Reinsurance Company Limited**

By _Christopher D. Sposato_

Christopher D. Sposato
Senior Vice President and General Counsel

26

## INTERESTS AND LIABILITIES AGREEMENT

to the
Reinsurance Contract
("Contract")

between

Security Insurance Company of Hartford
The Fire & Casualty Insurance Company of Connecticut
The Connecticut Indemnity Company
(each individually and collectively the "Company")

and

Commercial Risk Re-Insurance Company
South Burlington, Vermont

Under the terms of the Contract which is attached to this Agreement, the Reinsurer agrees to participate in a ten percent (10.0%) share of the interests and liabilities of the Company as described therein.

IN WITNESS WHEREOF, the parties have signed this Interests and Liabilities Agreement effective as of the Inception Date set forth in the Contract.

**Security Insurance Company of Hartford**
**for and on behalf of the other above-named ceding companies**

By _R.D. Schultz_
Name: Robert D. Schultz
Title Authorized Signatory

**Commercial Risk Re-Insurance Company**

By _M. Lipkin_
Michael Lipkin
Senior Vice President

27

# COMMERCIAL RISK RE-INSURANCE COMPANY
# COMMERCIAL RISK REINSURANCE COMPANY LIMITED

### Endorsement To
### HPP Workers' Compensation Program
### Quota Share Reinsurance Contract

Endorsement to the Reinsurance Agreement
protecting the Reinsured from the risks of the
HPP Workers' Compensation Program for the
Original Contract Period of 12:01 A.M. E.S.T.
May 1, 2001 Through 12:01 A.M. E.S.T.
April 30, 2002.

Endorsement Number:        001

Endorsement Issued to:     SECURITY INSURANCE COMPANY OF HARTFORD
                           THE FIRE AND CASUALTY INSURANCE COMPANY
                               OF CONNECTICUT
                           THE CONNECTICUT INDEMNITY COMPANY

Endorsement Effective
Date:                      April 30, 2002; 12:01 a.m., Eastern Standard Time.

This Endorsement changes the terms of the Quota Share Reinsurance Contract (hereinafter
the "Reinsurance Contract") to which it is attached and modifies the terms, conditions and
provisions of the reinsurance coverage provided therein. Please read this Endorsement
carefully.

Except as specifically stated herein, this Endorsement is subject to the terms, conditions,
exclusions and limitations (including the Per Occurrence Limits, the Contract Aggregate
Limit of Liability, and the other limitations therein specified) contained in the Reinsurance
Contract and all of such terms, conditions, exclusions and limitations shall have such
meanings as defined in the Reinsurance Contract, except when any such term, condition,
exclusion or limitation is assigned another meaning in this Endorsement.

In the event that any term, condition, exclusion or limitation of the Reinsurance Contract is
inconsistent with a term, condition, exclusion or limitation of this Endorsement, the
Endorsement shall control and the Reinsurance Contract shall be deemed amended so as to
conform herewith.

The Reinsurers and the Company hereby agree that the Reinsurance Contract is cancelled effective as of April 30, 2002.

COMMERCIAL RISK RE-INSURANCE COMPANY

By: _____     Date: _____
Michael Lipkin
Senior Vice President

COMMERCIAL RISK REINSURANCE COMPANY LIMITED

By: _____     Date: _____
Graham C. Pewter
President and Chief Executive Officer

Agreed and accepted according to the terms presented above.

SECURITY INSURANCE COMPANY OF HARTFORD
THE FIRE AND CASUALTY INSURANCE COMPANY OF CONNECTICUT
THE CONNECTICUT INDEMNITY COMPANY,

By: _____     Date: _____
Name: Ronald C. Mairano
Title: Authorized Signatory

# EXHIBIT 3

20000096

## QUOTA SHARE REINSURANCE CONTRACT

**ARTICLE I**
**REINSURED**
**PROGRAM:**

NHE Workers' Compensation Program, including The CraneComp, The Horizon Workers' Compensation Program and Transportation Group.

**ARTICLE II**
**COMPANY:**

Security Insurance Company of Hartford
The Fire and Casualty Insurance Company of Connecticut
The Connecticut Indemnity Company

**ARTICLE III**
**SUBSCRIBING**
**REINSURERS:**

Identified in the INTEREST AND LIABILITIES AGREEMENTS attached to and forming a part of this Contract.

**ARTICLE IV**
**TYPE:**

Quota Share Treaty Reinsurance Contract providing prospective coverage as set forth herein.

**ARTICLE V**
**CONTRACT PERIOD:**

The Contract shall apply to Policies that incept on or between 12:01 A.M. Eastern Standard Time March 15, 2000 (the "Inception Date") and 12:01 A.M. Eastern Standard Time March 14, 2001. This Contract shall continue until terminated pursuant to Article XX herein.

In the event either party terminates this Contract in accordance with such Article XX, the Reinsurer shall continue to reinsure policies ceded within the terms of this Contract pursuant to the terms stated below. In the event of the termination of this Contract, at the Company's option:

A.   The Reinsurer shall remain liable for all policies ceded within the terms of this Contract which have inception dates prior to the Contract termination date until the natural expiration date or cancellation date of such policies, whichever occurs first. The Reinsurer shall continue to be liable for its proportionate share of all outstanding losses (reported or unreported) which occur prior to such policy natural expiration date or cancellation date, whichever occurs first; or

B.   The Reinsurer shall be relieved of all liability hereunder for losses occurring subsequent to the Contract termination date. The Reinsurer shall continue to be liable for its proportionate share of all outstanding losses (reported or unreported) which occur prior to the Contract termination date.

The Reinsurer shall refund to the Company the unearned Net Ceded Premium, if any, (as such term is defined in Article XVI herein) applicable to the unexpired liability (calculated on a pro rata basis), at conclusion of the runoff if option A. above is elected, or at termination if option B. above is elected.

**ARTICLE VI
BUSINESS COVERED:**

Business with respect to risks of the Reinsured Program indicated in Article I herein only classified as Workers' Compensation and Employers' Liability under those *certain* insurance policies issued by the Company to the Original Insureds pursuant to and in accordance with the Underwriting Guidelines (as defined in Article XVI herein), as set forth below (the "Covered Policies"). Coverage hereunder is on an Occurrence Basis.

The Covered Policies with respect to which the Reinsurer shall indemnify the Company shall include policies (including renewals thereof) with inception dates pursuant to Article V herein, and identified as policies issued under the NHE Workers' Compensation Program, pursuant to and in accordance with the Underwriting Guidelines (as defined in Article XVI herein). This Contract shall continue until terminated pursuant to Article XIX herein.

**ARTICLE VII
REINSURING CLAUSE:**

With respect to losses arising from Workers' Compensation and Employers' Liability Accidents and Diseases during the Contract Period, the Reinsurer will indemnify the Company, subject to the limitations set forth herein, for Ultimate Net Loss, Loss Adjustment Expenses, Extra Contractual Obligations and Losses in Excess of Original Policy Limits pursuant to Articles XVI, XVII, XVIII and XIX and Exhibit A attached hereto and forming a part of this Contract. The Reinsurer shall indemnify the Company up to amounts Per Accident and Each Employee for Disease indicated in such Exhibit A, subject always to the Reinsurer's Aggregate Limit of Liability indicated in such Exhibit A and the other limitations herein specified.

For purposes of this Article, the terms "Accident", "Disease", "Ultimate Net Loss", "Loss Adjustment Expenses", "Extra Contractual Obligations" and "Losses in Excess of Original Policy Limits" are defined in Articles XVI, XVII, XVIII and XIX and Exhibit A attached to and forming a part of this Contract.

**ARTICLE VIII
TERRITORY:**

The territorial limits of this Contract shall be identical with those of the Covered Policies, issued pursuant to and in accordance with the Underwriting Guidelines (as defined in Article XVI herein.)

**ARTICLE IX
EXCLUSIONS:**

This Contract does not apply to:

A. Any losses, or liability for losses excluded under the Covered Policies; and

B. Any losses, or liability for losses arising from:

    1. Professional sports teams;

2

2.  Federal Acts, including Jones Act except where estimated payroll in respect of any one risk is less than 20% of total estimated payroll of such risk;

3.  Radioactive contamination;

4.  Loss or damage directly or indirectly occasioned by, happening through, or in consequence of war, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation or nationalization or requisition or destruction of or damage to property by or under the order of any government or public or local authority;

    Loss or damage occasioned by war, invasion, revolution, bombardment, hostilities, acts of foreign enemies, civil war, rebellion, insurrection, military or usurped power, martial law, or confiscation by order of any government or public authority, but not excluding loss or damage which would be covered under a standard form or policy containing a standard war exclusion clause.

5.  Loss or liability excluded by the Nuclear Incident Exclusion Clause – Liability – Reinsurance – U.S.A. (NMA 1590) attached to this Agreement (Exhibit D).

6.  All liability of the Company arising, by contract, operation of law, or otherwise, from its participation or membership, whether voluntary or involuntary, in any insolvency fund. "Insolvency Fund" includes any guaranty fund, plan, pool, association, fund or other arrangement, howsoever denominated, established or governed, which provides for any assessment of or payment or assumption by the Company of part or all of any claim, debt, charge, fee or other obligation of any insurer, or its successors or assigns, which has been declared by any competent authority to be insolvent, or which is otherwise deemed unable to meet any claim, debt, charge, fee or other obligation in whole or in part;

7.  The Company's liability as participant, member, subscriber or reinsurer of any pool, syndicate or association;

8.  Assumed reinsurance, except as specially accepted;

9.  Industrial Aid Aircraft;

10. Pollution – Absolute; and

11. Financial Guarantee, Insolvency, Title Insurance, Auto Warranty business and credit insurances.

**ARTICLE X**
**REINSURANCE**
**PREMIUM:**

The Company will cede to the Reinsurer its proportionate share of premiums under the Covered Policies, pursuant to Articles XIII and XVI herein.

**ARTICLE XI**
**CEDING COMMISSION:**

The Reinsurer will allow the Company a thirty-one percent (31%) ceding commission for the 2000/2001 Program Year (as such term is defined in Note #3.b.) under Exhibit A attached to and forming a part of this Contract. Such ceding commission will apply to the audited Gross Written Premium (as such term is defined in Article XVI herein) to all Covered Policies which comprise the 2000/2001 Program Year.

**ARTICLE XII**
**CURRENCY (BRMA 12A):**

Whenever the word "Dollars" or the "$" sign appears in this Contract, they shall be construed to mean United States Dollars and all transactions under this Contract shall be in United States Dollars.

Amounts paid or received by the Company in any other currency shall be converted to United States Dollars at the rate of exchange at the date such transaction is entered on the books of the Company.

**ARTICLE XIII**
**PREMIUM, ACCOUNTS**
**AND REMITTANCES:**

**A.   Premiums**

1.      Within sixty (60) days following the end of each calendar month during the term of this Contract, the Company will render to the Reinsurer a statement showing the Net Ceded Premium (as defined in Article XVI), if any, due the Reinsurer for such month which is defined and calculated in accordance with Section C.of this Article XIII. The Company will remit such Net Ceded Premium payment to the Reinsurer, pursuant to the terms of this Article XIII.

2.      Upon early termination of the Policies, the earned premium will be computed in accordance with the applicable rules, rates, rating plans, premiums and minimum premiums. If the earned premium less any uncollected premium, as finally determined, is different from the premium that was utilized to establish the reinsurance premium hereunder, prior payments made under this Contract will be recalculated by the Company utilizing the actual earned premium or the actual premium tax, and notice of such recalculation shall be provided to the Reinsurer within thirty (30) days of such termination. If the recalculation indicates that the Reinsurer owes money to the Company, the Reinsurer will pay that money within ten (10) days of the Reinsurer's receipt of such notice thereof from the Company. If the recalculation indicates that the Company owes money to the Reinsurer, the Company will pay that money at the time the recalculation is delivered to the Reinsurer.

**B.     Claims**

1.     The Company will, with funds provided by the Reinsurer (from funds withheld from Net Ceded Premium or other sources), establish an interest bearing bank account (hereinafter the "Loss Payment Fund Account") for the Company's benefit which shall be for use in payment of the Reinsurer's liabilities under this Contract. The Company and its authorized Third Party Claims Administrator (hereinafter the "TPA") will have the right to withdraw funds from the Loss Payment Fund Account to make payment of claims that are payable under the terms and conditions of the Covered Policies and this Contract. The authority of the TPA to withdraw funds from the Loss Payment Fund Account may be revoked at anytime by the Company upon written notice to all parties. The Company may deposit, from time to time, funds which are in excess of the Reinsurer's Reinsurance Limits of Liability (as stated in Exhibit A attached to this Contract) for the purpose of paying claims which are in excess of such Reinsurance Limits of Liability.

The Company will pay interest to the Reinsurer on any Loss Payment Fund Account amounts. Interest will begin accruing on the date such excess funds are available and will continue until all such excess funds are returned to the Reinsurer. Such interest may be paid monthly to the Reinsurer, or at the Reinsurer's election may be retained by the Company as excess amounts in the Loss Payment Fund Account to fund for future reinsurance obligations under this Contract.

The initial required amount of the Loss Payment Fund Account will be $25,000. Thereafter, the required balance of the Loss Payment Fund Account will be equal to two (2) times the monthly average of the sum of: (a) the current and previous (2) months' worth of paid Ultimate Net Losses (as such term is defined in Article XVI herein) within the Reinsurance Limits of Liability plus (b) Reinsurer's share of associated Loss Adjustment Expenses (as such term is defined in Article XVI herein). The Company and the Reinsurer agree that claim payment information provided by the TPA shall be used for the purpose of this calculation. The TPA shall be authorized to make payments out of the Loss Payment Fund Account in the amount of the Reinsurer's liabilities hereunder. The Reinsurer will provide the Company each month with sufficient funds to replenish the Loss Payment Fund Account within thirty (30) days after Reinsurer receives notice of the balance due pursuant to Section C. of this Article XIII. The Company may also review the adequacy of the account at any other time and the Reinsurer will send the Company funds to increase the account within five (5) working days of the Company's written request. If the Reinsurer fails to make any payment to the Company within the time required by this Contract, the Company will have the option to change the foregoing formula for replenishing the Loss Payment Fund Account by increasing the number of months used to estimate the required balance.

2.     Payments that may be withdrawn from the Loss Payment Fund Account will be for paid Ultimate Net Losses and Loss Adjustment Expenses within Reinsurer's Reinsurance Limits of Liability under this Contract with respect to

the Covered Policies. Payments may also be withdrawn from funds made available by the Company pursuant to paragraph 1. above.

3.    In the event that the Company becomes obligated for paid Ultimate Net Loss and Loss Adjustment Expenses that exceed the amount of the Loss Payment Fund Account balance for amounts representing the Reinsurer's liability under this Contract, the Reinsurer will, within five (5) working days after receipt of a written demand and documentation by the Company or the TPA on the Company's behalf, forward funds to the Company sufficient to cover such amounts that are greater than the then current Loss Payment Fund Account balance.

4.    Should payment due from the Reinsurer exceed $100,000 as respects any one Ultimate Net Loss, the Company may give the Reinsurer notice of payment made or its intention to make payment on a certain date. If the Company has paid the loss, payment will be made by the Reinsurer immediately. If the Company intends to pay the loss by a certain date and has submitted a satisfactory proof of loss or similar document, payment will be due from the Reinsurer twenty-four (24) hours prior to that date, provided the Reinsurer has a period of five (5) working days after receipt of said notice to dispatch the payment. Cash loss amounts specifically remitted by the Reinsurer as set forth herein will be credited to its next monthly account.

C.    Premium Reporting

Within sixty (60) calendar days following the end of each calendar month during the term of this Contract, the Company shall render to the Reinsurer a report showing the following, in arrears for such calendar month:

| | | |
|---|---|---|
| a. | Gross Ceded Premium | $. |
| | less | |
| b. | Ceding Commission (pursuant to Article XI herein) | $. |
| | equals | |
| c. | Net Ceded Premium | $. |
| | less | |
| d. | Additional Loss Payment Fund amount (pursuant to Section B.1 of this Article XIII) | $. |
| | less | |
| e. | Reinsurance Ultimate Net Losses and Loss Adjustment Expenses paid by the Company but not recovered from the Reinsurer (pursuant to Section B. of this Article XIII) | $. |

equals

f.   Balance Due to (or from) Reinsurer                                    $.

Any balance due to the Reinsurer shall be remitted with the report
indicated above. Any balance due to the Company shall be settled within
thirty (30) days after the Reinsurer receives the report indicated above.

In addition, the Company shall report to the Reinsurer under each
calendar monthly bordereaux the following:

1.   Policy Number;
2.   Policy Effective and Expiration Dates;
3.   Subject Business (pursuant to Exhibit A attached to this
     Contract);
4.   Risk State;
5.   Claims Number;
6.   Date of Loss;
7.   Claimant Name;
8.   Outstanding Reserves for Ultimate Net Loss; and
9.   Gross Ceded Unearned Premium Reserve.

For purposes of this Article XIII, the terms "Ultimate Net Loss" "Loss
Adjustment Expenses," "Gross Ceded Premium," and "Net Ceded
Premium" are defined in Article XVI.

**ARTICLE XIV**
**TAXES, ASSESSMENTS**
**AND DIVIDENDS:**

The Company shall pay all taxes and dividends on premiums (except
Federal Excise Tax which is described in Article XXVIII herein, or as,
otherwise, provided herein) reported to the Reinsurer. In the event that
this Contract is terminated, the provisions of this Article shall continue to
apply for as long as the Company is required to accept assignments
and/or assessments (including credits) because of the business reinsured
hereunder.

**ARTICLE XV**
**SECURITY:**

In the event that the Company would be unable to take credit for the
reinsurance provided by the Reinsurer hereunder because the Reinsurer is
unauthorized or is not accredited, the Reinsurer will provide the
Company with (i) a Security Trust Fund which is acceptable to the
appropriate insurance authorities and meets all applicable regulatory
requirements including 11 NYCRR 126 (Regulation 114), or (ii) a clean,
irrevocable and unconditional letter of credit which is acceptable to the
appropriate insurance authorities, meets all applicable regulatory
requirements including 11NYCCRR79 (Regulation 133), is in the form of
Exhibit B attached hereto and forming a part of this Contract, is issued
by a bank acceptable to the regulatory authorities having jurisdiction over
the Company's reserves. In each case, the Company shall be the
beneficiary. Such trust account and/or letter(s) of credit are hereinafter
referred to as the "Security".

The Reinsurer and the Company agree that the Security will be established and maintained in an amount equal to:

1. the Ultimate Net Loss and Loss Adjustment Expense paid by or on behalf of the Company but not recovered from Reinsurer, plus
2. Case Reserves for Ultimate Net Loss, Reserves for Ultimate Net Loss and Loss Adjustment Expense with respect to IBNR, plus
3. Reserves for Loss Adjustment Expenses, and Unearned Premium Reserves, less
4. the amount on deposit in the Loss Payment Fund Account; pursuant to Article XII herein.

The amount calculated in 1. through 4. above is hereinafter referred to as the "Unauthorized Reinsurer's Obligation".

At quarterly intervals, or more frequently as determined by the Company, but never more frequently than monthly, the Company shall prepare a specific statement showing the change in the Unauthorized Reinsurer's Obligation as of the date of such statement, as well as showing the changes in the Gross Ceded Premium (as such term is defined in Article XVI herein) as of the date of such statement, for the sole purpose of determining the required amount of Security.

In the event that the amount of Unauthorized Reinsurer's Obligation, as of the date of the above indicated Company's statement, exceeds the amount of the Security actually held in favor of the Company hereunder, the Company will provide prompt written notice of such event, and the Reinsurer shall increase the Security to the amount of the Unauthorized Reinsurer's Obligation within thirty (30) days following the receipt of such notice. In the event that the amount of the Security held in favor of the Company exceeds the Unauthorized Reinsurer's Obligation, the Company will provide prompt written notice of such event, and shall authorize a withdrawal or reduction of Security in the amount of such difference. Each such calculation and adjustment by the Company shall be binding and conclusive for purposes of this Contract absent bad faith or manifest error.

If the Security provided is in the form of letter(s) of credit, each letter of credit will be irrevocable, clean and unconditional, issued for a term of at least twelve (12) months and will be, by its terms, subject to any unlimited number of automatic renewals thereafter for additional twelve (12) month terms, unless the issuing bank advises the Company in writing at least sixty (60) days prior to the next expiration date of the bank's intention not to have the letter of credit be considered renewed. The Reinsurer will deliver or cause to be delivered to the Company at least thirty (30) days prior to the expiration date of the letter of credit which is about to non-renew, a replacement letter of credit establishing credit in the Reinsurer's favor in the same amount as the letter of credit which it replaces, unless such amount is to be otherwise adjusted as provided for herein. Upon timely receipt of the replacement letter of credit, the Company will immediately cancel the original letter of credit by notation and return it to

the Reinsurer postage prepaid, registered mail, however, if the Reinsurer is located outside the continental United States, such return shall be made by an internationally recognized overnight courier service.

The Reinsurer shall ensure that the required amount of Security remains in force throughout the term of this Contract and thereafter until all covered claims under the Policies have been closed, or until otherwise agreed. The Company shall release any Security or proceeds therefrom to the issuer of the Security when the Company determines that all obligations under this Contract, finally developed, have been paid. The Company shall make such a determination on a reasonable actuarial basis in good faith.

### Special Provisions for Letters of Credit

With respect to any Security, the Reinsurer and the Company agree that the Company (or any successor of the Company by operation of law, including, without limitation, any liquidator, rehabilitator, receiver or conservator of the Company as indicated in a letter(s) of credit) may draw upon such letter of credit and use the proceeds thereof for the following purposes only:

   (1)  Any Security is not replaced or increased as required by this Contract;

   (2)  The Reinsurer fails to discharge its payment of the Unauthorized Reinsurer's Obligation under this Contract; and

   (3)  The Reinsurer fails to cure such default under (1), or (2) above within ten (10) days of receiving notice of such default from the Company; and/or

   (4)  Any other reason for draw-down as described in a Security Trust Fund Agreement.

The Company may draw the full amount of such Security in the case of the preceding clause (1), but only the amount due from the Reinsurer in the case of the preceding clause (2). The Reinsurer and the Company agree that the proceeds of the Security provided by the Reinsurer pursuant to the provisions of this Contact may be utilized by the Company to pay or reimburse the Company for amounts due with respect to the Unauthorized Reinsurer's Obligation from the Reinsurer hereunder; or to fund an account with the Company for the Unauthorized Reinsurer's Obligation with respect to the Covered Policies. Such cash deposit shall be held in an interest bearing account separate from the Company's other assets.

All of the foregoing shall be applied without diminution because of insolvency on the Reinsurer's part. The Company will pay interest to the Reinsurer on any funds drawn by the Company and held pursuant to the preceding paragraph. Interest will begin accruing on the date such funds are drawn and will continue to accrue until such funds are paid out in satisfaction of the Unauthorized Reinsurer's Obligation hereunder or are returned to the Reinsurer. At the Reinsurer's discretion, such interest may be paid monthly to the Reinsurer or may be retained by the

Company and added to the funds held by the Company hereunder. Such interest will be equal to the interest actually earned by the Company from the investment of such funds. Such funds, and any amounts held in an account established as set forth in the preceding paragraph, shall be held by the Company in its sole possession, custody and control as security for the prompt payment and performance when due with respect to the Unauthorized Reinsurer's Obligation of the Reinsurer hereunder, and by the Reinsurer's execution of this Contract, the Reinsurer irrevocably transfers, assigns and pledges such funds, and all accounts, instruments and securities in which such funds may from time to time be held or invested, to the Company for the purposes herein described. In the event of a drawing-down of the Security pursuant to clause (1) or (2) above, and such failure or event has been cured, the Company will return to the Reinsurer any funds held by the Company upon receipt of Security satisfying the requirements of this Contract.

The bank chosen as the issuer of any letter of credit or as the depository of cash representing collateral hereunder will have no responsibility whatsoever in connection with the propriety of drawings or withdrawals made by the Company or the disposition of funds drawn or withdrawn, except to ensure that drawings or withdrawals are made only upon the order of the Company's properly authorized representatives.

**ARTICLE XVI**
**DEFINITIONS:**

For purposes of this Contract:

A.    The term "Ultimate Net Loss" shall mean the Company's gross liability for loss settlement (inclusive of Loss Adjustment Expenses, Extra Contractual Obligations and Excess of Original Policy Limit amounts as such terms are defined in Articles XVI, XVIII and XIX herein) paid on all Covered Policies and remaining after any deduction of any and all inuring reinsurance.

B.    The term "Loss Adjustment Expenses" shall mean expenses assignable to the investigation, appraisal, negotiation, adjustment, settlement, litigation, defense and/or appeal of specific claims, regardless of how such expenses are classified for statutory reporting purposes. Loss Adjustment Expenses shall include, but not be limited to, pre- and post- judgement interest, expenses of outside adjusters and counsel, court costs, and declaratory judgment expenses or other legal expenses and costs incurred in connection with coverage questions and legal actions connected thereto, but shall not include office expenses or salaries of the Company's regular employees. The Reinsurer's shared Loss Adjustment Expenses are indicated under section D.5. of Exhibit A attached hereto.

C.    The term "Gross Written Premium" means the total premium charged to the Original Insureds under the Covered Policies, plus additional premiums and/or less return premiums arising from subsequent premium transactions including cancellations and premium audits.

D.    The term "Gross Ceded Premium" means Gross Written Premium, as such term is defined herein, less Gross Retained Premium, as such term is defined herein.

E.    The term "Gross Retained Premium" means 9% of the Gross Written Premium, as such term is defined herein, as the premium for the total limits retained by the Company under the Covered Policies and the expenses of the Company for issuing and administering the Covered Policies.

F.    The term "Net Ceded Premium" means Gross Ceded Premium, as such term is defined herein, less the Ceding Commission as described in Article XI herein.

G.    The term "Accident" shall be given the same meaning under the Covered Policies.

H.    The term "Disease" shall be given the same meaning under the Covered Policies.

I.    The term "Underwriting Guidelines" means those underwriting, pricing and administration requirements (including any amendments thereto) in connection with the NHE Workers' Compensation Program, as mutually agreed to by the parties, which are included in Exhibit C attached to this Contract.

J.    The term "Unearned Premium Reserve(s)" means the pro rata portion of the premium represented by the unexpired portion of a Covered Policy in force as of any specified date using a daily amortization method.

K.    The term "IBNR" means a reserve for liability for future payment on losses which have already occurred but have not yet been reported to the Company and will also include expected future development on Case Reserves.

L.    The term "Case Reserves" means losses reported to the Company under the Covered Policies which have been reserved but unpaid as of any specified date.

**ARTICLE XVII**
**LOSS ADJUSTMENT**
**EXPENSES:**

The Reinsurer will indemnify the Company for a portion of Loss Adjustment Expenses, as defined in Article XVI herein and in accordance with Item D.5. of Exhibit A attached to and forming a part of this Contract.

**ARTICLE XVIII**
**EXTRA CONTRACTUAL**
**OBLIGATIONS:**

Subject to the Specific Reinsurance Limits indicated in Item D.3. of Exhibit A (attached to and forming a part of this Contract), the term "Extra Contractual Obligations" means those liabilities not covered under

any other provision of this Contract or under the Covered Policies and which arise from the handling of any claim on business covered hereunder, such liabilities arising because of, but not limited to, the following: failure by the Company to settle within the policy limit, or by reason of alleged or actual negligence, fraud, or bad faith in rejecting an offer of settlement or in the preparation of the defense or in the trial of any action against its insured or reinsured or in the preparation or prosecution of an appeal consequent upon such action. The date on which any Extra Contractual Obligation is incurred by the Company shall be deemed, in all circumstances, to be the date of the original disaster and/or casualty. However, this definition shall not apply where the loss has been incurred due to fraud by a member of the Board of Directors or a corporate officer of the Company acting individually or collectively or in collusion with any individual or corporation or any other organization or party involved in the presentation, defense or settlement of any claim covered hereunder.

**ARTICLE XIX**
**LOSS IN EXCESS OF**
**ORIGINAL POLICY LIMITS:**     Subject to the Specific Reinsurance Limits indicated in Item D.4. of Exhibit A (attached to and forming a part of this Contract), the term "Loss in Excess of Original Policy Limits" means a loss in excess of the original policy limits which occurs because of the failure by the Company to settle within the policy limit or by reason of alleged or actual negligence, fraud, or bad faith in rejecting an offer of settlement or in the preparation of the defense or in the trial of any action against its Original Insured or reinsured or in the preparation or prosecution of an appeal consequent upon such action. However, this definition shall not apply where the loss has been incurred due to fraud by a member of the Board of Directors or a corporate officer of the Company acting individually or collectively or in collusion with any individual or corporation or any other organization or party involved in the presentation, defense or settlement of any claim covered. For the purpose of this Article, the word "loss" shall mean any amounts for which the Company would have been contractually liable had it not been for the limit of the original Covered Policy.

**ARTICLE XX**
**TERMINATION:**     This Contract may be cancelled by either the Reinsurer or the Company upon ninety (90) days prior written notice delivered by the party canceling this Contract to the other party. Further, this Contract shall be cancelable by the Reinsurer for non-payment of any amount of Reinsurance Premium which is due pursuant to Article X herein. In the event of any such non-payment, the Reinsurer may transmit written notice of cancellation to the Company by telecopier or overnight courier and the Company shall have until the tenth business day following the delivery of such notice to pay the delinquent amount. In the event that the delinquent amount shall not be received by the Reinsurer prior to the close of business on such tenth day, the cancellation shall be deemed to be effective at 11:59:59 p.m. on the day preceding the date on which the delinquent amount of the Reinsurance Premium was due.

**ARTICLE XXI**
**INSPECTION AND AUDIT**
**OF BOOKS AND RECORDS:** The Company shall allow the Reinsurer to inspect and copy, at reasonable times during normal business hours of the Company, the books, records and claims files of the Company or its representatives or agents relevant to the business reinsured hereunder, including the Company's or its representatives' or agents' files concerning claims, losses or legal proceedings.

The Reinsurer shall be entitled to conduct an audit of the Company and its business insofar as it may be necessary, in the sole opinion of the Reinsurer, to determine the Company's compliance with the terms and conditions of this Contract, provided such audit shall be limited to matters which are relevant to the business reinsured hereunder, and the proper operation of the terms and conditions of, this Contract.

The Company and its representatives and agents shall cooperate in every respect with the Reinsurer and any representative or auditor of the Reinsurer insofar as implementing the requirements of this Article XXI.

**ARTICLE XXII**
**ERRORS AND OMISSIONS** Any inadvertent delay, error or accidental omission of either party shall not be held to relieve either party hereto from any liability which would attach to it hereunder if such delay, omission or error had not been made, provided such delay, omission or error is rectified upon discovery.

**ARTICLE XXIII**
**ORIGINAL CONDITIONS:** Except as otherwise provided under Article IX herein, all reinsurance under this Contract shall be subject to the same rates, terms, conditions, waivers and to the same modifications, alterations and interpretations as the Covered Policies of the Company, and the liability of the Reinsurer shall follow that of the Company in every case, subject to the terms, conditions and limitations of this Contract. It is the intent of the parties hereto that the Reinsurer shall follow the fortunes of the Company in all matters falling under this Contract.

**ARTICLE XXIV**
**LOSS SETTLEMENTS:** Except as otherwise provided under Article IX herein, all loss settlements made by the Company under the terms and conditions of the Covered Policies shall be binding upon the Reinsurer, and the Reinsurer agrees to pay or allow, as the case may be, its share of each such settlement in accordance with this Contract.

All loss settlements shall mean individual payments made by the Company in accordance with its obligations under the Covered Policies.

Nothing in this Article XXIV shall be construed as meaning that loss settlements are not recoverable hereunder until the final loss to the Company has been ascertained.

The date of loss as defined in the Covered Policies shall apply as respects any losses reported under this Contract.

Notwithstanding anything stated in this Contract to the contrary, should the expiration date of any Policy be extended as the result of any statute or regulation, the Reinsurer's liability will apply to all losses occurring during such policy period extension.

**ARTICLE XXV**
**SALVAGE AND**
**SUBROGATION:**

The Reinsurer shall be credited with its proportionate share of salvage or subrogation recoveries (i.e., reimbursement obtained or recovery made by the Company, less the actual cost, excluding salaries of officials and employees of the Company, of obtaining such reimbursement or making such recovery) on account of claims and settlements involving reinsurance hereunder. The Reinsurer shall be subrogated to the rights of the Company to the extent of its loss payments to the Company. The Company agrees to enforce its rights of salvage, subrogation, and its rights against other insurers or to assign these rights to the Reinsurer.

**ARTICLE XXVI**
**OFFSET (BRMA 36D):**

The Company and the Reinsurer, each at its option, may offset any balance or balances, whether on account of premiums, claims and losses, loss expenses or salvages due from one party to the other under this Contract; provided, however, that in the event of the insolvency of a party hereto, offsets shall only be allowed in accordance with applicable statutes and regulations.

**ARTICLE XXVII**
**INSOLVENCY:**

In the event of the insolvency of the Company, this reinsurance shall be payable immediately upon demand directly to the Company, or to its liquidator, receiver, conservator or statutory successor on the basis of the liability of the Company without diminution because of the insolvency of the Company or because the liquidator, receiver, conservator or statutory successor of the Company has failed to pay all or a portion of any claim. Such payments by the Reinsurer will be made directly to the Company or the Company's liquidator, receiver, or statutory successor except as provided by applicable law or separate contract. It is agreed, however, that the liquidator, receiver, conservator or statutory successor of the Company shall give written notice to the Reinsurer of the pendency of a claim against the Company indicating the Policy reinsured which claim would involve a possible liability on the part of the Reinsurer within a reasonable time after such claim is filed in the insolvency proceeding, and that during the pendency of such claim, the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claim is to be adjudicated, any defense or defenses that it may deem available to the Company or its liquidator, receiver, conservator or statutory successor. The expense thus incurred by the Reinsurer shall be chargeable, subject to the approval of the court, against the Company as part of the expense of liquidation to the extent of a pro rata share of the benefit which may accrue to the Company solely as a result of the defense undertaken by the Reinsurer. Should the Company be placed into liquidation or should a receiver be appointed, the Reinsurer will be entitled to set off mutual debts or mutual credits as provided under

applicable law. The maximum amount recoverable, the maximum amount retained and total premium due under this Contract will not be increased by application of the above provision.

Where two or more Reinsurers are involved in the same claim and a majority in interest elect to interpose a defense to such claim, the expense shall be apportioned in accordance with the terms of this Contract as though such expense had been incurred by the insolvent Company.

**ARTICLE XXVIII**
**FEDERAL EXCISE TAX:**

To the extent that any reinsurance hereunder shall be subject to Federal Excise Tax by virtue of reinsurance premiums being paid to a non-U.S. reinsurer, and there shall be no applicable exemption therefrom, the Company is authorized to deduct, for the purpose of paying such tax, the applicable percentage of the Reinsurance Premium payable as provided under Section 4371 of the Internal Revenue Code from the Reinsurance Premium payable to the non-U.S. Reinsurer with respect to the reinsurance subject to such tax. The Company shall allow such Reinsurer a credit for any such amount deducted in the event that any return premiums are paid to the Company and the Company or its agent should take steps to recover the tax from the United States Government.

**ARTICLE XXIX**
**SERVICE OF SUIT**
**(BRMA 49D):**

(This Article only applies to reinsurers domiciled outside of the United States and/or unauthorized in any state, territory, or district of the United States where authorization is required by insurance regulatory authorities).

It is agreed that in the event the Reinsurer fails to pay any amount claimed to be due hereunder, the Reinsurer, at the request of the Company, will submit to the jurisdiction of a court of competent jurisdiction within the United States. Nothing in this Article constitutes or should be understood to constitute a waiver of the Reinsurer's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Reinsurer hereby designates Primmer & Piper of 100 East State Street, P.O. Box 1309, Montpelier, Vermont, 05601-1309, U.S.A., as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Company or any beneficiary hereunder arising out of this Contract.

**ARTICLE XXX**
**THIRD PARTY RIGHTS**
**(BRMA 52B):**

This Contract is solely between the Company and the Reinsurer, and in no instance shall any other party have any rights under this Contract except as expressly provided otherwise herein.

**ARTICLE XXXI**
**LEGALITY:**

If any law or regulation of the federal, state, or local government of the United States or the rulings of officials having supervision over insurance companies should render illegal the undertaking of this Contact, then with regard to business within the jurisdiction of such authority, the Company may upon written notice to the Reinsurer suspend, abrogate, or amend this Contract insofar as it relates to business within the jurisdiction of such authority, to the extent as may be necessary to comply with such law, regulation or ruling. Such suspension, abrogation, or amendment of a portion of this Contract shall in no way affect any other portion thereof.

**ARTICLE XXXII**
**ARBITRATION:**

As a condition precedent to any right of action hereunder, any dispute or difference between the Company and any Reinsurer relating to the interpretation or performance of this Contract, including its formation or validity, or any transaction under this Contract, whether arising before or after termination, shall be submitted to arbitration.

If more than one reinsurer is involved in the same dispute, all such reinsurers shall constitute and act as one party for purposes of this clause provided that communication shall be made by the Company to each of the reinsurers constituting the one party, and provided, however, that nothing therein shall impair the rights of such reinsurers to assert several, rather than joint, defenses or claims, nor be construed as changing the liability of the Reinsurer under the terms of this Contract from several to joint.

Upon written request of any party, each party shall choose an arbitrator and the two chosen shall select a third arbitrator. If either party refuses or neglects to appoint an arbitrator within thirty (30) days after receipt of the written request for arbitration, the requesting party may appoint a second arbitrator. If the two arbitrators fail to agree on the selection of a third arbitrator within thirty (30) days of their appointment, the Company shall petition the American Arbitration Association to appoint the third arbitrator. If the American Arbitration Association fails to appoint the third arbitrator within thirty (30) days after it has been requested to do so, either party may request a justice of a Court of general jurisdiction of the state in which the arbitration is to be held to appoint the third arbitrator. All arbitrators shall be active or retired officers of insurance or reinsurance companies, or Lloyd's London Underwriters, and disinterested in the outcome of the arbitration. Each party shall submit its case to the arbitrators within thirty (30) days of the appointment of the third arbitrator.

The parties hereby waive all objections to the method of selection of the arbitrators, it being the intention of both sides that all the arbitrators be chosen from those submitted by the parties.

The arbitrators shall have the power to determine all procedural rules for the holding of the arbitration including but not limited to inspection of documents, examination of witnesses and any other matter relating to the

conduct of the arbitration. The arbitrators shall interpret this Contract as an honorable engagement and not as merely a legal obligation; they are relieved of all judicial formalities and may abstain from following the strict rules of law. The arbitrators may award interest and costs. Each party shall bear the expense of its own arbitrator and shall share equally with the other party the expenses of the third arbitrator and of the arbitration.

The decision in writing of the majority of the arbitrators shall be final and binding upon both parties. Judgment may be entered upon the final decision of the arbitrators in any court having jurisdiction.

The arbitration shall take place in the city where the Company's principal office is located, unless otherwise mutually agreed between the Company and the Reinsurer.

This article shall remain in full force and effect in the event any other provision of this Contract shall be found invalid or non-binding.

Should the Company and the Reinsurer mutually agree to an alternative remedy to resolve a dispute under this Contract, such agreement shall be made in writing and executed by duly authorized representatives of both the Company and the Reinsurer.

**ARTICLE XXXIII**
**AGENCY AGREEMENT:**

Security Insurance Company of Hartford, Farmington, Connecticut shall be deemed the agent of the other reinsured companies for the purposes of sending or receiving notices required by the terms and conditions of this Contract, and for the purposes of remitting or receiving any monies due any party.

**ARTICLE XXXIV**
**MISCELLANEOUS**
**PROVISIONS:**

A.     This Contract and the rights, duties and obligations of the parties hereto shall not be assignable by either party hereto without the prior written consent of the other party and any purported assignment in the absence of such consent shall be void.

B.     Each party shall execute and deliver all further instruments, documents and papers, and shall perform any and all acts necessary, to give full force and effect to all of the terms and provisions of this Contract.

C.     If any provision of this Contract, as applied to any party or to any circumstance, shall be found by a court of competent jurisdiction to be void, invalid or unenforceable, the same shall in no way affect any other provision of this Agreement, the application of any such provision in any other circumstance, or the validity or enforceability of this Contract.

D.     A waiver by any party of any of the terms and conditions of this Contract in any one instance shall not be deemed or construed to be a waiver of such term or condition for the future, or of any subsequent

breach thereof, nor shall it be deemed a waiver of performance of any other obligation hereunder.

E.     This Contract contains the entire understanding of the parties hereto relating to the subject matter hereof and supersedes all prior and collateral agreements, understandings, statements and negotiations of the parties, oral or written. Each party acknowledges that no representations, inducements, promises or agreements, oral or written, with reference to the subject matter of this Contract have been made other than as expressly set forth herein.

F.     In all matters of interpretation, whenever necessary to give effect to any provision of this Contract, each gender shall include the other, the singular shall include the plural and the plural shall include the singular. In addition, the titles of the Articles and subparagraphs of this Contract are for convenience only and shall not in any way affect the interpretation of any provision or condition of this Contract.

G.     Except as may be expressly set forth herein, the parties hereto do not intend to confer any rights or remedies upon any person other than the parties hereto and nothing in this Contract shall in any manner create any obligations or establish any rights against the Company or the Reinsurer in favor of any persons or third parties who are not parties to this Contract.

H.     This Contract may not be amended except by a written endorsement signed by both parties.

I.     This Contract may be executed in counterparts, each of which shall be an original and all of which, taken together, shall constitute the whole of the Contract between the parties.

EXHIBIT A

SCHEDULE OF LIABILITIES

| | A. Subject Business | B. Company's Policy Limits of Liability (Per Policy) | C. Company's Retained Limits of Liability (Per Policy) | D. Reinsurer's Specific Limits of Liability (Per Policy) | E. Reinsurer's Aggregate Limit (Combined for all Policies) |
|---|---|---|---|---|---|
| 1. | Workers' Compensation | Part 1: Statutory WC | Part 1: Statutory in Excess of First $250,000 Each Accident (BI by Accident) | Part 1: First $250,000 Each Accident (BI by Accident) | Included. See Note # 3 below. |
| | | | Part 1: Statutory in Excess of First $250,000 Each Employee (BI by Disease) | Part 1: First $250,000 Each Employee (BI by Disease) | Included. See Note # 3 below. |
| 2. | Employers' Liability | Part 2: $1,000,000 BI by Accident Each Accident | Part 2: $750,000 in excess of First $250,000 Each Accident (BI by Accident) | Part 2: First $250,000 Each Accident (BI by Accident) | Included. See Note # 3 below. |
| | | $1,000,000 BI by Disease Each Employee $1,000,000 Disease Policy Limit | Part 2: $750,000 in excess of First $250,000 Each Employee (BI by Disease) | Part 2: First $250,000 Each Employee (BI by Disease) | Included. See Note # 3 below. |
| 3. | Extra Contractual Obligations (ECO) | 100% (In addition to Policy Limits) | ECO amounts in excess of the Reinsurer's ECO indemnity amounts in D. | 90% of each ECO claim, subject to the applicable First $250,000 Specific Reinsurance Limit in Item 1. or 2. above, whichever is applicable. | Included. See Note # 3 below. |
| 4. | Loss in Excess of Original Policy Limits (XPL) | 100% (In addition to Policy Limits) | XPL amounts in excess of the Reinsurer's XPL indemnity amounts in D. | 90% of each ECO claim, subject to the applicable First $250,000 Specific Reinsurance Limit in Item 1. or 2. above, whichever is applicable. | Included. See Note # 3 below. |
| 5. | Loss Adjustment Expense (ALAE) | 100% (In addition to Policy Limits) | See Note #2. below. | See Note #2. below. | Included. See Note # 3 below. |

**EXHIBIT A (Continued)**

Notes:

1.  The Company's Policy Limits of Liability indicated in Items B.1. and 2. under this Exhibit A apply on a "per policy" basis and apply to Ultimate Net Loss only.

2.  The Reinsurer's Specific Limits (first $250,000) indicated in Items D.1. and 2. under this Exhibit A apply on a "per policy" basis and are combined for Each Accident or Each Employee for Disease with respect to the sum of:

    a.  Ultimate Net Loss,
    b.  Loss Adjustment Expense, and
    c.  90% of each ECO or XPL claim, pursuant to Items D.3. and 4. under this Exhibit A.

3.  a.  Subject to the Reinsurer's Specific Limits of Liability reinsurance, the Reinsurer's Aggregate Limit indicated in 3.b. below is:

    (1)  Combined for all reinsurance indemnity amounts indicated in D. under this Exhibit A,
    (2)  Combined for all Covered Policies, and
    (3)  Exhausted by the Reinsurer's share of Ultimate Net Loss, Loss Adjustment Expenses, Extra Contractual Obligations and Loss in Excess of Original Policy Limits pursuant to Note 2 above.

    b.  The Reinsurer's Aggregate Limit with respect to the 2000/2001 Program Year equals 80% of the audited Gross Written Premium (as defined in Article XVI) generated from all Covered Policies included in such Program Year. The 2000/2001 Program Year is defined to be comprised of all Covered Policies that incept on or between 12:01 A.M. Eastern Standard Time March 15, 2000 and 12:01 A.M. Eastern Standard Time March 14, 2001.

20

## EXHIBIT B

### LETTER OF CREDIT WORDING

To Beneficiary:                                            Date
                                                          Letter of Credit
                         No._____

Security Insurance Company of Hartford,
for and on behalf of itself or
(Other Writing Company 1 or
Other Writing Company 2                                   Applicant
Other Writing Company 3)                                  Name
C/O Alternative Risk Transfer Insurance Strategies        Address
100 Northfield Drive, 1st Floor
Windsor, CT 06095                                              )
Attn: ARTIS – Financial Manager

Applicants Name:

Dear Sirs:

We, (the bank), hereby establish this Clean, Irrevocable and Unconditional Letter of Credit No._____ in your favor as beneficiary by order and for account of (applicant name) for drawings up to an aggregate amount of _____(amount written out) effective _____.  This Letter of Credit is issued, presentable and payable by (the bank) at any time at our office located at _____(or to such other address as shall be designated by us under written notice to you) and expires with our close of business on _____or any automatically extended expiry date. Except when the amount of this Letter of Credit is increased, this Credit cannot be modified or revoked without your consent.

The term "Beneficiary" includes any successor or assign by operation of law of the named Beneficiary including without limitation any liquidator, rehabilitator, receiver or conservator. Drawings by any liquidator, rehabilitator, receiver or conservator shall be for the benefit of all the beneficiary's policyholders.  This Letter of Credit is transferable, in whole or in part, to your successors or assigns which transfer shall be effective upon receipt by (the bank) of an executed instrument effecting such transfer or assignment, and the successor, assignee or transferee shall be entitled to all the benefits and rights under this Letter of Credit

We hereby undertake to promptly honor your sight draft(s) drawn on us in immediately available funds, indicating our Letter of Credit No. _____, for all or any part of this Credit upon proper presentation of your sight draft drawn on us at our office specified in paragraph one on or before the expiration date hereof or any automatically extended expiry date.

21          PRINTED: 28 February 2001; 4:05 PM

Except as expressly stated herein, this undertaking is not subject to any other agreement, requirement or qualification. The obligation of (the bank) under this Letter of Credit is the individual obligation of (the bank) and is in no way contingent upon reimbursement with respect thereto, or upon our ability to perfect any lien, security interest or any other reimbursement.

It is a condition of this Credit that it shall automatically be extended without amendment for additional periods of one year from the present expiration date, or any future expiration date, unless at least sixty (60) days prior to any such date, we shall send you notice in writing, by registered mail, return receipt requested, that we elect not to renew this Credit for any additional period.

This Letter of Credit is subject to and governed by the Laws of the State of New York, including but not limited to the Uniform Commercial Code of New York, and the 1993 Revision of the Uniform Customs and Practice for the Documentary Credits of the International Chamber of Commerce, Publication No. 500 and in the event of any conflict, the Laws of the State of New York will control. If this credit expires during an interruption of business as described in Article 17 of said Publication 500, (the bank) specifically agrees to effect payment if this Credit is drawn against within 30 days after resumption of business.

Very truly yours,


(Signature)

(Title)

(Bank)

PRINTED: 28 February 2001; 4:05 PM

## INTERESTS AND LIABILITIES AGREEMENT

to the
Reinsurance Contract
("Contract")

between
Security Insurance Company of Hartford
The Fire & Casualty Insurance Company of Connecticut
The Connecticut Indemnity Company
(each individually and collectively the "Company")

and

Commercial Risk Reinsurance Company Limited
Hamilton, Bermuda

Under the terms of the Contract which is attached to this Agreement, the Reinsurer agrees to participate in an eighty percent (80%) share of the interests and liabilities of the Company as described therein.

IN WITNESS WHEREOF, the parties have signed this Interests and Liabilities Agreement effective as of the Inception Date set forth in the Contract.

**Security Insurance Company of Hartford**
**for and on behalf of the other above-named ceding companies**

By
Name: Stephen M. Mulready
Title: Vice President

**Commercial Risk Reinsurance Company Limited**

By
Graham C. Pewter
President and Chief Executive Officer

23          PRINTED: 28 February 2001; 4:05 PM

## INTERESTS AND LIABILITIES AGREEMENT

to the
Reinsurance Contract
("Contract")

between

Security Insurance Company of Hartford
The Fire & Casualty Insurance Company of Connecticut
The Connecticut Indemnity Company
(each individually and collectively the "Company")

and

Commercial Risk Re-Insurance Company
South Burlington, Vermont

Under the terms of the Contract which is attached to this Agreement, the Reinsurer agrees to participate in a twenty percent (20%) share of the interests and liabilities of the Company as described therein.

IN WITNESS WHEREOF, the parties have signed this Interests and Liabilities Agreement effective as of the Inception Date set forth in the Contract.

Security Insurance Company of Hartford
for and on behalf of the other above-named ceding companies

By _____
Name: Stephen M. Mulvey
Title: Vice President

**Commercial Risk Re-Insurance Company**

By _____
Michael Lipkin
Senior Vice President

24          PRINTED: 28 February 2001; 4:05 PM