**EXHIBIT 11**

# STROOCK

By UPS

January 25, 2006

Michele L. Jacobson
Direct Dial 212-806-6067
Direct Fax 212-806-9067
MJacobson@stroock.com

Mr. David Thirkill
24 Powder Hill Road
Bedford, New Hampshire 03110-4845

Re:    In the Matter of the Arbitration between Security Insurance
       Company of Hartford (Itself, and as Successor in Interest to The Fire and
       Casualty Insurance Company of Connecticut, The Connecticut Indemnity
       Company and Employee Benefits Insurance Company) and Commercial Risk
       Reinsurance Company Limited (Bermuda) and Commercial Risk Re-Insurance
       Company (Vermont)

Dear Mr. Thirkill:

The undersigned lawyers represent the same Claimants and Respondents in a second
arbitration on other contracts. As part of the panel selection process for this arbitration,
the parties have agreed to submit the enclosed questionnaire to the umpire candidates.
Please note that this questionnaire is substantially similar to that which you recently
filled out for the first arbitration. The only additional information required for this
arbitration is in paragraphs 9 and 13, so if your answers to the other questions have not
changed, please provide only the information requested in those paragraphs. We
request that you return this questionnaire within seven days to the undersigned counsel.
However, if you do not wish to be considered further for the position of umpire on this
panel, we would appreciate it if you could inform us as soon as possible in order that a
substitute nominee may be selected and we may send a questionnaire to him or her.

The parties have also agreed that there should be no *ex parte* contact with the umpire
candidates regarding this arbitration in connection with this selection process. They
have represented to each other that they have had no such contact with any of the
candidates they have nominated. If there is a question concerning this questionnaire,
we would appreciate it if you could present it to both sides in a joint communication
by, for example, e-mail, fax or a telephone conference.

STROOCK & STROOCK & LAVAN LLP · NEW YORK · LOS ANGELES · MIAMI
180 MAIDEN LANE, NEW YORK, NY 10038-4982 TEL 212.806.5400 FAX 212.806.6006 WWW.STROOCK.COM

Mr. David Thirkill
January 25, 2006
Page 2

We thank you in advance for your time and effort in completing this questionnaire, and
we will inform you as promptly as we can regarding the selection made pursuant to the
arbitration agreement in the treaties involved, as amended by agreement of the parties.

Respectfully submitted,

Michele L. Jacobson
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038
(212) 806-6067
(212) 806-9067 (facsimile)
mjacobson@stroock.com
Counsel For Claimant


John P. Higgins
D'Amato & Lynch
70 Pine Street
New York, New York 10270
(212) 269-0927
(212) 269-3559
jhiggins@damato-lynch.com
Counsel for Respondents


MLJ:mr
Encl.
cc:    Martin D. Haber
       Theodor Dielmann


SSL-DOCS2 70262236v1

# STROOCK

By UPS

January 25, 2006

Michele L. Jacobson
Direct Dial  212-806-6067
Direct Fax  212-806-9067
MJacobson@stroock.com

Mr. Clive Becker-Jones
Gleneagle Management Inc.
11 Gleneagle Drive
Bedford, New Hampshire 03110

Re:    In the Matter of the Arbitration between Security Insurance
       Company of Hartford (Itself, and as Successor in Interest to The Fire and
       Casualty Insurance Company of Connecticut, The Connecticut Indemnity
       Company and Employee Benefits Insurance Company) and Commercial Risk
       Reinsurance Company Limited (Bermuda) and Commercial Risk Re-Insurance
       Company (Vermont)

Dear Mr. Becker-Jones:

We would like to thank you for participating in the umpire selection process for the above-captioned dispute, but regret to inform you that you were not chosen as the umpire.    However, the undersigned lawyers represent the same Claimants and Respondents in a second arbitration on other contracts.  As part of the panel selection process for this arbitration, the parties have agreed to submit the enclosed questionnaire to the umpire candidates.  Please note that this questionnaire is substantially similar to that which you recently filled out for the first arbitration.    The only additional information required for this arbitration is in paragraphs 9 and 13, so if your answers to the other questions have not changed, please provide only the information requested in those paragraphs.  We request that you return this questionnaire within seven days to the undersigned counsel.  However, if you do not wish to be considered further for the position of umpire on this panel, we would appreciate it if you could inform us as soon as possible in order that a substitute nominee may be selected and we may send a questionnaire to him or her.

The parties have also agreed that there should be no *ex parte* contact with the umpire candidates regarding this arbitration in connection with this selection process.  They have represented to each other that they have had no such contact with any of the candidates they have nominated.  If there is a question concerning this questionnaire,

SSL-DOCS2 70262245v1

Mr. Clive Becker-Jones
January 25, 2006
Page 2

we would appreciate it if you could present it to both sides in a joint communication by, for example, e-mail, fax or a telephone conference.

We thank you in advance for your time and effort in completing this questionnaire, and we will inform you as promptly as we can regarding the selection made pursuant to the arbitration agreement in the treaties involved, as amended by agreement of the parties.

Respectfully submitted,

Michele L. Jacobson
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038
(212) 806-6067
(212) 806-9067 (facsimile)
mjacobson@stroock.com
Counsel For Claimant

John P. Higgins
D'Amato & Lynch
70 Pine Street
New York, New York 10270
(212) 269-0927
(212) 269-3559
jhiggins@damato-lynch.com
Counsel for Respondents

MLJ:mr
Encl.
cc:    Martin D. Haber
       Theodor Dielmann

SSL-DOCS2 70262245v1

# STROOCK

By UPS

January 25, 2006

Michele L. Jacobson
Direct Dial  212-806-6067
Direct Fax  212-806-9067
MJacobson@stroock.com

J.M. Nessi
NessPa Holdings
73 Avenue Mozart 75016
Paris, France

Re:    In the Matter of the Arbitration between Security Insurance
       Company of Hartford (Itself, and as Successor in Interest to The Fire and
       Casualty Insurance Company of Connecticut, The Connecticut Indemnity
       Company and Employee Benefits Insurance Company) and Commercial Risk
       Reinsurance Company Limited (Bermuda) and Commercial Risk Re-Insurance
       Company (Vermont)

Dear Mr. Nessi:

We would like to thank you for participating in the umpire selection process for the
above-captioned dispute, but regret to inform you that you were not chosen as the
umpire.    However, the undersigned lawyers represent the same Claimants and
Respondents in a second arbitration on other contracts.  As part of the panel selection
process for this arbitration, the parties have agreed to submit the enclosed questionnaire
to the umpire candidates.  Please note that this questionnaire is substantially similar to
that which you recently filled out for the first arbitration.    The only additional
information required for this arbitration is in paragraphs 9 and 13, so if your answers to
the other questions have not changed, please provide only the information requested in
those paragraphs.  We request that you return this questionnaire within seven days to
the undersigned counsel.  However, if you do not wish to be considered further for the
position of umpire on this panel, we would appreciate it if you could inform us as soon
as possible in order that a substitute nominee may be selected and we may send a
questionnaire to him or her.

The parties have also agreed that there should be no *ex parte* contact with the umpire
candidates regarding this arbitration in connection with this selection process.  They
have represented to each other that they have had no such contact with any of the
candidates they have nominated.  If there is a question concerning this questionnaire,

SSL-DOCS2 70262257v1

J.M. Nessi
January 25, 2006
Page 2

we would appreciate it if you could present it to both sides in a joint communication by, for example, e-mail, fax or a telephone conference.

We thank you in advance for your time and effort in completing this questionnaire, and we will inform you as promptly as we can regarding the selection made pursuant to the arbitration agreement in the treaties involved, as amended by agreement of the parties.

Respectfully submitted,

Michele L. Jacobson
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038
(212) 806-6067
(212) 806-9067 (facsimile)
mjacobson@stroock.com
Counsel For Claimant

John P. Higgins
D'Amato & Lynch
70 Pine Street
New York, New York 10270
(212) 269-0927
(212) 269-3559
jhiggins@damato-lynch.com
Counsel for Respondents

MLJ:mr
Encl.
cc:    Martin D. Haber
       Theodor Dielmann

SSL-DOCS2 70262257v1

# STROOCK

By UPS

January 25, 2006

Michele L. Jacobson
Direct Dial  212-806-6067
Direct Fax  212-806-9067
MJacobson@stroock.com

Mr. Francois Negrier
42 Bvard Richard Lenoir
Paris, France 75011

Re:    In the Matter of the Arbitration between Security Insurance
Company of Hartford (Itself, and as Successor in Interest to The Fire and
Casualty Insurance Company of Connecticut, The Connecticut Indemnity
Company and Employee Benefits Insurance Company) and Commercial Risk
Reinsurance Company Limited (Bermuda) and Commercial Risk Re-Insurance
Company (Vermont)

Dear Mr. Negrier:

The undersigned lawyers represent the same Claimants and Respondents in a second
arbitration on other contracts.  As part of the panel selection process for this arbitration,
the parties have agreed to submit the enclosed questionnaire to the umpire candidates.
We request that you complete this questionnaire within seven days and return it to the
undersigned counsel.  However, if you do not wish to be considered further for the
position of umpire on this panel, we would appreciate it if you could inform us as soon
as possible in order that a substitute nominee may be selected and we may send a
questionnaire to him or her.

The parties have also agreed that there should be no *ex parte* contact with the umpire
candidates regarding this arbitration in connection with this selection process.  They
have represented to each other that they have had no such contact with any of the
candidates they have nominated.  If there is a question concerning this questionnaire,
we would appreciate it if you could present it to both sides in a joint communication
by, for example, e-mail, fax or a telephone conference.

SSL-DOCS2 70262246v1

Mr. Francois Negrier
January 25, 2006
Page 2


We thank you in advance for your time and effort in completing this questionnaire, and we will inform you as promptly as we can regarding the selection made pursuant to the arbitration agreement in the treaties involved, as amended by agreement of the parties.

Respectfully submitted,

Michele L. Jacobson
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038
(212) 806-6067
(212) 806-9067 (facsimile)
mjacobson@stroock.com
Counsel For Claimant



John P. Higgins
D'Amato & Lynch
70 Pine Street
New York, New York 10270
(212) 269-0927
(212) 269-3559
jhiggins@damato-lynch.com
Counsel for Respondents


MLJ:mr
Encl.
cc:    Martin D. Haber
       Theodor Dielmann


SSL-DOCS2 70262246v1

# STROOCK

By UPS

January 25, 2006

Michele L. Jacobson
Direct Dial  212-806-6067
Direct Fax  212-806-9067
MJacobson@stroock.com

Mr. Ronald S. Gass
The Gass Company, Inc.
59 Ravenwood Drive
Weston, Connecticut 06883-1410

Re:    In the Matter of the Arbitration between Security Insurance
       Company of Hartford (Itself, and as Successor in Interest to The Fire and
       Casualty Insurance Company of Connecticut, The Connecticut Indemnity
       Company and Employee Benefits Insurance Company) and Commercial Risk
       Reinsurance Company Limited (Bermuda) and Commercial Risk Re-Insurance
       Company (Vermont)

Dear Mr. Gass:

We would like to thank you for participating in the umpire selection process for the
above-captioned dispute, but regret to inform you that you were not chosen as the
umpire.  However, the undersigned lawyers represent the same Claimants and
Respondents in a second arbitration on other contracts. As part of the panel selection
process for this arbitration, the parties have agreed to submit the enclosed questionnaire
to the umpire candidates. Please note that this questionnaire is substantially similar to
that which you recently filled out for the first arbitration.  The only additional
information required for this arbitration is in paragraphs 9 and 13, so if your answers to
the other questions have not changed, please provide only the information requested in
those paragraphs. We request that you return this questionnaire within seven days to
the undersigned counsel. However, if you do not wish to be considered further for the
position of umpire on this panel, we would appreciate it if you could inform us as soon
as possible in order that a substitute nominee may be selected and we may send a
questionnaire to him or her.

The parties have also agreed that there should be no *ex parte* contact with the umpire
candidates regarding this arbitration in connection with this selection process. They
have represented to each other that they have had no such contact with any of the
candidates they have nominated. If there is a question concerning this questionnaire,

SSL-DOCS2 70262231v1

STROOCK & STROOCK & LAVAN LLP · NEW YORK · LOS ANGELES · MIAMI
180 MAIDEN LANE, NEW YORK, NY 10038-4982 TEL 212.806.5400 FAX 212.806.6006 WWW.STROOCK.COM

Mr. Ronald S. Gass
January 25, 2006
Page 2

we would appreciate it if you could present it to both sides in a joint communication by, for example, e-mail, fax or a telephone conference.

We thank you in advance for your time and effort in completing this questionnaire, and we will inform you as promptly as we can regarding the selection made pursuant to the arbitration agreement in the treaties involved, as amended by agreement of the parties.

Respectfully submitted,

Michele L. Jacobson
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038
(212) 806-6067
(212) 806-9067 (facsimile)
mjacobson@stroock.com
Counsel For Claimant

John P. Higgins
D'Amato & Lynch
70 Pine Street
New York, New York 10270
(212) 269-0927
(212) 269-3559
jhiggins@damato-lynch.com
Counsel for Respondents

MLJ:mr
Encl.
cc:    Martin D. Haber
       Theodor Dielmann

SSL-DOCS2 7026223Iv1

```
                                                        x
In the Matter of the Arbitration of                    :
                                                        :
SECURITY INSURANCE COMPANY OF                           :
HARTFORD itself and as successor in interest to         :
THE FIRE AND CASUALTY INSURANCE                         :
COMPANY OF CONNECTICUT, THE                             :
CONNECTICUT INDEMNITY COMPANY, and                      :
EMPLOYEE BENEFITS INSURANCE                             :
COMPANY,                                                :
                                                        :
                       Claimant,                        :
            - against –                                 :
                                                        :
COMMERCIAL RISK REINSURANCE                             :
COMPANY LIMITED (BERMUDA) and                           :
COMMERCIAL RISK RE-INSURANCE                            :
COMPANY (VERMONT),                                      :
                                                        :
                       Respondents.                     :
                                                        x
```

## UMPIRE QUESTIONAIRRE

To assist the parties in evaluating the qualifications of persons nominated to serve as umpire in the arbitration between the parties listed above, and to identify any potential conflict of interest, please supply the following information.

1.  Name: _____

Company: _____

Address: _____

Telephone: _____

Home Address: _____

Home Telephone: _____

2. CURRENT EMPLOYMENT (Position and Length of Employment).

Position Title: _____

Length of Employment:_____

Principal Duties: _____

PAST QUALIFYING EMPLOYMENT (if not currently an officer of an insurance or reinsurance company).

_____
_____
_____
_____
_____
_____

Please attach a resume or curriculum vitae.


3. Are you presently or have you ever been an employee, officer, director, shareholder, agent or consultant of any of the parties listed below, or of such parties' subsidiaries, affiliates or parent companies.

Security Insurance Company of Hartford
The Fire and Casualty Insurance Company of Connecticut
The Connecticut Indemnity Company
Employee Benefits Insurance Company
Royal & Sun Alliance
ARTIS Group
The SCOR Group
Commercial Risk Reinsurance Company Limited (Bermuda)
Commercial Risk Re-Insurance Company (Vermont)


[ ] Yes [ ] No

If yes, please explain.


_____
_____
_____


4. Have you ever served as an arbitrator, umpire, attorney, or expert witness in a matter involving any of the parties listed above or any subsidiaries, affiliates or parent companies of such parties?

[ ] Yes [ ] No

-2-

SSL-DOCS2 70261663v1

8. To your knowledge, do any of companies with which you are presently affiliated or in which you presently have a financial interest have an ongoing business relationship with any of the parties and/or affiliates listed above?

[ ] Yes [ ] No

If yes, please explain.

_____
_____
_____

9. Have you ever had any involvement in an insurance or reinsurance transaction or dispute involving any of the specific claims, policies and/or treaties at issue in this matter as listed below?

This arbitration involves whether payments made by Security Insurance Company of Hartford itself and as Successor in Interest to The Fire and Casualty Insurance Company of Connecticut, The Connecticut Indemnity Company, and Employee Benefits Insurance Company ("Claimant") for losses incurred in connection with the ORS Workers Compensation Fund, the HPP Workers' Compensation Program and the NHE Workers' Compensation Program (including the CraneComp, Horizon Workers' Compensation Program and Transportation Group Programs) are reimbursable to Claimant, pursuant to the terms of separate reinsurance agreements issued to Claimants by Commercial Risk Reinsurance Company Limited (Bermuda) and Commercial Risk Re-Insurance Company (Vermont) for each program.

[ ] Yes [ ] No

If yes, please explain.

_____
_____
_____

10. Have you ever served on an arbitration panel with Martin Haber?

[ ] Yes [ ] No

If yes, for each such arbitration, state the approximate date of commencement and termination (or whether still pending) and the respective capacities in which you and Martin Haber acted, i.e., as arbitrator or umpire.

_____
_____
_____

11. Have you ever served on an arbitration panel with Theodor Dielmann?

[ ] Yes [ ] No

If yes, for each such arbitration, state the approximate date of commencement and termination (or whether still pending) and the respective capacities in which you and Theodor Dielmann acted, i.e., as arbitrator or umpire.

_____

_____

_____

_____

12. Have you ever served as an arbitrator, umpire, expert witness or consultant in an arbitration or litigation at the request of any counsel involved in this arbitration?

D'Amato & Lynch

Stroock & Stroock & Lavan LLP

[ ] Yes [ ] No

If yes, identify counsel and disclose type of service and approximate date so engaged.

_____

_____

_____

_____

13. This arbitration involves whether payments made by Security Insurance Company of Hartford itself and as Successor in Interest to The Fire and Casualty Insurance Company of Connecticut, The Connecticut Indemnity Company, and Employee Benefits Insurance Company ("Claimant") for losses incurred in connection with the ORS Workers Compensation Fund, the HPP Workers' Compensation Program and the NHE Workers' Compensation Program (including the CraneComp, Horizon Workers' Compensation Program and Transportation Group Programs) are reimbursable to Claimant, pursuant to the terms of separate reinsurance agreements issued to Claimants by Commercial Risk Reinsurance Company Limited (Bermuda) and Commercial Risk Re-Insurance Company (Vermont) for each program.

Would these facts or circumstances prevent you from rendering an unbiased decision in this arbitration?

[ ] Yes [ ] No

If yes, please explain.

_____
_____
_____
_____

14. Are you aware of any facts or circumstances which (1) might impair your ability to serve or (2) might create an appearance of partiality on your part in the above-captioned arbitration?

[ ] Yes [ ] No

If yes, please explain.

_____
_____
_____
_____

15. Please list dates that you are unavailable to serve as an umpire in this arbitration over the next 18 months.

_____
_____
_____
_____

Signature: _____
Date: _____

-6-

# EXHIBIT 12

-----Original Message-----
*From: David Thirkill [mailto:coomac@comcast.net]*
*Sent: Wednesday, March 01, 2006 1:13 PM*
*To: John Higgins; Lewin, Robert; Jacobson, Michele L.*
*Cc: Martin D Haber; theo*
*Subject: Re: Royal (Security of Harfford) v SCOR (Commercial Risk) - 2nd*

*Dear Counsel,*

*I have been informed by Marty and Theo of my appointment as Umpire in
this "second" matter. They advised me it is the other matter between
the parties (and the same cast) as was referred to during disclosures
at our recent Organizational Meeting. I am, of course, very thankful
that you wish me to play the same role in this second matter. I would
ask counsel to advise me as to what caption to use for the second
matter.*

*As you are aware, we (the panel in the first matter) had planned a
telephonic conference call to discuss security on March 28. It seems
that we would all be available the whole of that week, other than
Monday - and Mr Dielmann will be in the US. Accordingly, and if it is
suitable to you all (I recognize the relative short notice) we could
hold an Organizational Meeting on any of the 28th through the 31st (the
28th being preferable) and then also have an in person hearing on the
security issue. In fact you could both have an opportunity to make oral
arguments if you chose.*

*Please get back to me soonest. Perhaps you could confer on that and
venue. We would use the same agenda format.*

*As before, we would request that counsel submit Position Statements to
us no later than a week before the selected date (by email with hard
copy by overnight).*

*Thank you.*

*For the Panel.*

*David A Thirkill*

*Umpire*

# EXHIBIT 13

1

```
1
2    - - - - - - - - - - - - - - - - - - - - - x
3         In the Matter of the Arbitration
4                   -of-
5    SECURITY INSURANCE COMPANY OF HARTFORD Itself
     and as Successor in Interest to THE FIRE AND
6    CASUALTY INSURANCE COMPANY OF CONNECTICUT and
     THE CONNECTICUT INDEMNITY COMPANY,
7
              Claimant,
8
         -against-
9
     COMMERCIAL RISK REINSURANCE COMPANY LIMITED
10   (BERMUDA) and COMMERCIAL RISK RE-INSURANCE
     COMPANY (VERMONT),
11
         (Non-DIG Arbitration) Respondents.
12
     - - - - - - - - - - - - - - - - - - - - - x
13
                   March 28, 2006
14                 10:05 a.m.
15                 Stroock & Stroock & Lavan LLP
                   180 Maiden Lane
16                 New York, New York
17
             ORGANIZATIONAL MEETING
18   BEFORE:
19
20       DAVID A. THIRKILL, Umpire
21
         MARTIN D. HABER, ESQ., Arbitrator
22
         THEODOR DIELMANN, Arbitrator
23
24   Reported by:
25   ANDREW WALKER, RPR (1991)
```

2

```
1
2    A P P E A R A N C E S :
3
4    STROOCK & STROOCK & LAVAN LLP
         Attorneys for Claimant
5        180 Maiden Lane
         New York, New York  10038-4982
6
     BY:  MICHELLE L. JACOBSON, ESQ.
7         ANDREW LEWNER, ESQ.
8
     D'AMATO & LYNCH
9        Attorneys for Respondents
10       70 Pine Street
         New York, New York  10270
11
     BY:  JOHN P. HIGGINS, ESQ.
12
13
     ALSO PRESENT:
14
         JAMES F. MEEHAN, ESQ.
15       Vice President and General Counsel
         Royal & SunAlliance USA
16
         ANDRE LEFEBVRE
17       Financial Risk Officer
         Royal & SunAlliance USA
18
         JOELLE de LACROIX
19       CRP
20
21
22
23
24
25
```

3

```
1
2
3             THE UMPIRE:  Let's go on the
4    record.
5             Good morning, ladies and
6    gentlemen.  This is the organizational
7    meeting of a dispute between Security
8    of Hartford Insurance Company and
9    Commercial Risk Reinsurance Company
10   Limited, and I think we've all agreed to
11   caption this as, in parentheses,
12   "Non-DIG" to distinguish it from another
13   dispute between the parties which have,
14   in effect, the same cast of characters
15   if different underlying contracts.
16            I think everybody has got a copy
17   of an agenda that was circulated and, if
18   so, we could move straight to that
19   agenda and item 1, "Disclosures."
20            The panel, if it's okay with you,
21   would like to use the same disclosures
22   as was disclosed at the previous hearing
23   on the DIG matter.  The obvious only
24   update is that whereas before you had
25   not secured an umpire, in this matter
```

4

```
1    Proceedings - 3/28/06
2    obviously now you have, and it's me.  I
3    have no additional disclosures to that.
4             If none of the other panelists
5    do --
6             MR. HABER:  I have no further
7    disclosures.
8             MR. DIELMANN:  No, none either.
9             THE UMPIRE:  Would that be
10   acceptable to the parties?
11            MS. JACOBSON:  Yes, that's
12   acceptable.
13            MR. HIGGINS:  Yes.
14            THE UMPIRE:  So I thus assume
15   there's no questions of the panel in
16   relation to those disclosures.  And
17   would, therefore, ask you to formally
18   accept the panel as it is.
19            MS. JACOBSON:  We accept the panel
20   on behalf of the claimant.
21            MR. HIGGINS:  We do on behalf of
22   respondent.
23            THE UMPIRE:  May I take this
24   opportunity, I understand that there's
25   been some family situation with Mr. --
```

5

1        Proceedings - 3/28/06
2    Bob Lewin, and the panel would like to
3    pass on condolences to him in that
4    regard.
5        MS. JACOBSON: I will pass those
6    along, thank you.
7        THE UMPIRE: I think we had a hold
8    harmless at the last hearing.
9    Presumably somebody's prepared one on a
10   similar basis.
11       MS. JACOBSON: We have.
12       MR. LEWNER: Yes.
13       THE UMPIRE: Go off the record for
14   a second.
15       (Pause in the proceedings)
16       THE UMPIRE: Back on the record.
17       Just for the record, during the
18   break the parties signed – the parties
19   and the panel signed both the hold
20   harmless and a confidentiality
21   agreement.
22       Before we go on to brief
23   statements, what we'd like to do is to
24   go through this organizational meeting
25   and then adjourn that and then stay on

7

1    arbitration, in reality it's really
2    three separate programs, NHE, ORS and
3    HPP, that are all governed by separate
4    reinsurance contracts. Commercial Risk
5    has failed to make payments under three
6    separate reinsurance agreements which
7    covered business written by three
8    program managers with three separate
9    sets of facts. What's notable, really,
10   about Commercial Risk's position
11   statement is what it doesn't say.
12   Although paying lip service to the
13   notion that it's going to satisfy its
14   obligations under the reinsurance
15   agreements, it hasn't done that.
16       Despite the fact that Commercial
17   Risk has been in and audited, it does
18   not share the audit with the panel or
19   with the claimant. What's plain is that
20   Commercial Risk really doesn't have a
21   position, they only intend to use this
22   arbitration proceeding as a means to go
23   fish.
24       We will show that Commercial Risk,
25

6

1        Proceedings - 3/28/06
2    the record for some questions in
3    relation to the security issue, and then
4    we'll go off that record and the panel
5    will meet, and, if necessary, discuss
6    security related to both matters since
7    from a principle viewpoint we believe
8    that the issues are the same.
9        That's what we'd like to do if
10   that's okay with you.
11       MS. JACOBSON: That's fine.
12       MR. HIGGINS: That's fine with us.
13       THE UMPIRE: Thank you.
14       So if we move on, obviously – and
15   thank you, the panel would like to thank
16   the parties for the position statements
17   received, I think they were very clear,
18   as were the exhibits. If you'd like to
19   add anything to it, you should go ahead.
20       MS. JACOBSON: Okay.
21       At the outset – I would like to
22   thank the panel for hearing this matter.
23       At the outset, I want to make
24   clear that although we've been referring
25   to this arbitration as the non-DIG

8

1        Proceedings - 3/28/06
2    contrary to their position statement,
3    was very involved in these three
4    programs, and that their underwriter
5    participated in joint audits with
6    Security of Hartford. Commercial Risk
7    was in large measure the risk bearer and
8    took that role very seriously. If
9    anyone is an ostrich--and I've taken
10   that from their position
11   statement--that's Commercial Risk now
12   and not Commercial Risk at the time.
13   These reinsurance agreements were all
14   terminated or expired by June 30th of
15   '02 and if, in fact, there were
16   problems, why does it take so long for
17   them to complain?
18       We've asked for prehearing
19   collateral. I don't know if the panel
20   would like me to address that now, but
21   as set forth in our papers, we are
22   seeking security in connection with this
23   proceeding.
24       THE UMPIRE: Unless my
25   co-panelists have another decision, if

9

Proceedings - 3/28/06

1

2  you're talking in a principle sense,
3  keep going; if you want to get into
4  details, why don't you leave that to the
5  post-organizational meeting discussion I
6  referred to earlier.
7      MS. JACOBSON: Okay. Well, in
8  essence, our contention is that under
9  the reinsurance contracts, each
10  reinsurance contract, there is a
11  provision for security that is
12  unconditional, it's not conditioned on
13  there not being any disputes. So
14  irrespective of whether or not we are in
15  an arbitration proceeding, Commercial
16  Risk is required to post that as a
17  contractual matter. We are seeking that
18  security now, we're calling it
19  prehearing security but, in essence,
20  it's a contractual right which is
21  unconditional, and if the panel would
22  like, I can set aside the numbers
23  discussion for later on.
24      THE UMPIRE: Please.
25      MS. JACOBSON: Thank you.

10

Proceedings - 3/28/06

1

2      THE UMPIRE: Thank you.
3      MR. HIGGINS: We also would like
4  to thank the panel for attention.
5      We agree there are three separate
6  contracts, three separate contractual
7  agreements, but we take serious issue
8  with an implication that we're fishing
9  here. We did take a limited audit, and
10  that limited audit disclosed several
11  irregularities, to put it mildly, in the
12  underwriting. And those, although there
13  isn't a formal report of this
14  arbitration, we did share the
15  conclusions in broad terms. As a matter
16  of fact, a lot of it has to do with
17  referrals and that sort of thing, and a
18  statement was made by RSA that those
19  referral documents and all the issues
20  relating to the referral question would
21  be delivered to us last year, and we're
22  still waiting for them. So to suggest
23  that we're fishing is, I think, not
24  correct, and shouldn't be given any
25  weight by the panel.

11

Proceedings - 3/28/06

1

2      In terms of the contractual right
3  to security, I think we can get into the
4  details of it later. The only statement
5  we made in support of it at this stage
6  by Security is--I think there are too
7  many "securitys" here, but by
8  Security--is the contractual obligation.
9  They, in fact, made three arguments; I
10  don't know whether you want me to deal
11  with those at this stage as a matter of
12  principle. I'm happy to if that's the
13  panel's wish.
14      THE UMPIRE: Go ahead.
15      MR. HIGGINS: To begin with,
16  they've cited Section 13 -- was it?
17      MS. JACOBSON: 1213.
18      MR. HIGGINS: -- 1213 of the
19  New York Insurance Law. This has never
20  been used by an arbitration panel. It
21  is clear as to why it's never been used
22  by an arbitration panel because it only
23  applies to court proceedings. All the
24  cases cited are court proceedings,
25  there's no case that's been cited where

12

Proceedings - 3/28/06

1

2  the arbitration panel ordered the
3  security under 1213 and then the court
4  approved the arbitrators' act.
5      They're all cases where there was
6  a court proceeding, whether it's a
7  confirmation of an arbitration award or
8  a motion to compel arbitration, but
9  there, in every case, is a court
10  proceeding and the judge orders the
11  security to be put up. There's no
12  connection there. And that is a
13  clear -- clearly stated in Section 1213
14  because it refers to the proceeding in
15  which the court or the court where the
16  proceeding is pending, so you don't have
17  an arbitration pending before a court,
18  you may have aspects of it but not the
19  arbitration before the court.
20      Secondly, it's clear that the
21  monies are to be paid into the clerk of
22  the court, and that would only apply to
23  a court proceeding, not to an
24  arbitration proceeding. So it's clear
25  that -- and there's no support for this,

13

1        Proceedings - 3/28/06
2    it's clear that that section is utterly
3    irrelevant to this proceeding.
4        THE UMPIRE: Hold a second.
5        (Discussion off the record)
6        THE UMPIRE: I think it would
7    probably be efficient if we ask
8    questions as we go along, if that's okay
9    with the panel.
10       MR. HIGGINS: That's fine.
11       MR. HABER: Would you mind looking
12   at Exhibit B of Security's reply brief,
13   please.
14       MS. JACOBSON: It's also in our --
15       MR. HIGGINS: The new one?
16       MR. LEWNER: Yes.
17       MR. HABER: The case is American
18   Centennial versus Seguros la Republica.
19       MR. HIGGINS: That's it.
20       And what's the question?
21       MR. HABER: Well, I'm looking --
22   your position, if I understand it
23   correctly, is 1213 does not apply to
24   arbitrations.
25       MR. HIGGINS: Right.

14

1        Proceedings - 3/28/06
2        MR. HABER: Second column of the
3    first page of that says, and I'm reading
4    in the second full paragraph, second to
5    the last sentence, "The contention that
6    the legislature did not intend 1213 to
7    apply to reinsurance must be rejected.
8    In addition, the language of the statute
9    is clear that it applies broadly to any
10   proceeding, including an arbitration
11   proceeding. Accordingly, based on our,"
12   and then there's another citation to
13   1213(c)(1)," "Accordingly, based on our
14   review of this issue, we find no error
15   in the magistrate judge's recommendation
16   and, therefore adopt, that
17   recommendation in full."
18       Please explain how this case is
19   distinguished and supports your position
20   that 1213 doesn't apply to arbitration.
21       MR. HIGGINS: Well, it does
22   broadly, as this says, apply to
23   arbitrations in the sense that once it
24   gets to court, just the fact that an
25   underlying procedure is arbitration

15

1        Proceedings - 3/28/06
2    wouldn't alter the fact, but the judge
3    here ordered the security. It hadn't
4    been, it hadn't been -- the order hadn't
5    been issued by an arbitration panel so
6    we don't have a situation where the
7    arbitration panel ordered it under 1213,
8    so that -- well, number one, that issue
9    would be dicta, but number two --
10       MR. HABER: Yeah?
11       MR. HIGGINS: -- number two, this
12   is an underlying procedure, proceeding,
13   this arbitration. And as I said, there
14   are cases where you had a confirmation
15   proceeding in court and before the court
16   would allow a response to the
17   confirmation proceeding, the court
18   ordered that this security be put up
19   under 1213, and there have been cases
20   where there's a motion to compel
21   arbitration, there's very few cases, but
22   motion to compel arbitration where the
23   court ordered the security to be put up
24   before it would allow the respondent to
25   put in a response or an answer,

16

1        Proceedings - 3/28/06
2    pleading, which is what this refers to,
3    in the court.
4        MR. HABER: Okay. Could you now
5    go to Exhibit C, which is the next case,
6    which is Northwestern National v. Kansa
7    and I'm looking at the third page, first
8    column under "Request for Bond," and
9    this is the bond that Kansa is supposed
10   to post to security and the last two
11   sentences say, "Accordingly, the parties
12   are instructed to meet and attempt to
13   resolve the amount of the bond to be
14   posted by Kansa. If the parties are
15   unable to reach agreement within two
16   weeks from the date of this order, the
17   arbitration panel will then resolve the
18   issue."
19       How does that support your
20   position?
21       MR. HIGGINS: Well, not the issue
22   of whether there'd be security, just the
23   amount. So the court is ordering the
24   security under Section 1213, it isn't
25   assigning that job to the panel, which

17

1          Proceedings - 3/28/06
2    is what is being suggested by the
3    claimant.
4          MR. HABER:  Are you --
5          MR. HIGGINS:  All that the court
6    is assigning to the parties for
7    agreement or in default to the panel, is
8    the amount of the security.
9          MR. HABER:  I'm trying to
10   understand, so your argument is that it
11   is only a judge who may order the
12   posting of security, not this panel?
13         MR. HIGGINS:  Yes.
14         MR. HABER:  And your authority for
15   that position -- do you have affirmative
16   authority or are you just saying you
17   disagree with any reading of the cases
18   other than your interpretation?
19         MR. HIGGINS:  Well, I don't think
20   there is a disagreement with my
21   interpretation in terms of who ordered
22   the security.  Now, there are --
23         MR. HABER:  I'm going to go out --
24   your opposing counsel I think is.
25         MR. HIGGINS:  That there's

18

1          Proceedings - 3/28/06
2    security, that there's authority for an
3    arbitration panel ordering security?
4          MR. HABER:  You don't think
5    they've taken that position?
6          MR. HIGGINS:  They have taken that
7    position, there's no authority for it.
8    And I don't think you can read these
9    cases as a matter of fact to interpret
10   them that the panel issued the 1213
11   order and not a court.  In every case,
12   the court ordered the 1213.
13         MR. HABER:  Okay.
14         MR. HIGGINS:  And there is no
15   authority going the other way, simply
16   because the statute is clear.
17         MR. HABER:  Okay.
18         THE UMPIRE:  Let me see if I can
19   clarify that for my own mind.
20         It's your position that an
21   arbitration panel, per 1213, does not
22   have authority?
23         MR. HIGGINS:  Exactly.
24         THE UMPIRE:  Not an arbitration
25   panel doesn't have authority per se?

19

1          Proceedings - 3/28/06
2          MR. HIGGINS:  We don't contest
3    that.
4          THE UMPIRE:  Thank you.
5          MR. HIGGINS:  There are three
6    grounds here, that's one of them.
7          The second ground is the ground
8    that there's a contractual obligation,
9    and that was dealt with briefly by
10   Ms. Jacobson.  There's a number of
11   arguments against that.  The primary
12   argument is that that's final relief,
13   and until we have -- until we have a
14   hearing here, the panel shouldn't be in
15   the business of enforcing one provision
16   of the contract and refusing to enforce
17   the other provisions of the contract.
18   We say it's equally clear that these
19   contracts only cover business which is
20   written in accordance with the
21   underwriting guidelines.
22         Now, we have to prove that and
23   we'd like an opportunity to prove that,
24   but to say that one provision is clear
25   and, you know, object to the other

20

1          Proceedings - 3/28/06
2    provision is splitting the contract, and
3    that's final relief.  If we are ordered
4    to put up security at the end of the
5    case because the panel has determined
6    that it's part of the relief that
7    security should be granted, then that's
8    what we'll deal with at the time and
9    that's when we'll put up -- we're happy
10   to put up the security at that time.  We
11   don't think that at this stage we should
12   be looking at one aspect of the contract
13   and not at the other aspect.
14         Secondly, the clause only applies
15   to situations where credit for
16   reinsurance is a problem.  And there are
17   a number of reasons why we shouldn't be
18   thinking about prehearing security,
19   which presumably would be under the
20   control of the panel, as solving that
21   problem.  There's no contractual
22   requirement that we put up security that
23   is in the possession -- or under the
24   control of the panel, for the simple
25   reason that it wouldn't solve the credit

21

Proceedings - 3/28/06

1  Proceedings - 3/28/06
2  for reinsurance problem because if it's
3  not unconditional, then the state won't
4  accept it, it's got to be utterly
5  unconditional. So if the panel decides
6  that security is there and it can only
7  be paid over if the judgment provides
8  for that, which is the standard forms
9  for security under the ARIAS forms, then
10  that does Security no good.
11      Secondly, on that point, we don't
12  believe that there is an obligation
13  under the contract to provide security
14  for the amount that's being sought.
15  Number one, we question the number,
16  because we question our obligation in
17  light of the defenses that we have
18  raised.
19      Secondly, we question the number
20  based on the security that -- based on
21  the amount of letters of credit that
22  Security is showing on its Schedule F.
23  There is no penalty for this contract,
24  so if there's no penalty, then there's
25  no right to claim a right under the

23

1  Proceedings - 3/28/06
2  overpayment of premium, it's just not
3  covered by the treaty. And I think if
4  you push it all out and give us a credit
5  for the $4 million letter of credit, I'm
6  not sure that we owe them anything, even
7  under their interpretation.
8      The last argument that's made, and
9  we think it's libelous, is that
10  Commercial Risk doesn't have the
11  wherewithal to satisfy a $6 million
12  letter of credit. We think it's just
13  outrageous for a company like RSA to
14  make against Commercial Risk and
15  ultimately SCOR, to question the ability
16  of SCOR to satisfy a judgment. We trust
17  that that's an argument that's -- an
18  advocate, a lawyer would put forward and
19  not RSA, but it's kind of a sad
20  commentary when that sort of
21  bloody-minded attitude is put forth in
22  an arbitration. We have this much
23  security in these two big companies
24  going at each other for a paltry
25  $6 million, it's just, we think,

22

1  Proceedings - 3/28/06
2  contract for a letter of credit which
3  would cure the penalty. The fact that a
4  parent put up letters of credit we would
5  suggest is not a proper way to secure
6  under Schedule F. So the fact that they
7  have chosen to do this, and it cures
8  their problem, is not something that we
9  brought along. The problem is cured?
10  So be it.
11      The last item -- well, and also,
12  sorry, just to go back to that item, if
13  you look at the amounts claimed on the
14  schedule, number one, they keep
15  changing, and, number two, the schedule
16  is not understandable in terms of what
17  the security should be. It deals with
18  various items, premium items, claim
19  items, and, you know, there are negative
20  items on the funds held, there are
21  positive items on the amount of the
22  losses, Schedule F only deals with
23  losses, so we shouldn't -- you know, we
24  shouldn't be obligated to secure things
25  like return premium or, as they put it,

24

1  Proceedings - 3/28/06
2  outrageous.
3      Question was made as to whether a
4  an award would be enforceable in France.
5  That's unsupported by the claimant under
6  French law. I'm not an expert on French
7  law but I do know that France is a
8  signatory of the U.N. Convention for the
9  Enforcement of Foreign Arbitration
10  Awards, so, number one, there wouldn't
11  be any problem going to France and
12  getting it upheld and getting an order
13  confirming the award. As it wouldn't be
14  in this country if we had an arbitration
15  award in France. There's an assumption
16  that civilized countries should
17  recognize their judgments and also
18  should recognize their arbitration
19  awards. So we think that that is also a
20  fairly outrageous statement to make on
21  that issue.
22      And I think I had another point.
23  Also, a point was made that
24  there's a case that's been filed in, I
25  think Supreme Court New York, for an

25

1    Proceedings - 3/28/06
2    additional 55 million.
3        MR. LEWNER:  49.
4        MS. JACOBSON:  48.
5        MR. HIGGINS:  48, sorry.
6        That's -- you know, I think that's
7    utterly improper for anyone to suggest
8    that that has any relevance here.
9    Number one, it's not SCOR France, the
10   parent company, it's SCOR U.S.
11       Secondly, I think what's being
12   asked is for the panel to not only judge
13   this case but to judge that case as to
14   whether there's any merit to that claim
15   either.  We don't know what it's about.
16   I mean they claim they stopped paying
17   losses but, you know, who knows what
18   that dispute is about.  It's in court,
19   it's not an arbitration, and the panel
20   here really has no ability to analyze
21   it, to figure out whether it has any
22   application here or whether it affects
23   the ability of the parent company or
24   could affect the ability of the parent
25   company to satisfy this judgment which

26

1    Proceedings - 3/28/06
2    in this case is going to be, if they get
3    everything they want, $6 million, maybe
4    plus some interest.  So that's the
5    arguments we have on the security issue.
6        THE UMPIRE:  Thanks.
7        Any more questions of John
8    before -- Michelle?
9        MS. JACOBSON:  I believe that
10   Mr. Higgins has actually combined the
11   two security motions because a lot of
12   the references were actually to DIG and
13   I believe that we were here to discuss
14   the non-DIG programs, NHE, ORS and HPP.
15   However --
16       MR. HIGGINS:  I was mistaken, I
17   thought we were discussing -- we were
18   still in the organizational meeting when
19   we were discussing security.
20       THE UMPIRE:  Yes, we're still in
21   the organizational meeting.
22       MS. JACOBSON:  Right.
23       THE UMPIRE:  I understand that
24   there are perhaps some grayish and
25   blurry lines here when we're talking

27

1    Proceedings - 3/28/06
2    about security because we are going to
3    talk about security relative to both
4    contracts.
5        MS. JACOBSON:  Okay, well, Mr. --
6        THE UMPIRE:  I don't think that's
7    too much of a problem at the moment but
8    please go ahead.
9        MS. JACOBSON:  Okay.
10       First of all, with respect to
11   Mr. Higgins' attempt to parse the cases
12   with respect to Section 1213, that it
13   was ordered by the court and not the
14   arbitration panel, I thoroughly disagree
15   with that, we've only cited two cases,
16   there are more cases.
17       If you turn to the actual statute
18   that we've appended to our reply brief
19   with respect to the DIG motion, you will
20   see that, we turn to Exhibit A, page 16
21   of 19, see under "Bond or Deposit" in
22   general there is a series of cases which
23   deal with Section 1213, the first of
24   which is dealing with an arbitration
25   panel's interim order for prejudgment

28

1    Proceedings - 3/28/06
2    security.
3        THE UMPIRE:  Hold on, just a
4    second.
5        MS. JACOBSON:  That's the thin
6    one.
7        THE UMPIRE:  It's actually page 15
8    but at the top --
9        MS. JACOBSON:  Page 15 but it does
10   say page 16 of 19 at the top.
11       THE UMPIRE:  Okay.
12       MS. JACOBSON:  If you look to the
13   very first entry, there it is dealing
14   with an arbitration panel's interim
15   order, it was obviously being reviewed
16   by the court on prejudgment security.
17       So I think it is clear that 1213
18   does, in fact, apply to proceedings,
19   it's not limited to litigations, but in
20   any event, if I heard Mr. Higgins
21   correctly, he does not debate that the
22   panel has the inherent authority to
23   issue such awards, even if one were to
24   credit his argument under Section 1213.
25       Mr. Higgins' statement -- I'd like

29

Proceedings - 3/28/06
1
2    to respond to Mr. Higgins' statements
3    with respect to the contractual
4    provision. He's indicated that, in
5    essence, we're seeking final relief. I
6    mean that's not the case at all. In
7    both of our arbitration proceedings,
8    we're -- certainly we were entitled
9    under these provisions to completely
10   draw down on whatever we had, and we
11   haven't done so. We believe, however,
12   that these amounts should be set aside
13   in escrow, it's not akin to final
14   relief, and we would -- we assert that
15   the contract is clear that it does not
16   limit itself to matters not in dispute;
17   therefore, to the extent that we have
18   reserved and we have paid losses, and
19   that there is IBNR that we have set
20   aside, then they should post those sums
21   in an escrow amount per the terms of the
22   contract.
23       Mr. Higgins has discussed the
24   Schedule F. I think, frankly, that it's
25   shocking that Commercial Risk did not

30

Proceedings - 3/28/06
1
2    inform the panel that, indeed, it had
3    not posted the $29 million which appears
4    under LOCs. They know they haven't
5    posted that amount. In fact, there is
6    10.3 million that was as a result of
7    Royal's parent's LOC and to the extent
8    that Commercial Risk has contended that
9    in some regard that's improper, the
10   Delaware Insurance Department, which is
11   Royal Indemnity's domicile, has blessed
12   this very use of the parental LOC. It's
13   contained in the notes of the annual
14   statement of Royal Indemnity. So there
15   is nothing wrong with it.
16       However, they should not be
17   entitled to take credit for the parental
18   LOC that's out there. Their statement
19   that we solved the problem so that,
20   therefore, they don't have to abide
21   under their contractual obligations is
22   frankly -- I find it absurd.
23       Now, they express shock and dismay
24   over the fact that we said that they may
25   not have the wherewithal to satisfy any

31

Proceedings - 3/28/06
1
2    award here, and they said that they feel
3    it libelous. Well, to the extent that
4    we know that Commercial Risk has frankly
5    ceased paying on many millions of
6    dollars worth of obligations, we have a
7    problem with that. We don't think it's
8    libelous to assert that maybe that they
9    won't pay; their financial statements
10   show otherwise. They are relying
11   wholeheartedly on this guarantee that
12   has been posted by SCOR? Well, you
13   know, if you take a look at that
14   guarantee, it's addressed to whom it may
15   concern; that's not a contract that
16   anyone can rely on, to whom it may
17   concern.
18       And I would also indicate that if
19   you look at that SCOR guarantee, one of
20   them is dated July of '99. That's the
21   date of the first DIG contract that we
22   have. That parental guarantee is not
23   slapped on to the back of the
24   reinsurance contract, it is not our --
25   our reinsurance contract is with

32

Proceedings - 3/28/06
1
2    Commercial Risk, it's signed by
3    Commercial Risk and it's Commercial Risk
4    that we should look to to enforce any
5    obligations under the reinsurance
6    contract.
7        We, with all due respect, should
8    not have to go off to France to litigate
9    against the parent on a guarantee which
10   is certainly -- I'm not even sure if
11   it's a legal obligation under U.S. law
12   or French law.
13       And, certainly, I don't think that
14   Security Insurance Company of Hartford
15   should have to engage in ancillary
16   litigation in France to enforce
17   something here and that certainly
18   collateral should be posted.
19       MR. DIELMANN: I have a question.
20   Mr. Higgins said -- stated that there
21   are -- France is a signatory of the U.N.
22   agreement for enforcing arbitration
23   awards. Is this, indeed, correct, that
24   you have to go to France if the panel,
25   you know, gives you relief or can that

33

1   Proceedings - 3/28/06
2   award be enforced in this country?
3      MS. JACOBSON: Well, SCOR, the
4   parent, is not a party to this
5   arbitration. So if this panel -- this
6   panel would have to somehow suck SCOR,
7   the parent, into this arbitration on an
8   alter ego theory.
9      MR. DIELMANN: But is that not
10  then a formality to have it confirmed in
11  France? I mean what you are implying it
12  seems to me that you basically have to
13  struggle to get it enforced in France
14  but if SCOR is a signatory, then surely
15  the subsidiary -- you would have to just
16  to get it confirmed or do I understand
17  this incorrectly?
18     MS. JACOBSON: No, I believe, with
19  all due respect, I think you have it
20  incorrectly. I mean here SCOR is not a
21  party to this arbitration; they would
22  not -- there would not be an award
23  entered against SCOR in this arbitration
24  unless they're brought in as a party.
25  Therefore, there would be no award to

34

1   Proceedings - 3/28/06
2   enforce here or overseas against SCOR.
3   We would have to have an award against
4   Commercial Risk. If Commercial Risk
5   wouldn't pay, then we would be stuck
6   with that parental guarantee and have to
7   chase SCOR somewhere, either by
8   commencing arbitration against SCOR
9   somewhere or by litigating against SCOR
10  somewhere. That's the fear.
11     MR. HABER: Theo, isn't there a
12  simple solution. If SCOR voluntarily
13  wishes to submit to the jurisdiction of
14  this arbitration panel and be bound by
15  U.S. law and be subject to any judgment,
16  wouldn't that solve the problem?
17     MR. HIGGINS: That's something
18  that may well happen but I don't have
19  the authority, sitting here, to respond
20  to that, but I'm certainly willing to
21  respond to it in the next day or so.
22     THE UMPIRE: Let me make sure I
23  understand this, maybe I can --
24     MR. HIGGINS: I can assure you
25  that we didn't put that guarantee out as

35

1   Proceedings - 3/28/06
2   something which is illusory.
3      MR. HABER: Well, not --
4      MR. HIGGINS: To whom it may
5   concern is the world. It was sent to
6   RSA, it was sent to all the cedents.
7      MS. JACOBSON: With all due
8   respect, no one in our organization
9   recalls having been brought -- provided
10  with that.
11     THE UMPIRE: I tell you what,
12  let's move on, I'm happy with
13  understanding where I think we are.
14     MR. DIELMANN: I haven't really
15  understood what your suggestion, Marty,
16  was.
17     MR. HABER: Well, my suggestion is
18  this, under American laws with regard to
19  personal jurisdiction, because SCOR, the
20  parent, is not a party here, they are
21  not bound by anything legal.
22     MR. DIELMANN: Okay.
23     MR. HABER: They have signed a
24  judgment, they have signed an
25  arbitration treaty, if you will, that

36

1   Proceedings - 3/28/06
2   says in the event they lose an
3   arbitration in the United States and a
4   judgment is against the parent --
5      MR. DIELMANN: Right.
6      MR. HABER: -- that judgment may
7   be enforced in France, not a judgment
8   against their subsidiary.
9      MR. DIELMANN: Right.
10     MR. HABER: So your question, in
11  order to respond to your question
12  completely, they would have to be
13  subject to the jurisdiction of this
14  panel and they are not.
15     MR. DIELMANN: Okay.
16     MR. HABER: I mean no one here is
17  claiming that SCOR, the parent, is part
18  of this case.
19     MR. HIGGINS: No, we're not, but
20  it's certainly not clear that anyone
21  would have to go to France. SCOR's
22  doing business everywhere including
23  here.
24     THE UMPIRE: Let me say something
25  here for a second. As far as I

37

1       Proceedings - 3/28/06
2   understand it from following
3   Mr. Dielmann's question--I'll leave
4   Mr. Haber's question out of it for the
5   moment--in the event that this panel
6   found in favor of Security of Hartford,
7   that would be against Commercial Risk's
8   both Bermuda and Vermont --
9       MS. JACOBSON: That's right.
10      THE UMPIRE: -- where relevant.
11      If those companies -- and if there
12  were no security, with a small "S,"
13  posted, Security of Hartford would look
14  to Commercial Risk for satisfaction of
15  that award. In the event that
16  Commercial Risk failed to satisfy the
17  award, for whatever reason, it's
18  possible that Security could look to the
19  guarantee from SCOR as relief. In order
20  to satisfy that, it would need to write
21  to SCOR and say kindly pay us X amount
22  of dollars. If SCOR said, yes, end of
23  problem; if SCOR said no, however, then
24  I would imagine that Security of
25  Hartford would need to file litigation

38

1       Proceedings - 3/28/06
2   against SCOR, presumably in France,
3   under the terms of that guarantee.
4   Whether in France or the U.S., it would
5   need to file litigation, I'm just
6   assuming, but what I'm saying, it in
7   France; I would need to fight that
8   litigation in order to secure the award.
9       Is that a clear understanding of
10  that issue?
11      MS. JACOBSON: That is correct.
12      THE UMPIRE: As far as Mr. Haber's
13  question --
14      MR. HIGGINS: Well, could I
15  just --
16      THE UMPIRE: Go ahead.
17      MR. HIGGINS: One caveat to what
18  you just said. In the first instance,
19  it would be up to Security -- or, I'm
20  sorry, Commercial Risk to determine
21  whether they even satisfied the
22  judgment. I mean this is something that
23  only applies if there isn't enough
24  assets, and there's been no proof that
25  there isn't enough assets or that there

39

1       Proceedings - 3/28/06
2   won't be enough assets. You have to get
3   into the reserving of the company.
4       THE UMPIRE: In the event that
5   Commercial Risk paid the award that the
6   panel had given, it will be end of
7   story.
8       MR. HIGGINS: Yes.
9       THE UMPIRE: In the event that it
10  did not pay, for whatever reason,
11  whether it could, didn't want to or
12  couldn't because it was bust, makes no
13  difference.
14      MR. HIGGINS: I'm sorry, it does
15  make a difference on the first thing
16  that you said, because you can enforce
17  it against the company if they have the
18  funds. It's entitled to be entered in a
19  court and then enforced, entered as a
20  judgment and then enforced if they don't
21  want to pay. Now, if they're belly up,
22  then that would trigger what you're --
23      THE UMPIRE: Well, couldn't
24  Security pursue both angles --
25      MR. HIGGINS: Sure.

40

1       Proceedings - 3/28/06
2       THE UMPIRE: -- at the point in
3   time, i.e., pursue Commercial Risk,
4   let's assume that it's not in litigation
5   or even if it is, it's against the
6   receiver, and under the parental
7   guarantee, the guarantee I don't think
8   mentions the liquidation scenario, it's
9   just a blanket guarantee, what it's
10  worth is something else, I don't want to
11  get into that issue, but as a matter of
12  law, I think Security could pursue both
13  if they so choose?
14      MR. HIGGINS: If they believe that
15  it's clear that Commercial Risk can't
16  satisfy it, then they would be -- they
17  would be free to, you know, to litigate
18  under the guarantee and then pursue
19  rights against Security presumably at
20  the same time by filing a liquidation
21  proceeding or however. But the
22  guarantee is a standby, so, first,
23  they'd have to pursue Security, which is
24  normal, and if Security has sufficient
25  funds --

41

1          Proceedings - 3/28/06
2          THE UMPIRE:  You mean Commercial
3   Risk?
4          MR. HIGGINS:  I'm sorry, they have
5   to pursue Commercial Risk, and if
6   Commercial Risk has sufficient funds,
7   then they'd be obligated to pay them.
8          THE UMPIRE:  Thank you.
9          As far as Mr. Haber's question is
10  concerned, I would prefer that we didn't
11  raise the issue of bringing in any
12  parties yet until we've gone down
13  through stage one.  I think that's a
14  little premature and I'd like to have
15  panel discussion on that first which we
16  could -- I think that's --
17         MR. HABER:  That's perfectly fine
18  but I think when we deal with the
19  guarantee, and we're assuming facts not
20  in evidence, because it's not clear
21  under American law that this is a valid
22  guarantee, it might be under French law,
23  but we do not have an opinion of French
24  counsel that this is any sort of
25  enforceable guarantee because the first

42

1          Proceedings - 3/28/06
2   sentence says that "SCOR guarantees that
3   Commercial Risk Reinsurance Company,"
4   without determining which company,
5   "shall perform its claims obligations
6   when due."  If I understand this case,
7   there are two Commercial Risk
8   reinsurance companies, correct?
9          MR. HIGGINS:  Yes.
10         MR. HABER:  Which one does this
11  guarantee apply to?
12         MR. HIGGINS:  Both of them.
13         MR. HABER:  It doesn't say that,
14  they're two separate legal entities, you
15  have not specifically identified -- I
16  don't mean you personally, John, I don't
17  mean it that way, but SCOR has not
18  specifically identified the party whose
19  obligations it is guaranteeing.  In
20  America, under the rules of strictissimi
21  juris that voids this to begin with
22  because you don't have a party whose
23  actual performance is guaranteed without
24  having the party completely identified
25  and here the party isn't.  I think the

43

1          Proceedings - 3/28/06
2   guarantee is questionable.  It may be
3   perfectly valid under French law, I'm
4   not suggesting it's not, but there's
5   clearly no proof before the panel that
6   it is.
7          MR. HIGGINS:  Well, that's just
8   one of them.  The other one names both
9   companies.
10         MR. DIELMANN:  May I just, you
11  know, just taking on what Mr. Haber
12  said, I mean, well, where is the
13  problem -- to clarify this, even to take
14  out the remotest possibility that SCOR
15  doesn't stand behind their subsidiary,
16  is that, you know, that there is a, a
17  specific guarantee, referring to the two
18  treaties and, if need be, to this
19  particular or the two arbitrations that
20  are currently pending, I mean I do not
21  know whether that is too specific but
22  surely I would say it would take away
23  even the doubts that obviously in the
24  claimant's mind that there may be a risk
25  that SCOR or Commercial Risk will

44

1          Proceedings - 3/28/06
2   talk -- walk away from any award being
3   given by the panel?
4          MR. HIGGINS:  That is one thing I
5   indicated earlier we'd discuss -- what
6   you're suggesting is make it specific to
7   these contracts --
8          MR. DIELMANN:  Yeah.
9          MR. HIGGINS:  -- and have SCOR,
10  the parent --
11         MR. DIELMANN:  Right.
12         MR. HIGGINS:  -- state that the
13  guarantee covers that specifically.
14         MR. DIELMANN:  Exactly.
15         MR. HABER:  But there's something
16  else, the language in the guarantee says
17  that there's a guarantee that they shall
18  perform its payment obligations when
19  due.  This is a judgment in an
20  arbitration we're looking to be
21  guaranteed, not the performance of a
22  claims obligation when due, because in
23  theory, and only in theory, if this
24  panel ruled in favor of Security of
25  Hartford, we would be ruling that a

45

1        Proceedings - 3/28/06
2    claims obligation -- a claims demand
3    made X months ago or X years ago,
4    whenever it was made, was due when made
5    and wasn't paid.
6        This guarantee is unclear in a
7    literal sense as to all of Commercial
8    Risk's obligations. It's only talking
9    about claims obligations when due. It
10    could mean there's judgment--I'm not
11    suggesting it doesn't--but it's -- at
12    this point in time the language is so
13    unclear as to require a court's
14    interpretation. Not the kind of thing
15    you want to bank on to enforce.
16        MR. HIGGINS: Well, I mean the
17    suggestion is that we clarify that to --
18        MR. HABER: A brand --
19        MR. HIGGINS: -- to alleviate
20    those concerns.
21        But, secondly, when you're dealing
22    with guarantees, before you can pursue
23    the parent, you have to enforce the
24    obligation, to the extent you can,
25    against the guaranteeing party.

46

1        Proceedings - 3/28/06
2        MR. HABER: It depends on the
3    terms of the guarantee. Some are
4    guarantees of payment, some are
5    guarantees of performance. It depends
6    on the guarantee you enter into and what
7    the consideration is for the guarantee.
8    It's a little difficult on the July 1
9    '99 guarantee to understand how that was
10    consideration for the DIG contract since
11    it was the same date.
12        The March 9, 2001 guarantee, at
13    least I don't think the panel has seen
14    any evidence as to what the genesis was
15    for that document and what the
16    consideration is.
17        I'm just saying there are a lot of
18    open questions and as we all well know,
19    if you give a lawyer a chance, they can
20    make a thousand questions out of a
21    one-question issue. And there are
22    really a lot of questions here that are
23    unanswered and I don't think the
24    guarantee says precise -- and clearly,
25    you could clarify it by SCOR issuing a

47

1        Proceedings - 3/28/06
2    document that says, "Without offset
3    defense or counterclaim, we guarantee
4    the full payment and performance of all
5    debts owed under the two contracts."
6    I'm not saying you agree to that
7    language, I'm not suggesting that; all
8    I'm saying is you could draft a document
9    that was a lot tighter.
10        MR. HIGGINS: Yes, and that's what
11    I'm going to discuss with the client.
12        MS. JACOBSON: And I have a
13    comment to that.
14        We entered into these contracts
15    with Commercial Risk. That is our
16    contracting party. We are entitled to
17    look to Commercial Risk, we're not -- we
18    don't have to look to anyone else,
19    because that's not -- no one else signed
20    that contract; Commercial Risk signed
21    that contract, Commercial Risk Vermont
22    and Commercial Risk Bermuda, those are
23    the folks that we are pursuing in this
24    arbitration. Frankly, these are the
25    only folks that we have a right to

48

1        Proceedings - 3/28/06
2    pursue in this arbitration and we are
3    entitled to security from them. I don't
4    want other guarantees or that we may
5    pay, you know, the parent stands behind
6    us, I don't think that that does the
7    trick. That's not who we contracted
8    with.
9        THE UMPIRE: I think it's
10    probably -- now is probably a good time
11    to cut off this particular line of
12    discussion --
13        MS. JACOBSON: Yeah.
14        THE UMPIRE: -- (a) because I
15    think we'll start going round again, and
16    (b) I think from a procedural viewpoint
17    what we discussed earlier on is the
18    panel will discuss the issue. It may or
19    may not become relevant.
20        MS. JACOBSON: Okay.
21        THE UMPIRE: If it does become
22    relevant, we can revisit it and either
23    make an order or ask the parties to
24    comment some more but I think we've
25    probably added sufficiently enough from

49

Proceedings - 3/28/06

1
2  the principle viewpoint other than my
3  co-panelist who obviously doesn't agree
4  with me.
5      MR. DIELMANN:  No, I do agree with
6  you.
7      THE UMPIRE:  Good, let's move on.
8      MR. DIELMANN:  No, again, I just
9  have a very specific question.  Is that
10  correct or incorrect that, you know,
11  Commercial Risk Vermont can -- does have
12  under Article -- under the security
13  clause you can take credit or not, and
14  my question is, you know, does the
15  contractual obligation in respect of the
16  security requirement, does that also
17  refer to Commercial Risk Vermont or not?
18      Because I think they only have
19  to -- have to -- they only, you know,
20  have to oblige if you can -- if, you
21  know, Security of Hartford can take
22  credit, my question is I'm not clear on
23  this point whether that's correct or
24  not.
25      MS. JACOBSON:  I believe that

50

Proceedings - 3/28/06

1
2  Commercial Risk Vermont is an admitted
3  company.
4      MR. DIELMANN:  Okay.
5      MS. JACOBSON:  Authorized,
6  authorized, I'm sorry.
7      MR. DIELMANN:  So as far as if
8  there's a security obligation under the
9  Article 14, as far as DIG is concerned
10  and other articles of a similar nature
11  is concerned, they wouldn't have to post
12  letters of credit; is that correct?
13      MS. JACOBSON:  That would be
14  correct under the security provisions in
15  the contracts, apart from common law and
16  statute -- that's correct.
17      MR. DIELMANN:  And I have another
18  question that refers to the net funds
19  held.
20      Net funds held --
21      THE UMPIRE:  Theo, can we leave
22  that, I was going to ask you your first
23  question, you've asked it, but I want to
24  get into those details when we get into
25  the security discussion.

51

Proceedings - 3/28/06

1
2      MR. DIELMANN:  Okay, fine.
3      THE UMPIRE:  Maybe if we get back
4  to the organizational meeting here for a
5  moment at least.
6      I was incorrect at the beginning
7  here, I moved too quickly, I should have
8  asked everybody in the room to identify
9  themselves, so as a break now it might
10  be a good idea to do that.
11      I'll start here and then we'll
12  move round to the left.
13      Obviously, David Thirkill, umpire.
14      MR. HABER:  Martin Haber,
15  party-appointed arbitrator for Security
16  of Hartford.
17      MR. MEEHAN:  James Meehan, I'm
18  general counsel for Royal & SunAlliance
19  USA and its affiliated insurance
20  companies.
21      MR. LEFEBVRE:  Andre Lefebvre,
22  financial risk officer for Royal &
23  SunAlliance USA.
24      MR. LEWNER:  Andrew Lewner, from
25  Stroock & Stroock & Lavan, for claimant.

52

Proceedings - 3/28/06

1
2      MS. JACOBSON:  I'm Michelle
3  Jacobson, from Stroock & Stroock &
4  Lavan, for the claimant.
5      MR. HIGGINS:  John Higgins,
6  D'Amato & Lynch, for the respondent.
7      MS. de LACROIX:  Joelle
8  de Lacroix, CRP.
9      MR. DIELMANN:  Theo Dielmann,
10  party-appointed arbitrator for
11  Commercial Risk Vermont and Bermuda.
12      THE UMPIRE:  Thank you.
13      As far as prehearing motions are
14  concerned, obviously we have the motion
15  for security.  Are there any other
16  prehearing motions that anybody wants to
17  raise at this juncture?
18      MR. HIGGINS:  Which one are we on?
19      THE UMPIRE:  We're on the
20  organizational meeting?
21      MR. HIGGINS:  Non-DIG.
22      THE UMPIRE:  Non-DIG.
23      MR. HIGGINS:  I think we should
24  discuss the consolidation issue.  Should
25  I deal with that?

53

1             Proceedings - 3/28/06
2       THE UMPIRE:  Please.
3       MR. HIGGINS:  We believe that
4  consolidation -- not consolidation in a
5  literal sense because we don't have or
6  the panel doesn't have the authority
7  under New York or Connecticut law to
8  order parties to consolidate different
9  contracts, so we're not asking for
10  consolidation in a literal sense.  What
11  we're asking is for the panel to order
12  that the discovery or disclosure in the
13  hearings be held at the same time.  I've
14  seen that in many cases but -- and
15  that's what we're suggesting.
16       Now, the objection to that, as far
17  as we know, from Security is that we're
18  on a very tight schedule in the DIG
19  arbitration and it will interfere with
20  the ability to complete the schedule and
21  it will cause problems timewise for us
22  to do that.  And I think that if that's
23  the case, if that's -- if there's merit
24  to that argument, then we would be
25  willing to yield on that point so long

54

1             Proceedings - 3/28/06
2  as we don't end up doing the same thing,
3  which is pushing this arbitration, the
4  non-DIG arbitration, along at the same
5  time as the other and, you know,
6  creating the same problem that's being
7  objected to.
8       So what we would suggest, if the
9  panel wants to entertain it, is that we
10  have -- that we put this one off and
11  have it done after the DIG arbitration.
12  And that's perfectly acceptable to us.
13      MS. JACOBSON:  Okay.  Well, we,
14  despite what Mr. Higgins is saying that
15  he's not seeking consolidation, I think,
16  in fact, it would be a de facto
17  consolidation, which is not required
18  either contractually, you know, in any
19  of the agreements, and we don't agree to
20  it and I think that's been made clear.
21      We agree to consolidate NHE, ORS
22  and HPP--those were actually three
23  separate arbitrations--we agreed to
24  consolidate them into one, having --
25  leaving us with two arbitrations.

55

1             Proceedings - 3/28/06
2      There are substantial disparate facts
3  with respect to each of those programs.
4  In one we have a set of three disparate
5  facts and DIG has its own set of facts.
6  We don't believe that there is that much
7  of a substantial overlap.  I believe the
8  contention is violation of underwriting
9  guidelines.  The guidelines are
10  different in all of the arbitrations.
11      If what Mr. Higgins is suggesting
12  is to have the DIG arbitration in
13  December, as scheduled, and then have a
14  later date for the non-DIG, keeping them
15  separate, that's fine with us, and we
16  would propose an end-of-January hearing
17  date if that's acceptable to the panel,
18  just splitting them up, keeping them
19  separate.
20      THE UMPIRE:  Okay, let me make a
21  couple of points.  The panel has already
22  chatted datewise at least, and while I
23  don't have the specific dates -- are you
24  okay?
25      MS. JACOBSON:  Yeah.

56

1             Proceedings - 3/28/06
2      THE UMPIRE:  -- while I don't have
3  the specific dates, and we can come to
4  those in a second, the first date we
5  could offer you would be March anyway,
6  and, in effect, since we had already
7  reserved the whole -- the whole week in
8  December, I don't remember the exact
9  dates, but we reserved the whole week
10  and I think the impression that we
11  gained when we discussed this is we'd
12  need all of that time for the DIG
13  arbitration.
14      MS. JACOBSON:  That's right.
15      THE UMPIRE:  I mean just as a
16  matter of fact we want to be able to
17  go --
18      MR. HABER:  December 11th.
19      THE UMPIRE:  December 11th, thank
20  you, Marty.
21      We wouldn't be able to go until
22  March anyway.
23      Talking a little more generally,
24  and again I welcome any input from my
25  co-panelists here, since the panel has

57

Proceedings - 3/28/06

1
2 not heard from either of you relative to
3 discovery issues in relation to the DIG
4 contract, we assume one of two things,
5 either you're getting along famously or
6 you haven't chatted at all but in either
7 case, obviously there's no issues yet
8 before us on that. It would seem to me,
9 as a matter of logic, that if there's
10 auditors going in, just from an
11 efficiency viewpoint, one would imagine
12 that it would make sense for them to
13 sort of look at the two or three if that
14 was feasible but, again, if it is a
15 problem to either of you, please go
16 ahead and organize it as you think best
17 and come to us with any issues as they
18 arise.
19      As far as dates are concerned --
20 what was that date about, Marty?
21      MR. HABER: March 26th is my
22 earlier --
23      THE UMPIRE: Okay, that's good.
24 I'm free -- are you free?
25      MR. DIELMANN: Yes.

59

Proceedings - 3/28/06

1
2 be wrong because I have Easter Sunday
3 being on March 27th in 2007, which it
4 certainly isn't the case.
5      MR. HABER: That's a Monday.
6      THE UMPIRE: Let's put it this
7 way, let's reserve that week.
8      MS. JACOBSON: Yes.
9      THE UMPIRE: If it so transpires
10 there's a holiday at the end of it and
11 we need to go over to the following week
12 and come back, we'll do that but I think
13 that's important that we at least get it
14 on the calendar.
15      MS. JACOBSON: I agree with you.
16      MR. HABER: Unless you want to
17 pick the week of April 2nd and then be
18 sure?
19      MR. HIGGINS: That's probably
20 better anyway because I get concerned
21 about the suggestion of January but once
22 this one, the DIG one is over, we're
23 going to, you know, we're going to have
24 to shift gears and have some time to
25 prepare papers on the other.

58

Proceedings - 3/28/06

1
2      THE UMPIRE: Again, do you think
3 with the three that a week is
4 sufficient?
5      MS. JACOBSON: I believe so.
6      THE UMPIRE: So we could reserve
7 off -- if that was okay with you,
8 Mr. Higgins, also, the week of 26th of
9 March '07?
10      MR. HIGGINS: Should be okay.
11      THE UMPIRE: Is there anything
12 strange about that --
13      MR. HABER: 26th is a Monday.
14      THE UMPIRE: -- apart from it
15 being, the 29th being Mr. Haber's next
16 wedding anniversary after tomorrow?
17      MS. JACOBSON: We were attempting
18 to figure out which week it was Good
19 Friday and I can't -- according to my
20 list it's wrong. It must be the 23rd.
21      THE UMPIRE: The 23rd is Good
22 Friday?
23      MS. JACOBSON: I was just trying
24 to figure it out but apparently the
25 schedule that I have of holidays has to

60

Proceedings - 3/28/06

1
2      THE UMPIRE: I actually have no
3 problem if Mr. Dielmann doesn't with
4 either of those.
5      MR. DIELMANN: No.
6      THE UMPIRE: And I don't think
7 it's going to make that much difference.
8      MS. JACOBSON: If my notes are
9 correct, Passover may be the following
10 week, which is April 2nd, so we would
11 want to do it the 26th.
12      THE UMPIRE: Okay. Did you hear
13 that, Mr. Higgins?
14      MS. de LACROIX: I'm trying to
15 look at his journal and it seems that
16 he's going to a seminar in April, but I
17 can't see anything -- I'm sorry.
18      THE UMPIRE: That's okay.
19 Let's put in the week of the 26th
20 now and if it transpires that it's a big
21 issue either for Easter or Passover,
22 we'll revisit it.
23      MR. HABER: So we're at the 26th?
24      THE UMPIRE: 26th.
25      MR. HABER: Okay, done.

61

```
 1        Proceedings - 3/28/06
 2        MR. DIELMANN:  Yeah.
 3        MR. HIGGINS:  So the week of the
 4  2nd, April?
 5        THE UMPIRE:  No, the 26th, there's
 6  a question probably of Passover in that
 7  week.
 8        MR. LEWNER:  Passover is the first
 9  two days, April 2nd and April 3rd of
10  that year.
11        MS. JACOBSON:  We're better off in
12  the March dates it appears.
13        THE UMPIRE:  Okay, back to the
14  agenda, I think we're down -- could we
15  take it that the parties would like
16  similar procedural issues to that we
17  discussed and agreed on in the other
18  matter?
19        MR. HIGGINS:  Yes.
20        MS. JACOBSON:  Yes.
21        THE UMPIRE:  And ex parte
22  communication in the same way, I think
23  we said at the filing of the initial
24  prehearing briefs?
25        MS. JACOBSON:  Yes.
```

62

```
 1        Proceedings - 3/28/06
 2        MR. HIGGINS:  Yes.
 3        THE UMPIRE:  Dates and locations
 4  we've done.
 5        MS. JACOBSON:  Well, we'll offer
 6  to hold -- I don't think we discussed
 7  location but we'll offer our --
 8        MR. HIGGINS:  We can discuss that
 9  much later.  I prefer to avoid hotel
10  expenses and all the rest of that.
11        MS. JACOBSON:  That's why we're
12  offering.
13        THE UMPIRE:  The panel will not
14  insist on being in a hotel if the
15  parties can agree on a location.
16        MS. JACOBSON:  Okay.
17        THE UMPIRE:  And, again, I think
18  we're all agreed in New York --
19        MR. HIGGINS:  Yes.
20        THE UMPIRE:  -- as before.
21        Please correct my memory if it's
22  incorrect, but I don't think we actually
23  discussed the form of award, whether you
24  want a reasoned award or not in the
25  other matter, and I raise it now, it
```

63

```
 1        Proceedings - 3/28/06
 2  wasn't on the agenda here.  If
 3  necessary, we could revisit that one
 4  officially but if unofficially if we
 5  come to the same conclusion here, I
 6  think it will be much more efficient.
 7        MS. JACOBSON:  We would request a
 8  reasoned award.
 9        MR. HIGGINS:  What was that, I'm
10  sorry?
11        MS. JACOBSON:  We request a
12  reasoned award.
13        MR. HIGGINS:  We agree.
14        THE UMPIRE:  Okay.  I don't think
15  this particular panel is afraid of
16  writing written awards.
17        So if there's no other matters
18  before this particular organizational
19  meeting panel, we'd like to adjourn it.
20  Do you have any other matters?
21        MS. JACOBSON:  I don't believe so.
22        MR. HIGGINS:  We don't.
23        THE UMPIRE:  So we're going --
24  we'll adjourn the organizational meeting
25  and take a 10-, 15-minute break?
```

64

```
 1        Proceedings - 3/28/06
 2        MR. HABER:  10 is fine.
 3        THE UMPIRE:  10 is fine.
 4        (Time noted:  11:12 a.m.)
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

65

```
 1
 2          C E R T I F I C A T E
 3
 4          I, ANDREW WALKER, a Registered
 5   Professional Reporter and Notary Public,
 6   do hereby certify:
 7          I reported the proceedings in the
 8   within-entitled matter, and that the
 9   within transcript is a true record of
10   such proceedings.
11          I further certify that I am not
12   related, by blood or marriage, to any of
13   the parties in this matter and that I am
14   in no way interested in the outcome of
15   this matter.
16          IN WITNESS WHEREOF, I have
17   hereunto set my hand this_____day
18   of_____, 2006.
19
20          _____
                ANDREW WALKER, RPR
21
22
23
24
25
```

# EXHIBIT 14

```
                                                    1
1
2    - - - - - - - - - - - - - - - - - - - - -x
3    In the Matter of the Arbitration
4                    -of-
5    SECURITY INSURANCE COMPANY OF HARTFORD Itself
     and as Successor in Interest to THE FIRE AND
6    CASUALTY INSURANCE COMPANY OF CONNECTICUT and
     THE CONNECTICUT INDEMNITY COMPANY,
7
                         Claimant,
8
                 -against-
9
     COMMERCIAL RISK REINSURANCE COMPANY LIMITED
10   (BERMUDA) and COMMERCIAL RISK RE-INSURANCE
     COMPANY (VERMONT),
11
                         Respondents.
12
     - - - - - - - - - - - - - - - - - - - - -x
13
                    February 22, 2006
14                  10:05 a.m.
15                  Stroock & Stroock & Lavan LLP
                    180 Maiden Lane
16                  New York, New York
17
18              ORGANIZATIONAL MEETING
19   BEFORE:
20
          DAVID A. THIRKILL, Umpire
21
          MARTIN D. HABER, ESQ., Arbitrator
22
          THEODOR DIELMANN, Arbitrator
23
24
     Reported by:
25   ANDREW WALKER, RPR (1991)
```

```
                                                    2
1
2    A P P E A R A N C E S :
3    STROOCK & STROOCK & LAVAN LLP
          Attorneys for Claimant
4         180 Maiden Lane
          New York, New York 10038-4982
5
     BY:  ROBERT LEWIN, ESQ.
6         MICHELLE L. JACOBSON, ESQ.
7
8    D'AMATO & LYNCH
          Attorneys for Respondents
9         70 Pine Street
          New York, New York 10270
10
     BY:   JOHN P. HIGGINS, ESQ.
11
12   ALSO PRESENT:
13
          BRIAN THIBODEAU, ESQ.
14        Senior Counsel
          Royal & SunAlliance
15
          DENNIS T. HAVER, ESQ.
16        Assistant General Counsel
          Royal & SunAlliance
17
          ANDRE LEFEBVRE
18        Financial Risk Officer
          Royal & SunAlliance
19
          JOELLE de LACROIX
20        CRP
21
22
23
24
25
```

```
                                                    3
1         Proceedings - February 22, 2006
2         THE UMPIRE:  Let's all go on the
3    record.
4         Good morning, we are in the matter of
5    an arbitration between Security
6    Insurance Company of Hartford and
7    others, petitioners, and Commercial Risk
8    Reinsurance Company Limited (Bermuda)
9    and Commercial Risk Re-Insurance Company
10   (Vermont), respondents.
11        Let's do an identification of
12   everybody in the room, going this way
13   round.  I'll start.
14        I'm David Thirkill, umpire in this
15   matter.
16        MR. HABER:  Martin D. Haber, I'm
17   the party-appointed arbitrator for
18   Security of Hartford.
19        MR. THIBODEAU:  Brian Thibodeau,
20   senior counsel of Royal & SunAlliance.
21        MR. LEFEBVRE:  Andre Lefebvre,
22   financial risk officer of Royal &
23   SunAlliance.
24        MS. JACOBSON:  Michelle Jacobson,
25
```

```
                                                    4
1         Proceedings - February 22, 2006
2    Stroock & Stroock & Lavan, for the
3    claimants.
4         MR. HAVER:  Dennis Haver,
5    assistant general counsel with Security,
6    part of the Royal & SunAlliance group of
7    companies.
8         MR. LEWIN:  Robert Lewin, from
9    Stroock & Stroock & Lavan, for the
10   claimants.
11        MR. HIGGINS:  John Higgins,
12   D'Amato & Lynch, for the respondents.
13        MS. LACROIX:  Joelle de Lacroix,
14   Commercial Risk.
15        THE UMPIRE:  Thank you.
16        MR. DIELMANN:  I'm Theodor
17   Dielmann, and I'm the party-appointed
18   arbitrator for Commercial Risk.
19        THE UMPIRE:  I had circulated an
20   agenda.  Does everybody have that or
21   would anybody like a copy?
22        We're all good to go.  Let's start
23   off with disclosures by the panel.  I'll
24   go first.
25        As far as my fellow panelists are
```

5

1    Proceedings - February 22, 2006
2    concerned, starting with Mr. Dielmann,
3    whom I've known for 20 years, our first
4    meeting was conducting business between
5    our then respective employers. I've
6    seen him many times particularly in the
7    last five years or so, mainly in social
8    contexts, such as ARIAS meetings and so
9    on. I know there were a number of
10   business dealings between my immediately
11   preceding employer, RiverStone Group,
12   and companies that Mr. Dielmann
13   represented but I was not directly
14   involved in any of those. Mr. Dielmann
15   and I have come close to working
16   together on panels but this is the first
17   time we have ever done so.
18          As far as Mr. Haber is concerned,
19   I met him first several years ago when
20   he was part of the faculty at an ARIAS
21   intensive training workshop and I was a
22   mere student. I have met him many
23   times, again, in social and ARIAS type
24   contexts and at industry conferences or
25   seminars since. Like Mr. Dielmann, I

6

1    Proceedings - February 22, 2006
2    know Mr. Haber and I have come close to
3    working together on panels but this is
4    the first time we have done so.
5    Mr. Haber was a party-appointed
6    arbitrator a number of times, I don't
7    know how many, for companies that were
8    managed or associated with my former
9    employer, RiverStone, but I was never
10   involved in any of those.
11          As far as counsel is concerned,
12   I've met Mr. Lewin on many occasions, in
13   the last few years particularly. I
14   believe, again, he also has represented
15   some RiverStone or Fairfax associated
16   companies but not anything that I've
17   directly worked on.
18          Mr. Haver and I have not met prior
19   to this morning although we've known of
20   each other's existence for some years,
21   which I'll come back to in a moment.
22          I don't believe I've met any of
23   the other representatives heretofore of
24   Security although I did find out that
25   Mr. Lefebvre lives not 20 miles from

7

1    Proceedings - February 22, 2006
2    where I live in New Hampshire. I did
3    not know that until this morning.
4          Mr. Higgins and I, I don't believe
5    we've had the pleasure of meeting, we
6    might have seen each other at ARIAS type
7    contexts, but I don't believe so.
8          Ms. Lacroix, I believe I've met
9    you somewhere in our careers in
10   reinsurance, I just don't recall where
11   but I know we have met sometime, forgive
12   me if your memory is better than mine.
13          As far as the parties are
14   concerned, when I was a litigation
15   manager at RiverStone I was involved in
16   what turned out to be quite a complex
17   dispute that did involve Security of
18   Hartford that I believe Mr. Haver was
19   directly involved in managing and, as I
20   say, I was involved in the litigation
21   side of that. We never did meet during
22   it although I think we probably read
23   each other's correspondence quite
24   extensively. It was a matter that did
25   settle eventually, I believe last year.

8

1    Proceedings - February 22, 2006
2          I was also involved at RiverStone
3    in trying to resolve some business
4    issues such as commutations and so on
5    with a company, my memory tells me it's
6    Connecticut Indemnity, an affiliate of
7    Security of Hartford, for yet another
8    affiliate of the Fairfax group.
9          As far as Commercial Risk is
10   concerned, either of the companies, I
11   have had no business relationship with
12   them.
13          Now, my memory may be slightly
14   incorrect here when I was putting
15   together these disclosures but I think
16   that when Commercial Risk first opened
17   its doors in Bermuda, it was in the same
18   building, ironically enough the
19   Continental Insurance building, that I
20   worked in for a former employer of mine
21   called Forum Re. And I did know well, I
22   can't recall whether he was then
23   president or at least a senior officer
24   in the company, a man called Graham
25   Pewter. Which leads me to add that I

9

1        Proceedings - February 22, 2006
2    don't know that this amounts to a
3    disclosure yet but as I read the briefs,
4    it did occur to me that if either or
5    both sides call witnesses that have a
6    Bermudian connection, such as
7    individuals from Commercial Risk, from
8    Legion Insurance Company, or from
9    H&H Park, the brokers involved here, I
10   may well know them personally because I
11   lived in Bermuda twice so I'm just
12   giving predisclosure of that were it to
13   come up.
14       I would add that during my over
15   35 years' career in the reinsurance
16   business, which included over 25 years
17   as a reinsurance underwriter, I know
18   that I was involved in business
19   relationships, I could not specify them
20   at all here, that would involve
21   virtually all of the companies here on a
22   reinsurance or ceded or assumed basis
23   other than Commercial Risk, I don't
24   think anything there.
25       Those are my disclosures.

11

1        Proceedings - February 22, 2006
2    the same two parties but different
3    transactions where he and I are both
4    party-appointed arbitrators, and the
5    counsel is the same, the only difference
6    is we don't have an umpire.
7        And that's my disclosures as to
8    the panel.
9        As to Security of Hartford and the
10   Royal & SunAlliance Group, let me
11   preface my disclosures by saying in my
12   former life I was general counsel to the
13   Continental Corporation, that means
14   every person in this room has either
15   sued me, been sued by me, engaged in
16   reinsurance transactions with us, both
17   as cedent and assuming company. I have
18   no recollection of any of that but if
19   someone wishes to remind me, I will
20   search my memory and disclose as much as
21   I can recollect.
22       I believe disclosure is an ongoing
23   obligation and I will endeavor to
24   disclose everything necessary to the
25   point of boredom for all of you up

10

1        Proceedings - February 22, 2006
2    Obviously I welcome any questions.
3        MR. LEWIN:  We have no questions.
4        MR. HIGGINS:  We have no
5    questions.
6        THE UMPIRE:  Thank you.
7        MR. HABER:  Thank you.
8        Again, I'm Martin Haber,
9    party-appointed arbitrator for Security
10   of Hartford in this matter.
11       First as to my colleagues, I will
12   reiterate exactly what Mr. Thirkill has
13   said about our relationship. I have
14   nothing really further to add to that.
15       Mr. Dielmann and I met, I guess
16   this is the second time of our
17   face-to-face meeting on his last trip
18   when this -- to America when this case
19   was first starting, he and I did met for
20   lunch and we had a very pleasant
21   discussion about how we would be working
22   together on this matter.
23       The only other disclosure I have
24   is, with regard to Mr. Dielmann, is
25   there is another case pending involving

12

1        Proceedings - February 22, 2006
2    through the final judgment or settlement
3    of this case.
4        With regard to Security of
5    Hartford, as I said, there are two other
6    cases -- there was one other case
7    pending, and in 1998, prior to the
8    purchase of Security of Hartford by the
9    Royal & Sun group, I think they had a
10   premium finance dispute in the State of
11   South Carolina and I was hired by the
12   Orion Capital Group, which was the prior
13   owner, as an expert witness regarding
14   premium financing. That case settled in
15   1998.
16       With regard to SCOR, there were
17   three matters, one of which is pending
18   but I am told is inches away from
19   settlement and there is a settlement
20   negotiation going on now between SCOR
21   and the other party. No counsel in this
22   room is involved and substantively there
23   are no issues that I know that are
24   similar.
25       The Royal cases were the other

13

```
 1          Proceedings - February 22, 2006
 2    things, as I said, that I've disclosed.
 3          With regard to D'Amato & Lynch,
 4    there were a total of three cases in
 5    which I was involved, other than this
 6    one.  One is the other Royal case as
 7    mentioned previously.  We had a case
 8    where I was appointed for a client
 9    opposite to D'Amato & Lynch's client
10    that settled in February of 2001, and
11    another case that went to judgment in
12    February of 2004.
13          As to the Stroock law firm, there
14    were nine matters in total where I was
15    involved.  Of the nine matters, with the
16    exception of one where I was appointed
17    by a client opposed to Stroock's client,
18    I have been appointed by Stroock in, as
19    I said, eight other matters.
20          Of the eight matters, two matters
21    are pending and -- not counting the
22    Royal cases.  And I am told one of those
23    two matters might be settling but,
24    again, no one has told me anything more
25    specific, and in the two matters that
```

14

```
 1          Proceedings - February 22, 2006
 2    are pending, we've not even appointed an
 3    umpire yet so I have no idea how that's
 4    going to go.
 5          Four of the matters went to
 6    judgment and two others were settled.
 7          And those are the sum total of my
 8    Stroock disclosures.
 9          I am pleased to answer -- oh, yes,
10    one other thing, Mr. Haver and I know
11    each other probably north of 25 years.
12    When he was employed solely by the Royal
13    and when the Royal was here in New York,
14    we were involved in various lobbying
15    efforts, for want of a better term,
16    involving the American Insurance
17    Association.
18          And I believe those are the sum
19    total of my disclosures and I'm pleased
20    to answer any questions.
21          Mr. Lewin?
22          MR. LEWIN:  No questions.
23          MR. HAVER:  Just for the sake of
24    this, my recollection is you served as
25    an umpire involving The Fire and
```

15

```
 1          Proceedings - February 22, 2006
 2    Casualty Insurance Company in an
 3    arbitration and The Fire and Casualty
 4    Company is a --
 5          MR. HABER:  I'm sorry, you're
 6    absolutely right, let me amend.
 7          There was another arbitration that
 8    did, in fact, go to judgment.  My
 9    problem is because so many companies
10    have so many subsidiaries it's very
11    difficult to remember, but I thank
12    Mr. Haver for reminding me.  I was the
13    umpire in a case that went to judgment
14    three years ago, I'm going to say,
15    involving a different affiliate and
16    another company involving transactions
17    in California that have nothing to do
18    with this.
19          MR. HIGGINS:  No questions.
20          MR. LEWIN:  We have no questions.
21          THE UMPIRE:  Let me supplement
22    mine with two things that you jogged my
23    memory on there.
24          One is the panel that you're
25    talking about earlier on with
```

16

```
 1          Proceedings - February 22, 2006
 2    Mr. Dielmann, I believe that I filled up
 3    a questionnaire form or the same
 4    questionnaire form as was filled up for
 5    this one.  I'm delighted to hear that an
 6    umpire hasn't been selected.  Which also
 7    leads me -- as far that umpire
 8    questionnaire form, and I'm sorry I
 9    forgot to mention it earlier, but I
10    believe and my hope is that I put on the
11    original questionnaire form is that I am
12    currently an umpire in a matter where
13    Stroock & Stroock & Lavan's West
14    Coast -- a West Coast office, so Jim
15    Fitzgerald, I don't remember which
16    particular office, is the counsel.  I do
17    not know who nominated me for that but I
18    believe I put it on the questionnaire
19    form, I just forgot it this morning.
20    Sorry.
21          MR. DIELMANN:  Compared to my
22    esteemed co-panelists, I am just a blank
23    sheet, so I can cut this short.
24          As far as the panel is concerned,
25    you've heard what they said, there is
```

17

1   Proceedings - February 22, 2006
2   nothing to add other than to say who
3   doesn't know Marty has never been to an
4   ARIAS meeting.
5       As far as the parties are
6   concerned, I have no relationship
7   whatsoever other than, you know, this
8   particular arbitration.
9       As far as the legal counsel are
10  concerned, you know, it both comes back
11  to when I did my round I think four or
12  five years ago, I visited both
13  Mr. Higgins and some gentleman from
14  Stroock & Stroock. Somehow, I do not
15  know how they -- Mr. Higgins dug up my
16  name again, but there is a present that
17  I still have in my cupboard, a T-shirt
18  with Stroock & Stroock on it, but the
19  color doesn't suit me so well so I
20  haven't put it on yet.
21      So this is all I have to say.
22      MR. HIGGINS: We have baseball
23  hats.
24      MR. LEWIN: What color?
25      MR. DIELMANN: It was black.

18

1   Proceedings - February 22, 2006
2       THE UMPIRE: The umpire refuses to
3   wear a black hat.
4       MR. LEWIN: We have no questions.
5       THE UMPIRE: Any questions of
6   Mr. Dielmann?
7       MR. HIGGINS: No questions.
8       THE UMPIRE: So can I take it that
9   the parties accept the panel as
10  constituted?
11      MR. LEWIN: Yes.
12      THE UMPIRE: And has -- thank you.
13      Has either of you prepared hold
14  harmless forms, the customary ARIAS
15  type?
16      MR. LEWIN: Yes. Would you like
17  to sign them?
18      THE UMPIRE: We'd be very
19  grateful.
20      MR. LEWIN: Do you want us to take
21  a moment to sign this and the
22  confidentiality, should we do this at
23  the same time or is that acceptable?
24      THE UMPIRE: If that's okay with
25  you?

19

1   Proceedings - February 22, 2006
2       MR. HIGGINS: I just have a couple
3   questions on the confidentiality.
4       THE UMPIRE: Okay, why don't you
5   do the hold harmless and then we'll do
6   the confidentiality.
7       MR. LEWIN: Fair enough.
8       THE UMPIRE: Did you want to go
9   ahead with comments on the
10  confidentiality?
11      MR. HIGGINS: We did discuss, I
12  did discuss with an associate from
13  Stroock, who is not here today, the
14  one -- the change that they indicated
15  they wanted which was disclosure
16  essentially only on a judgment -- I'm
17  sorry, on a court order which would
18  require it, disclosure. And some other
19  provisions in the original agreement.
20  We don't have a problem with that.
21      We'd like to make sure that to the
22  necessary extent reinsurers can be made
23  aware of this arbitration if we need to
24  give reinsurers information, you know,
25  in the ordinary course of business that

20

1   Proceedings - February 22, 2006
2   provides for auditors.
3       Does anyone have a problem with
4   that?
5       MS. JACOBSON: Actually, it's the
6   typical ARIAS form which provides that
7   you may disclose to retrocessionaires.
8       MR. HIGGINS: Where is that?
9       MS. JACOBSON: Let me give you a
10  copy, John.
11      MR. HABER: Michelle, out loud for
12  the record.
13      MS. JACOBSON: 3(a) says,
14  "Disclosure of arbitration information
15  may be made: (a) to the extent necessary
16  to obtain compliance with any interim
17  decisions or the final award herein, or
18  to secure payment from
19  retrocessionaires." So the form would
20  provide for that.
21      MR. HIGGINS: Okay.
22      The other question I had, the form
23  talks about disclosures pursuant to
24  subparagraphs (a) and (c), it seems to
25  me to be a bit onerous or complicated

# EXHIBIT 15

```
--------------------------------------------------------x
```
In the Matter of the Arbitration of

SECURITY INSURANCE COMPANY OF
HARTFORD Itself and as Successor in Interest to
THE FIRE AND CASUALTY INSURANCE
COMPANY OF CONNECTICUT and THE
CONNECTICUT INDEMNITY COMPANY,

                    Claimant,

          -against-

COMMERCIAL RISK REINSURANCE
COMPANY LIMITED (BERMUDA) and
COMMERCIAL RISK RE-INSURANCE
COMPANY (VERMONT),

*(Non- DI6)*        Respondents.
```
--------------------------------------------------------x
```

**Panel:**

David Thirkill (Umpire)
Theodor Dielmann
Martin Haber

## STIPULATION

WHEREAS, David Thirkill, Martin Haber and Theodor Dielmann have been appointed to serve as members of the Arbitration Panel ("Panel") in the above-captioned arbitration; and

WHEREAS, an organizational meeting was held on March 28, 2006, in the offices of Stroock & Stroock & Lavan, LLP at 180 Maiden Lane, New York, New York, 10038, at which counsel for both parties and all members of the Panel were present; and

WHEREAS, the Panel members have in good faith and to the best of their recollection disclosed any interest in the outcome of these proceedings, and any business and social relationships which they have or have had among themselves and/or with parties, counsel, and as applicable, others; and

WHEREAS, based on those disclosures, the parties have unanimously found that no Panel member has any conflict of interest that would make him or her unfit to serve in this Arbitration; and

WHEREAS, based on those disclosures, the parties accept this Panel as being without conflicts of interest and duly constituted to hear the matter(s) under dispute in this Arbitration.

NOW, THEREFORE, the parties agree as follows:

(1) Each party agrees that it shall not assert any claim, file any suit, or initiate any action against the Panel or any member thereof in connection with their rendering of services as arbitrator and/or umpire in this Arbitration proceeding (including, but not limited to, any claim, suit or

action relating to any alleged conflict, bias or lack of disinterestedness); and

(2) Both parties further agree jointly and severally, to protect, defend, indemnify and hold harmless any and all members of the Panel against any and all expenses, costs and fees of any kind incurred by the members of the Panel, and the payment of their reasonable hourly fees, in connection with any claim, action or lawsuit arising or resulting from or out of this Arbitration.

Nothing in this Stipulation, however, shall abridge any rights the Petitioner and Respondent may have with respect to each other to seek to vacate or modify any Order, Ruling or Award which the Panel may render except in regard to any conflicts of interest which have been fully disclosed to the parties. This Stipulation is non-cancelable and of unlimited duration.

Members of the Panel:

Arbitrator: _____

Arbitrator: _____

Umpire: _____

AGREED:

_____ for Claimant

_____ for Respondent

Dated: __3/28/06_____

# EXHIBIT 16

Message

---

**From:** Lewner, Andrew S. [mailto:ALEWNER@stroock.com]
**Sent:** Tuesday, December 05, 2006 2:22 PM
**To:** David Thirkill; theo; Haber Martin D
**Cc:** Jacobson, Michele L.; Higgins, John
**Subject:** DIG and Non-DIG Arbitrations

Members of the Panel:

The parties in the above-referenced arbitrations have conferred, and have agreed to move the DIG Hearing to the weak previously set aside for Non DIG (March 5-9). In addition, Claimant has advised counsel for Commercial Risk that we are also available during the previous week from Tuesday, February 27 through Friday, March 2, and counsel for Commercial Risk has agreed to check his client's availability for those dates and let us know promptly. If those days are acceptable to Commercial Risk and to the Panel, then Claimant will agree to conduct the Non-DIG hearing and the DIG hearing together during those two weeks. If those dates are unacceptable, however, we will conduct only the DIG hearing during March 5-9, and will have to schedule additional dates at some point in the future for the Non-DIG hearing.  If this is unacceptable to the Panel, please let us know.

Respectfully submitted,

Andrew S. Lewner, Esq.
Stroock & Stroock & Lavan, LLP
Direct Dial: 212-806-5820
Desktop Fax: 212-806-7820
E-mail: alewner@stroock.com

4/16/2007

-----Original Message-----
From: David Thirkill <coomac@comcast.net>
To: Jacobson, Michele L.; John Higgins <JHiggins@damato-lynch.com>; Lewner, Andrew S.
CC: Haber Martin D <haberlaw@aol.com>; theo Com <theo.dielmann@th-dielmann.com>
Sent: Fri Dec 29 09:59:08 2006
Subject: Non-DIG Postponed Hearing

Dear Counsel,

The Panel has conferred regarding possible dates for the postponed non-DIG hearing.  As
suspected, there are not too many available dates.
   The week that would suit us all the best would be the week of June 25th.  We could also
possibly do the week of April 9.  Please advise our availability.

Thanks and Happy New Year

David Thirkill
For the panel

Message

-----Original Message-----
**From:** coomac@comcast.net [mailto:coomac@comcast.net]
**Sent:** Monday, January 29, 2007 6:27 PM
**To:** Shulman, Regan; JHiggins@damato-lynch.com; Jacobson, Michele L.; Lewin, Robert; Lewner, Andrew S.
**Cc:** haberlaw@aol.com; theo.dielmann@th-dielmann.com
**Subject:** Re: Non-Dig Amended Schedule

Dear Counsel

The Panel confirms that the NON DIG hearing will take place during the week of June 25th. Please note an amended schedule below.  The items in RED should have been completed or be in the process of completeion. We request you inform us of their status.  The items in blue replace those in the previous schedule.

Thank you

David Thirkill
For the Panel

## Non-DIG 2nd Amended Schedule

| | |
|---|---|
| Organizational Meeting | March 28, 2006 |
| Serve Document Requests /Audit Plan Submitted | June 20, 2006 |
| Serve Responses / Objections to Document Requests or Audit Plan | June 27, 2006 |
| Complete Document Production | September 8, 2006 |
| Serve Privilege Logs | September 15, 2006 |
| Exchange Preliminary Lists of Witnesses | September 28, 2006 |
| Commercial Risk to provide audit report | October 9, 2006 |
| Fact Deposition Discovery | October 9, 2006 –  January 5, 2006 |
| Status Call | October 16, 2006 |
| Exchange Expert Reports | December 8, 2006 |
| Exchange Rebuttal Expert Reports | January 5, 2006 |
| Expert Deposition Discovery | January 22 – February 2, 2007 |
| **Status Call** | May 1, 2007 |
| **Exchange Pre-Hearing Briefs** | **May 11. 2007** |
| **Exchange Reply Briefs** | **June 1, 2007** |

Message

| Exchange Preliminary Exhibit Lists | June 1, 2007 |
|---|---|
| Exchange Hearing Witness Lists | June 5, 2007 |
| Exchange of Deposition Designations (for witnesses who are not appearing at the hearing) | June 8, 2007 |
| Exchange of Deposition Counter-Designations | June 14, 2007 |
| Hearing | June 25. 2007 |

2/12/2007