UNITED STATES DISTRICT COURT  
SOUTHERN DISTRICT OF NEW YORK

**TO BE FILED**  
**UNDER SEAL**

---------------------------------------- x  
In the Matter of the Arbitration of  : Docket No. 07 CV 3277 (VM)

SECURITY INSURANCE COMPANY OF HARTFORD  
Itself and as Successor in Interest to  
THE FIRE AND CASUALTY INSURANCE COMPANY  
OF CONNECTICUT and THE CONNECTICUT  
INDEMNITY COMPANY,

                  Petitioner,

         -against-

COMMERCIAL RISK REINSURANCE COMPANY  
LIMITED (BERMUDA) and COMMERCIAL RISK RE-  
INSURANCE COMPANY (VERMONT),

                  Respondents.

---------------------------------------- x

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF SECURITY INSURANCE COMPANY OF HARTFORD'S PETITION TO COMPEL ARBITRATION

STROOCK & STROOCK & LAVAN LLP  
180 Maiden Lane  
New York, New York 10038  
(212) 806-5400

*Attorneys for Petitioner*

Of Counsel:  
    Michele L. Jacobson  
    Regan A. Shulman  
    Andrew Lewner  
    Christian Fletcher

TABLE OF CONTENTS

Page

TABLE OF CONTENTS ..................................................................................................ii

PRELIMINARY STATEMENT ........................................................................................1

ARGUMENT.......................................................................................................................1

POINT I     COMMERICAL RISK SHOULD BE COMPELLED TO ARBITRATE WITH THE EXISTING UMPIRE ON THE AGREED-UPON Hearing dates...................................................................1

    A.     The Panel Vacancy Should Be Filled And The Remaining Panel Members Retained ..........................................................................1

    B.     Pursuant To The Arbitration Clause Commercial Risk Waived Its Objection To Mr. Thirkill's Continued Service As Umpire......................................................................................................5

    C.     The Public Policy Goal Of Avoiding Panel Manipulation Supports Retention Of The Umpire And Replacement Of The Withdrawing Arbitrator....................................................................6

    D.     The Treaties Require Commercial Risk To Proceed With The Arbitration On The Agreed-Upon June 25-29, 2007 Dates ..................................................................................................8

POINT II     THIS COURT SHOULD APPOINT A TREATY-ELIGIBLE ARBITRATOR BECAUSE RESPONDENTS HAVE NOT DONE SO........................................................................9

CONCLUSION ..................................................................................................................10

# TABLE OF AUTHORITIES

## CASES

<u>Arista Marketing Associates Inc v. Peer Group, Inc.</u>,
    720 A.2d 659 (N.J. Super 1998)..................................................................................8

<u>Dow Corning Corp. v. Safety National Casualty Corp.</u>,
    335 F.3d 742 (8th Cir. 2003)......................................................................................7

<u>Home Insurance Co. v. Banco de Seguros del Estado (Uruguay)</u>,
    No. 98-Civ-6022, 1999 U.S. Dist. LEXIS 22478 (S.D.N.Y. Feb. 24, 1999) .............2

<u>Marine Products v. M.T. Globe Galaxy</u>,
    977 F.2d 66 (2d Cir. 1992) ....................................................................................2, 3

<u>National American Insurance Co. v. Transamerica Occidental Life Insurance Co.</u>,
    328 F.3d 462 (8th Cir. 2003)......................................................................................8

<u>Pemex Refinacion v. Tbilisi Shipping Co</u>
    No. 04-Civ-02705, 2004 WL 1944450 (S.D.N.Y. Aug. 31, 2004) ............................4

<u>S.R. International Bus. Inc. v. World Trade Center Properties, LLC</u>,
    467 F.3d 107 (2d. Cir. 2006) ......................................................................................5

<u>Trade & Transport, Inc. v. Natural Petroleum Charterers, Inc.</u>,
    738 F. Supp. 789, 791 (S.D.N.Y. 1990), <u>aff'd</u>, 931 F.2d 191 (2d Cir. 1991) .............2

## STATUTES

9 U.S.C. § 4 ..................................................................................................................1, 2, 9

9 U.S.C. § 5 ......................................................................................................................9, 10

9 U.S.C. § 206 ........................................................................................................................2

## PRELIMINARY STATEMENT

Respondents' admissions demonstrate that, notwithstanding their conclusory assertions to the contrary (see Resp. Br. at 7), Respondents have failed and refused to proceed with the Non-DIG Arbitration in accordance with the parties' agreements (the "Treaties"):

(1) Respondents entered into the Treaties with SICH and agreed to arbitration of disputes (Petition ¶¶ 22-27; Answer ¶¶ 22-27; Jacobson Dec., Exhibits 1-5);

(2) "Based upon [an] agreed-upon process . . the parties selected Mr. David Thirkill . . ." (Petition ¶¶ 33-37; Answer ¶¶ 33-37);

(3) "[P]rior to Mr. Dielmann's resignation, the parties agreed to proceed with the Non-DIG Arbitration on the dates June 25-29, 2007" (Answer ¶ 94); and

(4) "[R]espondents have refused to proceed with the Non-DIG arbitration prior to the appointment of a new panel" (Answer ¶ 89).

As Respondents concede, in the event of such failure and refusal, this Court may compel them to proceed with the arbitration pursuant to 9 U.S.C. §§ 4 and 206. For the reasons set forth herein and in SICH's moving submission, that is precisely what this Court should do.

In addition, Respondents refuse to provide information from which SICH can confirm that the proposed replacement arbitrator is disinterested and thus eligible to serve under the Treaties. Respondents' refusal to appoint an unquestionably qualified arbitrator constitutes a lapse in filling the vacancy which justifies this Court's appointment of a qualified arbitrator.

## ARGUMENT

### POINT I -- COMMERICAL RISK SHOULD BE COMPELLED TO ARBITRATE WITH THE EXISTING UMPIRE ON THE AGREED-UPON HEARING DATES

A.  **The Panel Vacancy Should Be Filled And The Remaining Panel Members Retained**

Section 4 of the FAA provides that "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the

agreement." 9 U.S.C. § 4; see also 9 U.S.C. § 206 ("A court . . . may direct that arbitration be held in accordance with the agreement . . . ."). That Respondents have failed to comply with the agreement for arbitration in this case is not in issue. They admit it. See supra at 1; Answer ¶ 89 ("admit that respondents have refused to proceed with the Non-DIG arbitration prior to the appointment of a new panel"). Thus, the Court should order Respondents to proceed in accordance with the terms of their agreement.

Here, proceeding "in accordance with the terms of the agreement" means – as a matter of established Second Circuit law – proceeding with a replacement for Mr. Dielmann, and without reconstituting the entire panel. See Trade & Transport, Inc. v. Natural Petroleum Charterers, Inc., 931 F.2d 191, 196 (2d Cir. 1991); see also Home Ins. Co. v. Banco de Seguros del Estado (Uruguay), No. 98-Civ-6022, 1999 U.S. Dist LEXIS 22478 (S.D.N.Y. Feb. 24, 1999). Where, as in this case, a vacancy occurs prior to any deliberations or consideration of evidence regarding unresolved issues, replacement, not re-selection, is appropriate. Id.

Respondents' argument that this case warrants application of the "general rule" which requires that an arbitration commence anew with a new panel in the event of an arbitrator's death before rendering an award (Resp. Br. at 9) is misplaced. Not only was that "general rule" formulated for cases involving the death of an arbitrator, but it also applies only where the vacancy arises while the arbitrators are *in medias res*. See Marine Products v. M.T. Globe Galaxy, 977 F.2d 66, 68 (2d Cir. 1992). As Black's Law Dictionary provides, *in media res* means "into the heart of the subject." Black's Law Dictionary 788 (6th ed. 1990). And, as courts have held, the concept of *in medias res* connotes a proceeding in the midst of evidence presentation or panel deliberation. See, e.g., Marine Products, supra; Home Insurance Co., supra. Significantly, Respondents acknowledge that arbitrators must be *in medias res* for the general rule to apply. Thus, Respondents rest their argument for application of the general rule

2

on the demonstrably false contention that Mr. Dielmann's resignation "occurred *in medias res*." (Resp. Br. at 12.)

In the instant case, there is no dispute about what has transpired in the arbitration thus far: an organizational meeting and a hearing and ruling on pre-hearing security which took place <u>over a year ago</u>, and an exchange of documents which did not involve the panel. <u>See</u> Resp. Br. at 3; Pet. Br. at 5-6. The panel has conducted no evidentiary hearings of any kind, has heard no evidence at all, and has not made any ruling, interlocutory or otherwise, relating to discovery. Indeed, apart from the issue of hearing scheduling, until Mr. Dielmann's withdrawal, the panel has had no involvement in this matter, whatsoever, for the last year. There is simply no factual basis from which to conclude that the panel was *in medias res* when Mr. Dielmann inexplicably withdrew.

Respondents attempt to analogize this case procedurally to <u>Marine Products</u>, contending "it appears that the <u>Marine Products</u> arbitration was in the same stage as the arbitration herein." (Resp. Br. at 10). Respondents claim that <u>Marine Products</u> is similar to the present case because the arbitrator there died "subsequent to a preliminary evidentiary hearing which was followed by 'interlocutory orders relating to discovery'". (Resp. Br. at 10.) Respondents are wrong; <u>Marine Products</u> is far from similar to the present case. First, Mr. Dielmann has not died. Second, the evidentiary hearing Respondents dismissively characterize as "preliminary" in <u>Marine Products</u> (an adjective not used in the opinion, nor in the affirmed district court decision) was, in fact, comprised of <u>testimony</u> by the captain of the vessel – the single most important witness – in a disputed charter party contract. <u>Marine Products</u>, 977 F.2d at 67. In an arbitration where an export company alleged that the ship it chartered to transport fish oil delivered the cargo 100 tons short, the testimony of the ship's captain would unquestionably be significant and substantial enough to put the members of the arbitration panel "into the heart of the subject." Black's Law

Dictionary 788 (6th ed. 1990) ("*In medias res*"). The hearing also included the submission of documentary evidence, and when a dispute arose about further documentation, the panel made two rulings regarding discovery disputes. See Marine Products Export Corp. v. M.T. Globe Galaxy, No. 82 Civ 944, 1982 WL 30933 at *1 (S.D.N.Y. Feb. 13, 1992). No such events have transpired in the Non-DIG Arbitration. The hearing on pre-hearing security which occurred over a year ago related to an issue that is independent of Respondents' liability – the issue at the heart of this case. Moreover, the panel's award of pre-hearing security is final and Respondents posted it without further proceedings.

Respondents' attempt to analogize Pemex Refinacion v. Tbilisi Shipping Co. to the instant case fails as well. No. 04-Civ-02705, 2004 WL 1944450 (S.D.N.Y. Aug. 31, 2004). Indeed, in noting that Pemex is "the exact type of case that falls under the 'general rule,'" the court there explained that "the panel [had] heard the totality of testimony and admitted the entirety of evidence[.]" Id. (emphasis added). The opposite is true here, as this panel has heard no testimony on liability, and received no evidence of any kind. Importantly, Respondents do not suggest otherwise. Pemex is instructive precisely because it distinguishes itself from the type of case presently before this Court. Id. at *6 ("Courts have rejected the general rule and appointed replacement arbitrators after a partial final decision was rendered, but always before proceedings had commenced with respect to the unresolved issues.").

Trade & Transport and Home Insurance, on the other hand, are on point. In summarizing those cases, Respondents correctly note that the courts refused to order new panels that would have to revisit issues as to which the former panels were *functus officio* (Resp. Br. at 10), but Respondents conveniently omit the crucial fact that those courts also refused to order new panels for the upcoming, unresolved issues, citing "special circumstances." Trade & Transport v. National Petroleum Charterers, Inc., 738 F. Supp. 789, 791 (S.D.N.Y. 1990), aff'd, 931 F.2d 191

4

(2d Cir. 1991). Like the panel in Trade & Transport, the panel here is *functus officio* on the issue of pre-hearing security – the only issue it has addressed. And, like the court in Trade & Transport, this Court need not order a new panel for the upcoming unresolved issues.

**B.    Pursuant To The Arbitration Clause Commercial Risk Waived Its Objection To Mr. Thirkill's Continued Service As Umpire**

It is undisputed that at the inception of the Non-DIG Arbitration, pursuant to the terms of the Arbitration Clause of the Treaties, SICH and Commercial Risk each selected an arbitrator to serve on a tri-partite panel. Answer ¶ 4; Jacobson Dec., Exhibit 1 at 18-19.[1] It is also undisputed that the parties agreed to modify the contractual method of selection of the third, neutral, arbitrator through a process which the parties both referred to as Umpire selection.[2] Jacobson Dec., Exhibit 11; Jacobson Reply Dec., Exhibit 1. As reflected by the parties' correspondence, including counsel's joint submission of "Umpire Questionnaires" to Umpire candidates, and Commercial Risk's own admission (Answer ¶ 4), through an agreed upon process, and with significant input, the parties jointly selected David Thirkill as the Umpire.

Significantly, the Arbitration Clause itself makes clear that, pursuant to the parties' agreement, Mr. Thirkill's selection cannot now be undone. It provides that "[t]he parties hereby waive all objections to the method of selection of the arbitrators, it being the intention of both

---

[1] Because the Treaties contain the same Arbitration Clause, only one is cited for reference herein.

[2] Respondents inexplicably claim that Mr. Thirkill is not the "Umpire" but is merely a third arbitrator on equal footing with the other two. (Resp. Br. at 2 fn 2.) Respondents' assertions in this regard are belied by Respondents' course of conduct and the documentary record in the Arbitration, including the fact that the cover of their own arbitration Position Statement listed Mr. Thirkill as the Umpire. See, e.g., Jacobson Dec., Exhibit 11; Jacobson Dec., Exhibit 13; Jacobson Reply Dec., Exhibit 1. Indeed, as Mr. Thirkill noted in accepting the position, Commercial Risk's party appointed arbitrator, along with SICH's party appointed arbitrator, informed him of his "appointment as Umpire." Jacobson Dec., Exhibit 12. To the extent that Commercial Risk makes these untenable assertions to avoid the import of Mr. Wollan's opinion regarding arbitrator replacement as the custom and practice in the reinsurance industry (see Wollan Aff. ¶¶ 10-16), they are factually and legally unpersuasive. See S.R. Int'l Bus. Inc. v. World Trade Center Props., LLC, 467 F.3d 107, 134 (2d. Cir. 2006)(parties' custom and usage or industry standards can explain contract terms). Furthermore, Commercial Risk's attempt to attack Mr. Wollan's opinion regarding custom and practice in the reinsurance industry by remarking that he had not considered the Pemex case (Resp. Br. at n.8), misses the mark, as Pemex was not a reinsurance case.

5

sides that all the arbitrators be chosen from those submitted by the parties." Jacobson Dec., Exhibit 1 at 19. Mr. Thirkill was jointly selected by the parties. Petition ¶ 4; Answer ¶ 4. He was accepted, unqualifiedly, by the parties. See Petition ¶ 5; Answer ¶ 5; Jacobson Dec., Exhibits 13 at 4:19-22 and Exhibit 15. He has not resigned, and, indeed, has indicated he is ready to proceed. Jacobson Dec., Exhibits 19 and 24. Respondents' attempt to force Mr. Thirkill's replacement is a challenge to his method of selection and is prohibited by the Arbitration Clause. Thus, as long as he is willing and able to serve, pursuant to the terms of the Treaties, once selected and accepted, Mr. Thirkill may not be unseated.

**C.    The Public Policy Goal Of Avoiding Panel Manipulation Supports Retention Of The Umpire And Replacement Of The Withdrawing Arbitrator**

In their papers, Respondents spend an inordinate amount of time expressing outrage over SICH's so-called "scandalous accusations" about Commercial Risk's role in Mr. Dielmann's resignation. (See, e.g., Resp. Br. at 5-7.) SICH, however, never actually leveled such accusations. (See, generally, Pet. Br.) Of course, under the curious circumstances of this case (i.e., a ruling adverse to Respondents from the identical panel followed days later by the unexplained resignation of the Respondents' arbitrator after "in depth deliberation" which in turn provided an implausibly serendipitous opportunity for Respondents to demand a new panel and delay the schedule),[3] SICH's inference from the facts that Commercial Risk may have influenced the resignation was perfectly reasonable. Furthermore, any speculation on SICH's part regarding the motivation for Mr. Dielmann's withdrawal was fueled by Commercial Risk's flat refusal to respond to SICH's request for "the details of any information that you or your client have, or any conversations that either you or your client have had with Mr. Dielmann concerning his actions."

---

[3] If Respondents truly viewed Mr. Dielmann's withdrawal as an unfortunate circumstance (Resp. Br. at 13), they would not be seeking to take advantage of that withdrawal to obtain a new Umpire.

6

Jacobson Dec., Exhibit 22.[4] Commercial Risk could have avoided that negative inference by simply responding and providing the information they now include effortlessly in their opposition papers; yet, they chose not to do so when the issue first arose. Instead, Respondents' counsel invited further speculation by replying that "we will not be responding in any way to the request for information." Jacobson Dec., Exhibit 23.

While the reasons for Mr. Dielmann's withdrawal (although still a mystery) are no longer at issue (and thus, require no hearing),[5] the controversy engendered thereby illustrates the public policy reason against requiring a new panel in the wake of an arbitrator's withdrawal. Indeed, whether provoked or not, Commercial Risk still seeks to take advantage of Mr. Dielmann's withdrawal to replace an Umpire who participated in an adverse decision.[6] Thus, what Commercial Risk is doing is attempting to manipulate the arbitral process to replace the Umpire. (See Pet. Br. at 1.) Indeed, Commercial Risk cannot seriously contend that, had it won the DIG Arbitration, it would be insisting on the Umpire's replacement.[7] It is this danger of manipulation that other courts have guarded against, that underlie the ethical rules of arbitrators (see Pet. Br. at 19-21), and should guide the Court's decision here. See <u>Dow Corning Corp. v. Safety Nat'l Cas. Corp.</u>, 335 F.3d 742, 749 (8th Cir. 2003) (noting that party advocating new umpire "well knew, starting over would have deprived [its opponent] of its 'win' in the umpire selection process.");

---

[4] This was particularly curious given Mr. Dielmann's prior candor in disclosing that scheduled cancer surgery required re-scheduling of the DIG and Non-DIG Arbitration hearings.

[5] Commercial Risk appears to request a hearing for the purpose of "establish[ing] the . . . actual circumstances of Mr. Dielmann's withdrawal" (see Resp. Br. at 4), which SICH will not challenge in connection with this Petition. Thus, any need for an evidentiary hearing on this Petition is obviated.

[6] These facts are undisputed. The DIG Arbitration resulted in a majority award against Commercial Risk and Commercial Risk seeks to replace Mr. Thirkill. See Resp. Br. at 11; Answer ¶¶ 50, 89.

[7] By selecting the same panel to preside over both arbitrations, the parties accepted the fact that, inevitably, one side would be dissatisfied with the first ruling, and nonetheless would have to proceed to arbitrate the second matter before the same panel. Respondents should not be allowed to disavow this expectation and seek a new Umpire.

7

National American Ins. Co. v. Transamerica Occidental Life Ins. Co., 328 F.3d 462, 465 (8th Cir. 2003) (party "cannot now use the resignation of its chosen arbitrator to abort the arbitration process."); Arista Marketing Assocs. Inc v. Peer Group, Inc., 720 A.2d 659, 670 (N.J. Super 1998) (distinguishing case where death of arbitrator led to selection of new panel, and observing "[t]he death of an arbitrator, where no one is at fault, is different from circumstances where the actions of one party causes the pre-arbitration disqualification of its designated arbitrator").

Any rule which allows a party to use the resignation of its own appointed arbitrator as an excuse to demand a new panel would create an environment in which one could artfully orchestrate or subtly encourage an arbitrator's resignation for strategic purposes. As a matter of public policy, parties should not be given this ability to compromise the integrity of a panel, once selected and accepted. Therefore, Commercial Risk, as the party whose appointed arbitrator resigned, should not be allowed to demand the ouster of the rest of the panel.

**D.     The Treaties Require Commercial Risk To Proceed With
        The Arbitration On The Agreed-Upon June 25-29, 2007 Dates**

Commercial Risk challenges this Court's authority to order the parties to proceed on the agreed-upon June 25-29 Hearing dates because "[n]othing in the arbitration agreements herein require the arbitration hearing to take place on specific dates." (Resp. Br. at 8.) Commercial Risk is simply wrong. The Arbitration Clause expressly provides that "the case shall be submitted to the arbitrators within thirty (30) days of the appointment of the third arbitrator." Jacobson Dec., Exhibit 1 at 19. While Commercial Risk and SICH agreed to modify that term to provide that the Hearing would take place on March 5, 2007, and then (to accommodate Commercial Risk's party appointed arbitrator Mr. Dielmann) June 25, 2007, SICH did not agree to waive this provision entirely. See, e.g., Exhibit 1 at 20 (Article 34(D)). Thus, pursuant to the parties' agreement, this Court has the authority to compel Commercial Risk to proceed with the

8

Non-DIG Arbitration on the agreed-upon dates. 9 U.S.C. §§ 4, 206.[8]

**POINT II -- THIS COURT SHOULD APPOINT A TREATY-ELIGIBLE ARBITRATOR BECAUSE RESPONDENTS HAVE NOT DONE SO**

Commercial Risk admits that 9 U.S.C. §§ 5 and 206 permit a court to appoint an arbitrator where there is a "lapse in . . . filling a vacancy." (Resp. Br. at 13.) However, Respondents claim that since they named Mr. Gentile to fill the vacancy, there is no lapse. Id. Both Commercial Risk and Mr. Gentile, however, have refused to demonstrate that Mr. Gentile is "disinterested," which is an indisputable requirement for an arbitrator to be eligible for service under the Treaties. Jacobson Dec., Exhibit 1 at 19 ("All arbitrators shall be . . . disinterested in the outcome of the arbitration"). Thus, if Mr. Gentile is not disinterested, he is not qualified to serve under the Treaties, and there is, indeed, a lapse by Commercial Risk in filling the vacancy.

It is significant that nowhere in their submission does Commercial Risk undertake to demonstrate that Mr. Gentile could be considered disinterested. And, given this absence of information, SICH understandably has significant concerns regarding Mr. Gentile's disinterestedness.

While Commercial Risk eschews the reinsurance industry practices that support arbitrator replacement in the event of a vacancy, Commercial Risk cites those same "practices" that generally require that arbitrator disclosures be made "on the record at an organizational meeting." (Resp. Br. at 13.) The parties are not, as Commercial Risk would have it, at the initial stage of the arbitrator appointment process. An organizational meeting has already been held; two arbitrators have already been accepted; and the practices followed at that beginning stage are not appropriate here, as delaying potentially disqualifying disclosures until after a second such

---

[8] Despite Respondents' characterization of the relief sought as injunctive (Resp. Br. at 8), it is, in fact, merely enforcement of an arbitration agreement, as permitted by the Convention and the FAA. Id.

9

"organizational meeting" could further delay hearing and resolution of the Non-DIG Arbitration.

Once again (as it chose to do in withholding a response to SICH regarding its knowledge of Mr. Dielmann's withdrawal), by intentional design, Commercial Risk is withholding information.[9] As SICH has indicated, if Mr. Gentile is disinterested, it is willing to proceed with Mr. Haber, Mr. Gentile, and Mr. Thirkill as the Panel. If Mr. Gentile is not disinterested, or Commercial Risk declines to supply information required to so demonstrate, it is a lapse in arbitrator appointment that this Court may, and should, fill under 9 U.S.C. §§ 5 and 206.

## CONCLUSION

For the reasons set forth above, as well as in SICH's Petition, and moving submissions, SICH's Petition to Compel Commercial Risk to proceed with the Non-DIG Arbitration with Mr. Thirkill as Umpire on the agreed-upon dates should be granted, along with such other and further relief as the Court deems necessary or appropriate.

Dated: New York, New York
       May 4, 2007

STROOCK & STROOCK & LAVAN LLP

By: _____
    Michele L. Jacobson (MJ 4297)
*Attorneys for Petitioner*
180 Maiden Lane
New York, New York 10038
(212) 806-5400

Of Counsel:
  Michele L. Jacobson
  Regan A. Shulman
  Andrew Lewner
  Christian Fletcher

---

[9] Contrary to Respondents' suggestion that completing an Umpire Questionnaire is "punishment" and a "superfluous examination," the questionnaire, Jacobson Dec., Exhibit 11, contains the same questions answered by Mr. Thirkill and requests the same information provided by the other arbitrators on the record to confirm their disinterested status. Jacobson Dec., Exhibit 15 at 4:25 – 15:18.