UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**TO BE FILED
UNDER SEAL**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of the Arbitration of : Docket No. 07 CV 3277 (VM)

SECURITY INSURANCE COMPANY OF HARTFORD
Itself and as Successor in Interest to
THE FIRE AND CASUALTY INSURANCE COMPANY
OF CONNECTICUT and THE CONNECTICUT
INDEMNITY COMPANY,

Petitioner,

-against-

COMMERCIAL RISK REINSURANCE COMPANY
LIMITED (BERMUDA) and COMMERCIAL RISK RE-
INSURANCE COMPANY (VERMONT),

Respondents.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN SUPPORT OF
SECURITY INSURANCE COMPANY OF HARTFORD'S
PETITION TO CONFIRM ARBITRATION AWARD**

STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, New York 10038
(212) 806-5400

*Attorneys for Petitioner*

Of Counsel:
  Michele L. Jacobson
  Regan A. Shulman
  Andrew Lewner
  Christian Fletcher

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 4

    A.  Commencement of the Arbitration ............................................................. 4

    B.  Selection of the Panel .................................................................................. 5

    C.  CR's Change of Position .............................................................................. 6

    D.  Evidence Adduced at the Arbitration Hearing ........................................... 8

          1.  The Treaty Terms ................................................................................ 9

          2.  Neither Industry Standards Nor Course
              of Conduct Required "Zero Tolerance" ........................................... 10

          3.  Throughout the Course of the Programs, CR
              Acknowledged and Accepted Deviations from
              the Underwriting Guidelines Regarding Referrals ........................... 14

          4.  SICH's Damages ............................................................................... 15

    E.  The Panel's Issuance of the Award ........................................................... 16

ARGUMENT ................................................................................................................. 19

    POINT I   THE ARBITRATION AWARD SHOULD BE
                         CONFIRMED ............................................................................ 19

CONCLUSION ............................................................................................................. 23

## TABLE OF AUTHORITIES

### CASES

ABC v. DEF,
    No. 07-2440-cv (2d Cir. filed June 13, 2007) ................................................... 6

Bear Stearns & Co., Inc. v. 1109580 Ontario, Inc.,
    409 F.3d 87 (2d Cir. 2005) ............................................................................. 22

Continental Grain Co. v. Foremost Farms Inc.,
    No. 97 Civ. 0848(DC), 1998 WL 132805 (S.D.N.Y. Mar. 23, 1998) ............................. 20

Florasynth, Inc. v. Pickholz,
    750 F.2d 171 (2d Cir. 1984) ............................................................................ 21

Folkways Music Publishers, Inc. v. Weiss,
    989 F.2d 108 (2d Cir. 1993) ............................................................................ 22

Henry v. Murphy,
    No. M-82, 2002 WL 24307 (S.D.N.Y. Jan. 8, 2002) ............................................. 20

NAR S.P.A.-Industria Nastri Adesivi v. I.R. Industries,
    5 F. Supp. 2d 203 (S.D.N.Y. 1998) ................................................................. 20

Security Insurance Co. v. Commercial Risk Reinsurance Co.,
    No. 07-CV-2772 (VM) (S.D.N.Y. May 8, 2007) ........................................... 6, 21

Wien & Malkin LLP v. Helmsley-Spear, Inc.,
    6 N.Y.3d 471 (2006) ...................................................................................... 22

Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.,
    126 F.3d 15 (2d Cir. 1997) ........................................................................ 19, 20

### STATUTES

9 U.S.C. § 9 .............................................................................................................. 21

9 U.S.C. § 202 .......................................................................................................... 19

9 U.S.C. § 207 .......................................................................................................... 19

9 U.S.C. § 208 .......................................................................................................... 20

## PRELIMINARY STATEMENT

Security Insurance Company of Hartford, for itself and as successor in interest to the Fire and Casualty Insurance Company of Connecticut and the Connecticut Indemnity Company ("SICH"), submits this memorandum of law in support of its Petition to confirm the award issued by the arbitration panel presiding over an underlying arbitration proceeding with its reinsurers, Commercial Risk Reinsurance Company Limited (Bermuda) ("CR Bermuda") and Commercial Risk Re-Insurance Company (Vermont) ("CR Vermont") (together, "CR"), in which SICH sought to recover losses relating to three workers' compensation programs under five reinsurance treaties (the "Arbitration"). By all contemporaneous accounts, the three workers' compensation programs involved in the Arbitration – the HPP Workers' Compensation Program (the "HPP Program"), the NHE Workers' Compensation Program (the "NHE Program"), and the ORS Workers' Compensation Program (the "ORS Program") – were well-run by their respective managing general agents/program managers – High Performance Programs Group ("HPP"), NHE Managers LLC ("NHE"), and Occupational Risk Service Managers LLC ("ORS")[1] – and operated to the satisfaction of both SICH, the insurer, and CR, the reinsurer. Indeed, CR accepted their quota share percentage of the premiums and paid losses without complaint until several years later when SICH entered run-off and CR embarked on their present course of unjustifiably refusing payment due and owing under their reinsurance contracts with SICH.

The underlying Arbitration, which the parties referred to as the "Non-DIG Arbitration" to distinguish it from another dispute between them, centered on five reinsurance treaties pursuant to which CR agreed to reinsure SICH for workers' compensation policies written by the MGAs in the HPP, NHE and ORS Programs: (1) the HPP Quota Share Reinsurance Agreement

---

[1] HPP, NHE, and ORS, the managing general agents and program managers are collectively referred to herein as the "MGAs."

incepting May 1, 2000; (2) the HPP Quota Share Reinsurance Agreement incepting May 1, 2001;
(3) the NHE Quota Share Reinsurance Agreement incepting March 15, 2000; (4) the NHE Quota
Share Reinsurance Agreement incepting March 15, 2001; and (5) the ORS Quota Share
Reinsurance Agreement incepting September 1, 2001 (together, the "Treaties").[2]  The Treaties
memorialize the agreements by CR, as subscribing reinsurers, to accept a percentage share of
SICH's interests and liabilities in relation to the HPP, NHE, and ORS Programs that SICH
insured.

At the outset of the Arbitration, CR refused to pay amounts billed by SICH based on the
contention that there were "numerous instances" where the MGAs breached the underwriting
guidelines and "substantial numbers" of policies ceded to the Treaties which had not been
underwritten in conformity with the underwriting guidelines.  See Exhibit 7 (CR position
statement) at 5-7.[3]  By the time the Arbitration Hearing commenced, CR was challenging only a
tiny fraction of the policies written by the MGAs – less than 2%.  See Exhibit 11 at 25:17-24,
32:2-33:8 (Higgins opening); 6:11-8:25 (Jacobson opening) and 608:18-609:05 (Jacobson
closing).

Although they did not present a single witness at the hearing, CR argued that their non-
payment was justified because the files for thirty-seven particular policies (out of the 2,336 total
that had been ceded to the five Treaties) lacked documentation of a referral by the MGA to SICH
as allegedly required under the respective Underwriting Guidelines, and thus, were not covered

---

[2]    The Treaties are identical to each other in all material respects other than program name, quota share
percentage, limits, inception date, and termination date.

[3]    All Exhibits referenced herein are attached to the accompanying Declaration of Michele L. Jacobson, dated
August 10, 2007.

by the Treaties.[4]  CR also contended that the damages calculations advanced by SICH were improper.  See 666:11-22 (Higgins closing).

Through evidence presented at the Arbitration Hearing, SICH conclusively demonstrated that all of the business written by the MGAs was covered, and that CR's "zero tolerance" approach to the absence of referral documentation in thirty-seven policy files did not comport with the language of the Treaties, the custom and practice in the industry, or the course of conduct of the parties.  Moreover, at the Arbitration Hearing, SICH also introduced evidence of a referral for virtually every one of those thirty-seven policies.  On the issue of damages, SICH proffered its calculations through its damages witness, André Lefebvre.  The hearing lasted three days, during which SICH presented, and CR cross-examined, four factual witnesses and one expert, and the parties introduced a significant number of documents.[5]  The parties also submitted pre-hearing briefs on the issues in dispute.

The Arbitration culminated in a unanimous Reasoned Award (the "Award"), which: directed CR Bermuda to pay SICH $2,512,816.79, plus interest in the amount of $330,478.21; directed CR Vermont to pay SICH $417,714.65, plus interest in the amount of $66,959.73; and declared that "the Treaties are binding and enforceable and that [CR] is required to remit payment pursuant to the terms of the applicable Treaties as cession statements are remitted." Exhibit 39 at 6 (the Award).

SICH now seeks confirmation of the Award and respectfully requests that this Court follow the mandate of Section 207 of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (9 U.S.C. §§ 201-208) (the "Convention") and Section 9 of the Federal

---

[4]    At his deposition, CR's Chief Financial Officer could not explain how the remaining amounts outstanding related to the thirty-seven policies.  See Exhibit 8 at 118:25-120:17, 121:4-122:5 (Passis depo.).

[5]    Although CR had the opportunity to present live witnesses at the hearing, CR chose not to do so.

Arbitration Act (9 U.S.C. §§ 1-16) (the "FAA") and issue an Order confirming the Award and entering Judgment thereon.

## **STATEMENT OF FACTS**

The Arbitration arose out of a dispute under five Treaties, pursuant to which CR agreed to reinsure SICH, up to a stated limit, for an agreed upon quota share of each loss arising under the HPP, NHE, and ORS Programs.  See Exhibits 1 - 5 at Exhibit A (limits and percentages). While CR sought to avoid coverage under the Treaties for certain of the policies bound in the HPP, NHE, and ORS Programs, the evidence adduced at the Arbitration Hearing soundly defeated CR's asserted defense.  The following is a factual summary of the evidence that was adduced at the Arbitration Hearing, both via documents and via witness testimony, and a description of the significant procedural history.

**A.    Commencement of the Arbitration**

SICH was the insurer, and CR its reinsurer, for over 2,300 workers' compensation insurance policies bound in the HPP, NHE, and ORS Workers' Compensation Programs. Exhibit 11 at 473:12-14, 477:4-8, 481:13-15 (Macdonald); id. at 414:7-8 (Lefebvre).  The parties' relationship was memorialized in five reinsurance Treaties, spanning the period March 15, 2000 to June 30, 2002, pursuant to which CR, as subscribing reinsurers, agreed to accept a percentage share of SICH's interests and liabilities in workers' compensation policies written in the HPP, NHE, and ORS Programs.  See Exhibits 1-5.  In accordance with the terms of the Treaties, SICH issued cession statements to CR accounting for premium and losses, and remitted to CR their proportionate share of premium net of losses.  Exhibit 11 at 384:2-15 (Lefebvre). The parties performed a reconciliation of the HPP, NHE, and ORS Programs at year-end 2004. Id. at 382:8-383:12 (Lefebvre).  Notwithstanding this reconciliation, CR did not pay all amounts

4

outstanding.  Id. at 383:5-8, 385:2-12 (Lefebvre).  CR did not pay future amounts as they came

due either.  Id. at 386:5-17 (Lefebvre).

The Treaties provide that any disputes between SICH and CR are to be settled in a

binding arbitration, conducted in accordance with the procedure set forth in the arbitration clause

(the "Arbitration Clause"):

> any dispute relating to the interpretation or performance of th[e] Contract,
> including its formation or validity, or any transaction under th[e] Contract,
> whether arising before or after termination, shall be submitted to arbitration.

*                    *                    *

> The decision in writing of the majority of the arbitrators shall be final and binding
> upon both parties.

Exhibits 1-5 at Article XXXII.  The Arbitration Clause also sets forth the procedure through

which a panel is to be chosen, stating that "each party shall choose an arbitrator and the two

chosen shall select a third arbitrator," "the arbitrators shall be active or retired officers of

insurance or reinsurance companies, or Lloyd's London Underwriters," and that "the parties

hereby waive all objections to the method of selection of the arbitrators, it being the intention of

both sides that all the arbitrators be chosen from those submitted by the parties."  Id.

Commercial Risk's protracted refusal to pay outstanding losses prompted SICH to

commence the Non-DIG Arbitration, in accordance with the Arbitration Clause contained in the

Treaties, by serving three separate Arbitration Demands – one for each of the HPP, NHE and

ORS Programs – on August 2, 2005.  See Exhibit 6.

**B.      Selection of the Panel**

In accordance with the Arbitration Clause of the Treaties, in its Arbitration Demands,

SICH identified its party appointed arbitrator for each of the disputes and requested that CR

appoint an arbitrator.  Id. at 5.  CR appointed an arbitrator and based on a commonly used,

agreed-upon process, the parties jointly selected a third arbitrator to serve as Umpire. See Jacobson Dec. ¶¶ 15-16.

After a substantial award was issued in SICH's favor by the identical arbitration panel in another arbitration between the same parties, CR's party-appointed arbitrator withdrew from the Non-DIG Arbitration without explanation. Id. at ¶ 19. At SICH's request, CR appointed a replacement arbitrator, but refused to proceed with the Non-DIG Arbitration Hearing with the previously agreed-upon Umpire on the previously agreed-upon dates of June 25-June 29, 2007. Id. at ¶ 20. Accordingly, SICH filed a Petition to Compel CR to proceed with the Hearing as required by the Treaties and established case law. Id. at ¶ 21. After the parties briefed the issues on an expedited basis and after the Court heard oral argument on the Petition, this Court granted SICH's Petition to Compel CR to proceed with the agreed-upon Umpire on the previously agreed-upon dates. See Security Ins. Co. v. Commercial Risk Reinsurance Co., No. 07-CV-2772 (VM) (S.D.N.Y. May 8, 2007) (order compelling arbitration).[6] Thereafter, in accordance with the Court's Decision and Order, the parties proceeded with the Non-DIG Arbitration Hearing as previously scheduled before a panel comprised of SICH's original party-appointed arbitrator, CR's replacement party-appointed arbitrator, and the original, mutually selected, Umpire (the "Panel"). Jacobson Dec. ¶ 23.[7]

## C.    CR's Change of Position

Despite its involvement in, and knowledge of, regularly conducted audits of the MGAs which revealed isolated lapses in referral protocol, during the life of the Programs CR never complained about such lapses or took any other action with respect thereto. See Exhibit 11 at

---

[6]    For the Court's convenience, a copy of this decision is annexed as Exhibit 9 to the Jacobson Dec. CR has noticed an appeal of this Decision and Order. See ABC v. DEF, No. 07-2440-cv (2d Cir. filed June 13, 2007).

[7]    Ultimately, the parties chose not to utilize the full five days set aside by the Panel for the Hearing, as the Arbitration Hearing was completed in three days.

68:2-19, 77:21-78:13 (Brown); 198:22-199:13 (Carlin); 466:7-10, 526:19-532:16, 539:16-540:20, 590:5-571:8 (Macdonald).

In its Position Statement filed at the outset of the Arbitration, CR represented that it had not paid losses because it had discovered that "substantial numbers of policies . . . were written and ceded to the treaties which had not been underwritten in conformity with the Underwriting Guidelines . . ." Exhibit 7 at 5 (emphasis added). CR also informed the Panel that it had commissioned a preliminary audit that revealed "numerous instances [in which] the Underwriting Guidelines were seriously and materially breached." Id. at 6 (emphasis added). Tellingly, while CR's claim of "substantial" and "numerous" alleged underwriting guideline violations was derived from that preliminary audit, the evidence adduced during discovery and presented at the Arbitration Hearing demonstrated that NRC LLC ("NRC"), the firm which conducted that so-called preliminary audit, had no written material concerning that audit – not notes, not work papers, and not a report. See Exhibit 10 at 50:9-51:15 (Sachdev depo. designated testimony).[8] As acknowledged by NRC's auditor, that is a highly unusual and unprecedented state of affairs for NRC. Id. at 60:12-24.

After more than a year of discovery and CR's performance of another audit in connection with this Arbitration, CR abandoned their claim of "substantial" and "numerous" alleged underwriting guideline violations. See Exhibit 11 at 25:17-24, 32:02-33:08 (Higgins Opening). Significantly, after CR's targeted audit of a biased sample of underwriting files in October 2006, CR emerged with a meager total of thirty-seven policies – out of the 2,336 policies that were written in the HPP, NHE, and ORS Programs – that were allegedly underwritten in violation of

_____

[8]     CR did not present Mr. Sachdev or any NRC representative at the Arbitration Hearing. Instead CR designated (and in response SICH counter-designated), certain portions of Mr. Sachdev's deposition testimony for the Panel's consideration.

the underwriting guidelines for their respective programs. See Exhibit 11 at 39:5-7 (Higgins Opening) ("We believe that the only issue for the Panel is coverage of these 37 policies under the coverage provision of the contract"); id. at 25:17-24, 32:2-33:8. Of the total population of policies bound in the HPP, NHE, and ORS Programs, these thirty-seven alleged violative policies constitute approximately 1.6% of the policies written. See Exhibit 11 at 414:7-11 (Lefebvre). This quantification is neither "numerous" nor "substantial."

CR attempted to use the Arbitration to search for some excuse to avoid payment, and then they failed to find one. CR's initial, unsubstantiated allegations of "numerous" and "substantial" underwriting guideline violations were a pretext they concocted to withhold payment from SICH, which is further confirmed by the fact that when called to testify by SICH, CR Chief Financial Officer Jeffrey Passis admitted that he did not know who at CR formulated the corporate decision not to pay. Exhibit 11 at 375:5-376:25 (Passis).

**D.    Evidence Adduced at the Arbitration Hearing**

The Arbitration Hearing was conducted from June 25-27, 2007 in New York, New York. SICH called four fact witnesses, including Marc Brown and Peter Carlin – the SICH underwriters for the HPP, NHE, and ORS Programs – and an expert witness, and presented evidence that the terms of the Treaties and the custom and practice of the industry required that the parties must reasonably attempt to ensure adherence to Underwriting Guidelines, but that alleged minor deviations from guidelines would not defeat coverage under the Business Covered clauses of the Treaties. Exhibit 11 at 40:8-80:4, 112:15-117:6 (Brown); id. at 118:16-213:14, 266:6-276:17 (Carlin); id. at 455:22-549:18, 583:5-585:18 (Macdonald). SICH also adduced evidence establishing that, as contemplated by the Treaties' terms and the custom and practice of the industry, and as reflected by the parties' course of conduct, the parties did not intend for the Business Covered clause of the Treaties to be interpreted so as to eliminate from coverage a

8

small number of policies allegedly beset with Underwriting Guideline violations.  Id.  SICH

further presented evidence debunking CR's claim that thirty-seven policies lacked

documentation of a referral.  See Exhibit 11 at 632:18-636:14 (Jacobson closing) (summarizing

evidence).

In response, CR called no live fact or expert witnesses whatsoever, and presented only

the designated deposition testimony of NRC auditor Deepak Sachdev – and his reports – for the

proposition that documentation of referrals was absent from thirty-seven policy files.  See,

generally, Exhibit 11; see also Exhibit 10 (Sachdev depo.).

In addition to the witnesses' testimony, the Hearing Record included among other things,

the Treaties and Underwriting Guidelines, numerous contemporaneous audit reports of the

Programs, and documents establishing that with respect to the NHE and ORS Programs, CR

entered into rent-a-captive arrangements with the MGAs – which it attempted to keep secret

from SICH – by which CR retroceded losses back to the MGAs.  Exhibits 1-5 (Treaties);

Exhibits 12-16 (Underwriting Guidelines); Exhibits 17-25 (audit reports); Exhibits 27-28 (rent-a-

captive agreements); see also Exhibit 11 at: 293:17-298:25 (Passis).

1.    **The Treaty Terms**

Significantly, each of the five Treaties at issue in this Arbitration includes an "Honorable

Engagement" clause, which provides that:

> The arbitrators shall interpret th[e] Contract as an honorable engagement and not
> as merely a legal obligation; they are relieved of all judicial formalities and may
> abstain from following the strict rules of law.

Exhibits 1-5 at Article XXXII (emphasis added).  SICH argued (Exhibit 11 at 22:2-22; 605:22-

607:3; 636:23-637:11), and the Panel agreed (Exhibit 39 (Award) at ¶ 8), that such an Honorable

Engagement clause required the panel to consider as evidence industry custom and practice, as

well as the parties' course of conduct, with respect to the implementation of underwriting

guidelines.  The Panel members' familiarity with industry custom and practice was plainly

important to the parties, as their agreements also include the requirement that

> [a]ll arbitrators shall be active or retired officers of insurance or reinsurance
> companies, or Lloyd's London Underwriters, and disinterested in the outcome of
> the arbitration.

Exhibits 1-5 at Article XXXII.

Additionally, each of the Treaties contains an Errors and Omissions Clause, which

provides that:

> [a]ny inadvertent delay, error or accidental omission of either party shall not be
> held to relieve either party hereto from any liability which would attach to it
> hereunder if such delay, omission or error had not been made, provided such
> delay, omission or error is rectified upon discovery.

Id. at Article XXII.  The Panel cited the Errors and Omissions Clause of the Treaties as evidence

of the parties' intent that the Underwriting Guidelines were not to be applied unwaveringly to

determine reinsurance coverage for each policy written in the program.  Exhibit 39 (Award) at

¶ 8.

### 2.    Neither Industry Standards Nor Course of Conduct Required "Zero Tolerance"

CR's asserted defense to payment in the Arbitration was based on their erroneous

interpretation of the Treaties' "Business Covered Clause" and Underwriting Guidelines as

prohibiting any latitude with respect to application of Underwriting Guidelines' criteria for

business that should be referred from the MGAs to the insurer (SICH's underwriting arm,

ARTIS) for approval.  In other words, CR advocated an interpretation of the Treaties that had

"zero tolerance" for any lapse in, or unconventional, policy referrals, regardless of the reason.

At the Hearing, SICH presented the testimony of an industry expert and the underwriters

responsible for the HPP, NHE, and ORS Programs, all of whom unanimously agreed that such a

"zero tolerance" approach was contrary to the custom and practice in the industry.

10

James Macdonald, SICH's expert with more than thirty-six years of experience variously as an insurer, reinsurer, and broker, opined in his expert reports that application of a zero-tolerance performance standard to the assessment of an insurer's duties under the terms of a reinsurance treaty "is unreasonable and unprecedented in the custom and practice of the business." Exhibits 40 at 13, 41 at 12, and 42 at 12. (Navigant Consulting Reports on the HPP, NHE, and ORS Programs, respectively).

At the Hearing, Mr. Macdonald described the custom and practice in the industry regarding program business referrals (Exhibit 11 at 491:25-493:8 (Macdonald)), and testified that "in the real business world . . . there are many occasions when it's reasonable that errors occur or referrals are not made because of a misunderstanding regarding a guideline, or referrals are made and simply not documented in the hard copy file." Id. at 489:22-490:7. Indeed, Mr. Macdonald confirmed that such conduct is "quite common." Id. at 490:15. In addition, Mr. Macdonald noted that, given the five to seven year age of the files inspected by NRC for CR, there was a good chance that documentation of referrals would be missing, thereby making it appear that no referral had been made when in fact it had. See id. at 490:16-491:24. Mr. Macdonald also testified regarding the evidence he found in the files and correspondence among the parties that demonstrated there had been referrals with respect to many of the thirty-seven challenged policies. Id. at 526:19-532:16, 590:5-571:8. But most importantly, Mr. Macdonald testified at the hearing that CR's "zero tolerance" interpretation of the Treaties was unreasonable, and inconsistent with industry practice:

> Q:    In your expert opinion, is it reasonable for a reinsurer to expect that 100 percent of files will be fully documented for referrals?
>
> MR. MACDONALD:    It would be completely unreasonable.
>
> Q:    Is that notwithstanding the inclusion of language in a business covered

provision that policies are to be written pursuant to and in accordance with Underwriting Guidelines?

MR. MACDONALD:    That's right.  The custom and practice of the business recognizes that 100 percent documentation in a file is an admirable goal, but it's in the real world, totally unachievable.

Q:    Why is that?

MR. MACDONALD:    For many reasons, such as simple error, oversight, lack of clarification or the fact that referrals were made, but the documentation just simply didn't make its way into the file.

Q:    We talked about reinsurer expectations with respect to lack of documentation.  Do reinsurers also acknowledge that an occasional referral that might have needed to be made was not made?

MR. MACDONALD:    Sure.

Q:    Is that something they generally accept in the custom and practice?

MR. MACDONALD:    Absolutely.  I have never heard of this standard that's being argued here being applied in my 36 years of experience in the business.

Q:    Have you ever heard in your 36 years of experience as a reinsurer, insurer, reinsurance broker of an instance of a zero tolerance standard such as the one Commercial Risk is proposing being accepted by an insurance company?

MR. MACDONALD:    It's completely unacceptable, and any reinsurer that ab initio stated that to be their position would never write a piece of business.

Q:    Is it ever workable in program business?

MR. MACDONALD:    It's never even been mentioned in my experience and wouldn't be accepted.

Q:    So you can't conceive of any insurer that would enter into a reinsurance contract with the understanding that a zero tolerance approach was going to be applied to Underwriting Guidelines and the referral process?

MR. MACDONALD:    Absolutely not.

Exhibit 11 at 547:2-549:8; see also id. at 501:18-502:11 (Macdonald).  Significantly, Mr.

Macdonald's testimony on this point was unrebutted.  CR offered no evidence to the contrary.

In addition to Mr. Macdonald's expert opinion, SICH underwriters Marc Brown and Peter Carlin testified that their contemporaneous understandings of the Treaties were consistent with Mr. Macdonald's explanation of industry practice. Marc Brown, an underwriter with thirty-three years of experience in the insurance and reinsurance industry, who oversaw the HPP Program, testified at length about his course of dealings with Sara Margesian, the CR representative and underwriter responsible for the HPP Program, including with respect to program audits. See, generally, Exhibit 11 at 43:2 – 80:3 (Brown). When asked for his reaction to CR's claim that "it should not have to cover . . . accounts which they claim to be outside of the Underwriting Guidelines because there's no referral in the file," Mr. Brown testified,

> I could not support that request. The Underwriting Guidelines are – first of all, they are guidelines, they are not dictates or mandates. It's an attempt to define the overall parameters of the program . . . the way I am looking at it is, well, okay, is the program manager making a - you know, a good faith effort to follow the guidelines as they are laid out? And I say yes, they are. . . . [D]o we expect them to achieve perfection with respect to, you know, every statement that's in there? No. . . .[T]he patterns that we observed in the audits indicate that they were doing a very good job complying with the guidelines as they are laid out.

Id. at 79:2 – 80:3. He also testified that in his own experience, CR's coverage position was not normal. See id. at 78:14-18.

Likewise, Peter Carlin, an underwriter with over thirty years of experience in the insurance industry, who oversaw the NHE and ORS Programs on behalf of SICH, testified extensively regarding his communications with Ms. Margesian of CR, including working with Ms. Margesian, receiving, reviewing, and approving or denying referrals of program business from the MGAs, and conducting periodic audits of the program, in which Ms. Margesian participated. See, generally, Exhibit 11 at 122:2 – 212:25 (Carlin). Based on his experience, Mr. Carlin testified "that the allegations that the policies in question aren't coverable is a specious assertion." Id. at 121:23-25. When asked if he felt it was "normal for a reinsurer of program

13

business who finds a policy ceded to a treaty without a referral to insist on backing it out?," he

responded, "[t]his is the first I have ever heard of it." Id. at 212:13-18.

3.    **Throughout the Course of the Programs, CR Acknowledged and Accepted Deviations from the Underwriting Guidelines Regarding Referrals**

Both Mr. Brown and Mr. Carlin testified in detail about audits performed by SICH and

others to monitor the performance of the MGAs for the HPP, NHE, and ORS Programs.

According to Mr. Brown, the HPP Program was audited at least three times during its two one-

year program terms. See Exhibit 11 at 57:10-75:5, 75:21-77:20 (Brown). On July 19 and 20,

2000, SICH and the HPP Program's excess reinsurer, Swiss Re, performed a joint audit.

Subsequently, CR and SICH jointly audited the program twice, first on January 9 and 10, 2001,

and then again on December 12, 2001. Id. Mr. Brown reported that Sara Margesian represented

CR at the latter two audits, and that she received a copy of the written summary report of the first

audit. Id. Significantly, as Mr. Brown testified, each of the audits, and the various reports

thereof, noted an instance of at least one policy that had not been referred in accordance with

Underwriting Guidelines. Id. at 58: 8-77:20.

Mr. Brown testified that notwithstanding CR's knowledge of the occasional referral

lapse, CR renewed their participation in the program. Id. at 75:6-16. Moreover, as Mr. Brown

pointed out, despite this knowledge, CR never objected to the HPP Program, never raised the

absence of referrals as an issue, never demanded that a non-referred policy be backed out and

never advised SICH that it would not cover a policy that had not been referred. Id. at 68:2-19,

77:21-78:13.

According to Mr. Carlin, the NHE and ORS Programs were audited three times. See

Exhibit 11 at 158:11-199:13 (Carlin). Two of the audits were performed jointly by CR and

SICH – in April 2001 and in January 2002 – and one audit was performed by CR alone on

14

October 17, 2001. Id. Mr. Carlin, like Mr. Brown, testified that Ms. Margesian was fully aware of the audits' findings, and that neither she, nor anyone else at CR, ever objected to CR's reinsurance participation in the programs. Id. at 198:22-199:13. Reviewing particular instances where the audits revealed that business had not been referred as the Underwriting Guidelines apparently required, Mr. Carlin testified that Ms. Margesian knew of, but did not object to the un-referred policies, and did not demand, as CR was now doing, that those policies be backed out of the programs or offer to refund the attendant premiums. Id. at 164:2-165:13, 196:19-197:3. Of particular significance, documentation of Ms. Margesian's audit of October 17, 2001 indicates that CR reviewed several of the thirty-seven policies now being challenged, and never recorded, or registered a complaint that such policies were required to be, but were not, referred. See Exhibit 11 at 526:19-532:16, 570:5-571:8 (Macdonald).

4. **SICH's Damages**

At the Hearing, SICH also presented the testimony of André Lefebvre, the Financial Risk Officer of SICH's parent company, and submitted exhibits Mr. Lefebvre prepared, to prove the amount of SICH's damages. Exhibit 11 at 378:14–455:7 (Lefebvre). Mr. Lefebvre testified to the chronology of SICH's billing CR, CR's failure to pay, and the negotiations between the two entities, as well as the method by which Mr. Lefebvre calculated the amounts currently owed by CR. Id. at 380:21-389:25; 390:2-407:16, 416:24-421:18 (Lefebvre); Exhibits 29, 30, and 31. For the amounts owed by CR with respect to each of the HPP, NHE, and ORS Programs, Mr. Lefebvre presented four interest calculations for the Panel's consideration. He used the rates of 4.5 percent, 8 percent, 9 percent, and 10 percent, representing SICH's historical rate of investment return, the North Carolina statutory interest rate, the New York statutory interest rate and the Connecticut statutory interest rate, respectively. See Exhibits 32, 33, and 34. Mr. Lefebvre's testimony included a summary of CR's payments, including the application of letters

15

of credit that were drawn down at CR's direction.  Exhibit 11 at 408:9-413:23 (Lefebvre).  And,

Mr. Lefebvre testified to CR's dilatory and otherwise improper conduct, upon which SICH's

claim for additional damages was based.  Id. at 422:10-423:8.

**E.      The Panel's Issuance of the Award**

On July 9, 2007, approximately two weeks after the conclusion of the Hearing, a

unanimous Panel issued a reasoned award[9] in SICH's favor in the amount of $2,930,531.44 in

damages, with interest at the 4.5% historical rate of investment return, in the amount of

$397,437.94.  Exhibit 35.  The effective date of the award was July 10, 2007 and the Panel

awarded interest at the rate of 10 percent on any balance that remained unpaid thirty business

days from the effective date of the award.  Id.  The Panel also declared that the Treaties were

binding and enforceable, that CR is to make payments, pursuant to the terms of the applicable

Treaties, as future cession statements are remitted, and that CR could not raise as a defense to

payment any issues brought before the Panel.  Id.  The Panel did not award punitive or

exemplary damages based on CR's dilatory conduct.  Id.

On July 10, 2007, SICH informed the Panel and CR via email of a potential

typographical error, which the Panel acknowledged and corrected the same day.  Exhibit 36.  On

July 11, 2007 CR asked the Panel to reconsider those portions of the award that granted interest

at 10% per annum on any unpaid balance after thirty business days, and that restricted CR from

advancing in the future any defenses to payment already raised in the Arbitration.  Id.

Additionally, CR requested that the award be physically signed by all three Panel members, and

that the amount of damages and interest awarded be broken out between CR Bermuda and CR

Vermont.  Id.  The Panel denied the request for reconsideration, but indicated that the award

---

9       The parties had requested, at the organization meeting in the Arbitration, that the Panel issue a reasoned award.

would be signed by each of the arbitrators, and asked SICH to provide a breakdown of the

payment amounts between CR Bermuda and CR Vermont. Exhibit 37. SICH complied with the

Panel's request and, after being requested to do so by CR, explained how it arrived at the

breakdown. Id. On July 14, 2007, after receiving SICH's breakdown and explanation, the Panel

issued a modified award (the "Award") that contained separate figures for CR Bermuda and CR

Vermont, but was in all other ways, identical to the initial written award (save for the

typographical errors that had earlier been corrected by the Panel). Compare Exhibit 39 with

Exhibit 35.[10] In the email accompanying the Award, the Panel confirmed that liability was

several as between CR Bermuda and CR Vermont. Exhibit 38. The Award retained its July 10,

2007 effective date and was signed by each of the arbitrators. Exhibit 39.

In the Award, the Panel articulated its decision as follows:

After reviewing the Treaties, in particular the "Arbitration" clauses (which state,
inter alia, that "*(t)he arbitrators shall interpret this contract as an honorable
engagement and not merely a legal obligation*), and the "Errors and Omissions"
clauses, the conduct of the Respondents during the terms of the Treaties (in
particular the actions of certain staff of Respondents who participated in audits
conducted by Petitioners and/or conducted their own audits and/or were in
communication directly with personnel from the Program Administrators and/or
agreed referrals directly with the Program Administrator without reference to
Petitioners) and after considering customs and practices in this area of the
reinsurance industry, the Panel concluded that while the general intent of the
parties was to attempt to ensure that any business written . . . was written so as to
be in accord with all requirements of any Underwriting Guideline, it was not a
specific intent that any particular policy straying from a strict ruling of the
Business Covered Clause (as such relates to Underwriting Guidelines) would not
be covered by the Treaties, unless:

(a) that particular policy was for a class or type of business not contemplated by
the Underwriting Guidelines or allowed per the Treaties [such as an aviation risk
which would not be covered regardless of whether it was otherwise written in
compliance with Underwriting Guidelines], . . . . or

---

[10] The signature pages bear the date July 16, 2007. See Exhibit 39.

> (b) Respondents could establish . . . that deviations from the Underwriting Guidelines were frequent and flagrant . . . .

Id.  It was not disputed that all of the challenged policies covered workers compensation risks. Exhibit 10 at 36:8-15 (Sachdev depo.); Exhibit 11 at 461:19-462:22, 494:10-23 (Macdonald). And the Panel noted that CR did not argue, and given the facts, could not have argued, that lapses in referrals were "frequent and flagrant" and ignored by SICH.  Exhibit 39 at ¶ 8(b). Having rejected CR's zero tolerance argument, the Panel concluded that it did not have to engage in a policy-by-policy referral analysis.  Id. at ¶ 9.

The "Reasoned Award" specifically laid out the basis for the Panel's decision, noting its reliance on the customs and practices of the industry – with which all three Arbitrators, as experienced reinsurance professionals, were undoubtedly familiar – and the Treaties' incorporation of an Honorable Engagement provision and an "Errors and Omissions" clause. Exhibit 39 at ¶ 8.  The Panel also cited its reliance on the parties' conduct during the course of the Programs, including CR's conclusion that the MGAs "were doing a reasonable job", and the absence of any contemporaneous objection by CR to the known lapses in referrals.  Exhibit 39 at ¶ 8(b) ("Petitioners and Respondents, it was particularly noted by the Panel, were aware that several lapses in referrals were found to have happened and that Respondents did or said nothing about that at the time.").

*     *     *

The Treaties provide that "Judgment may be entered upon the final decision of the arbitrators in any court having jurisdiction."  Exhibits 1-5 at Article XXXII.  The arbitrators have issued a final decision, and this Court has jurisdiction under the Convention and the FAA. Accordingly, SICH files the instant Petition for confirmation of the Award.

18

## **ARGUMENT**

## **POINT I:  THE ARBITRATION AWARD SHOULD BE CONFIRMED**

The Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9

U.S.C. §§ 201-208 (the "Convention") applies to any "arbitration agreement or arbitral award

arising out of a legal relationship, whether contractual or not, which is considered as commercial,

including a transaction [or] contract" except when the "agreement or award arising out of such a

relationship  . . . is entirely between citizens of the United States." 9 U.S.C. § 202.  The

Arbitration here undisputedly arises out of a commercial relationship, and CR Bermuda is not a

citizen of the United States.  Thus, the Convention governs confirmation of the Award.  See

Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc., 126 F.3d 15 (2d Cir. 1997).

Pursuant to the express language of the Convention, the Award must be confirmed.  The

Convention provides that

> any party to the arbitration may apply to any court having jurisdiction under this
> chapter for an order confirming the award as against any other party to the
> arbitration.  The court shall confirm the award unless it finds one of the grounds
> for refusal or deferral of recognition or enforcement of the award specified in the
> said Convention.

9 U.S.C. § 207 (emphasis added).  In the seminal case of Yusuf Ahmed Alghanim v. Toys "R"

Us, in which confirmation of an arbitration award was sought under the Convention, the United

States Court of Appeals for the Second Circuit explained:

> [T]he confirmation of an arbitration award is a summary proceeding that merely
> makes what is already a final arbitration award a judgment of the court.  The
> review of arbitration awards is very limited . . . in order to avoid undermining the
> twin goals of arbitration, namely, settling disputes efficiently and avoiding long
> and expensive litigation.  Accordingly, the showing required to avoid summary
> confirmance is high.

126 F.3d at 23 (internal quotations and citations omitted).  On the specific issue of enforcement

of an arbitral award under the Convention, the court held that "[u]nder the Convention, the

19

district court's role in reviewing a foreign arbitral award is strictly limited: 'The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.'" (internal citation omitted) Id. at 19.[11]

Moreover, this Court has repeatedly enunciated the minimal showing required for enforcement of an arbitration award that falls under the Convention.  See Henry v. Murphy, No. M-82, 2002 WL 24307, at *3 (S.D.N.Y. Jan. 8, 2002) ("the grounds for relief set forth in Article V of the Convention are the *only* grounds available for refusing to enforce an arbitral award.") (emphasis added); see also NAR S.P.A.-Industria Nastri Adesivi v. I.R. Industries, 5 F. Supp. 2d 203, 204 (S.D.N.Y. 1998); Continental Grain Co. v. Foremost Farms Inc., No. 97 Civ. 0848(DC), 1998 WL 132805, at *1 (S.D.N.Y. Mar. 23, 1998).

Confirmation of the Award in this case is also mandated under the Federal Arbitration Act, 9 U.S.C. §§ 1-16 (the "FAA"), which "applies to actions and proceedings brought under [the Convention] to the extent that [the FAA] is not in conflict with [the Convention] as ratified by the United States." 9 U.S.C. § 208.  Much like the Convention, the FAA provides that "any party to the arbitration may apply . . . for an order confirming the award, and thereupon the court

---

[11]    Under Article V of the Convention, the grounds for refusing to recognize or enforce an arbitral award are:

(a) The parties to the agreement ... were ... under some incapacity, or the said agreement is not valid under the law ...; or
(b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings ...; or
(c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration ...; or
(d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties ...; or
(e) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

See Convention at Art. V(1)

20

must grant such an order unless the award is vacated, modified, or corrected . . . ." 9 U.S.C. § 9. Thus, the FAA mandates confirmation of the Award here to the same extent as the Convention.

Here, there can be no doubt that the Award satisfies the requirements for confirmation. The parties knowingly and consensually submitted to arbitration in accordance with the Treaties. The Panel oversaw two days of live hearing testimony, complete with direct and cross-examination of four fact witnesses and an expert, and heard closing arguments on the third day. The Panel itself questioned all five of the witnesses to clarify specific portions of testimony and to resolve its own questions. See e.g. Exhibit 11 at 94:20-97:2, 114:2-117:7 (Brown); 242:8-252:10 (Carlin); 347:25-361:5 (Passis); 384:16-24 (Lefebvre); 540:11-21(Macdonald). Furthermore, prior to the Arbitration Hearing, the parties submitted, and the Panel reviewed, extensive pre-hearing briefs with exhibits and deposition testimony.

CR has not and cannot establish a ground under the Convention for refusing to recognize or enforce an arbitral award.[12] Moreover, given the manner in which the Arbitration Hearing was conducted, it is plain that the Convention's enumerated reasons for refusing enforcement do not apply, and CR cannot claim to the contrary.

As the Second Circuit has held, "the confirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court." Florasynth, Inc. v. Pickholz, 750 F.2d 171, 176 (2d Cir. 1984). "Arbitration awards are subject to very limited review in order to avoid undermining the twin goals of arbitration, namely,

---

[12]    To the extent that CR attempts to claim that "the composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties," that claim must be rejected, as CR's challenge to the composition of the arbitral authority was already raised and rejected by this Court, when the Court granted SICH's Petition to Compel CR to proceed with the Non-DIG Arbitration with the existing Umpire. See Security Ins. Co., No. 07-Civ-3277(VM) (order compelling arbitration) (Exhibit 9). While this Court's decision on the Petition to Compel is being appealed presently by CR, SICH respectfully submits that the appeal is meritless. Moreover, CR's challenge to the Umpire is largely irrelevant, as the Arbitration Clause requires only that the decision of the Panel be by a majority and the Reasoned Award was unanimous. Thus, irrespective of the Umpire's vote, a majority of the Panel ruled in favor of the Reasoned Award.

settling disputes efficiently and avoiding long and expensive litigation." <u>Folkways Music Publishers, Inc. v. Weiss</u>, 989 F.2d 108, 111 (2d Cir. 1993). "It is well settled that judicial review of arbitration awards is extremely limited. An arbitration award must be upheld when the arbitrator offer[s] even a barely colorable justification for the outcome reached." <u>Wien & Malkin LLP v. Helmsley-Spear, Inc.</u>, 6 N.Y.3d 471, 479 (2006) (citations omitted); <u>Bear Stearns & Co., Inc. v. 1109580 Ontario, Inc.</u>, 409 F.3d 87, 91 (2d Cir. 2005) ("arbitration decision must be confirmed if there is *any* basis for upholding the decision and 'if there is even a barely colorable justification for the outcome reached.'"). (emphasis added).

The Award, which contains the Panel's well-founded justification for its decision, and is fully supported by the evidence summarized above, easily surpasses any requirements for confirmation. Accordingly, an Order confirming the Award is amply warranted.

## CONCLUSION

For the foregoing reasons, SICH respectfully requests that the Court should (i) issue an Order confirming the Final Award issued, effective July 10, 2007, by the Arbitration Panel; (ii) enter Judgment on the basis thereof as itemized in the WHEREFORE clause of SICH's Petition to Confirm Arbitration Award; (iii) award SICH its costs in this litigation; and (iv) grant any further relief that the Court deems proper.

Dated:  New York, New York
       August 10, 2007

**STROOCK & STROOCK & LAVAN, LLP**

By: _____
Michele L. Jacobson (MJ-4297)
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, New York 10038
(212) 806-5400

Of Counsel:

Michele L. Jacobson
Regan A. Shulman
Andrew Lewner
Christian Fletcher