**Page 1**

```
------------------------------x
In the Matter of the Arbitration
         -of-
SECURITY INSURANCE COMPANY OF HARTFORD Itself
and as Successor in Interest to THE FIRE AND
CASUALTY INSURANCE COMPANY OF CONNECTICUT and
THE CONNECTICUT INDEMNITY COMPANY,

                Claimant,

        -against-

COMMERCIAL RISK REINSURANCE COMPANY LIMITED
(BERMUDA) and COMMERCIAL RISK RE-INSURANCE
COMPANY (VERMONT),

        (Non-DIG Arbitration) Respondents.
------------------------------x

            March 28, 2006
            10:05 a.m.
            Stroock & Stroock & Lavan LLP
            180 Maiden Lane
            New York, New York

        ORGANIZATIONAL MEETING
BEFORE:

    DAVID A. THIRKILL, Umpire

    MARTIN D. HABER, ESQ., Arbitrator

    THEODOR DIELMANN, Arbitrator


Reported by:
ANDREW WALKER, RPR (1991)
```

**Page 2**

APPEARANCES:

STROOCK & STROOCK & LAVAN LLP
    Attorneys for Claimant
    180 Maiden Lane
    New York, New York 10038-4982

BY: MICHELLE L. JACOBSON, ESQ.
    ANDREW LEWNER, ESQ.

D'AMATO & LYNCH
    Attorneys for Respondents
    70 Pine Street
    New York, New York 10270

BY: JOHN P. HIGGINS, ESQ.


ALSO PRESENT:

    JAMES F. MEEHAN, ESQ.
    Vice President and General Counsel
    Royal & SunAlliance USA

    ANDRE LEFEBVRE
    Financial Risk Officer
    Royal & SunAlliance USA

    JOELLE de LACROIX
    CRP

**Page 3**

THE UMPIRE: Let's go on the record.

Good morning, ladies and gentlemen. This is the organizational meeting of a dispute between Security of Hartford Insurance Company and Commercial Risk Reinsurance Company Limited, and I think we've all agreed to caption this as, in parentheses, "Non-DIG" to distinguish it from another dispute between the parties which have, in effect, the same cast of characters if different underlying contracts.

I think everybody has got a copy of an agenda that was circulated and, if so, we could move straight to that agenda and item 1, "Disclosures."

The panel, if it's okay with you, would like to use the same disclosures as was disclosed at the previous hearing on the DIG matter. The obvious only update is that whereas before you had not secured an umpire, in this matter

**Page 4**

Proceedings - 3/28/06

obviously now you have, and it's me. I have no additional disclosures to that.

If none of the other panelists do --

MR. HABER: I have no further disclosures.

MR. DIELMANN: No, none either.

THE UMPIRE: Would that be acceptable to the parties?

MS. JACOBSON: Yes, that's acceptable.

MR. HIGGINS: Yes.

THE UMPIRE: So I thus assume there's no questions of the panel in relation to those disclosures. And would, therefore, ask you to formally accept the panel as it is.

MS. JACOBSON: We accept the panel on behalf of the claimant.

MR. HIGGINS: We do on behalf of respondent.

THE UMPIRE: May I take this opportunity, I understand that there's been some family situation with Mr. --

5

```
1           Proceedings - 3/28/06
2   Bob Lewin, and the panel would like to
3   pass on condolences to him in that
4   regard.
5           MS. JACOBSON: I will pass those
6   along, thank you.
7           THE UMPIRE: I think we had a hold
8   harmless at the last hearing.
9   Presumably somebody's prepared one on a
10  similar basis.
11          MS. JACOBSON: We have.
12          MR. LEWNER: Yes.
13          THE UMPIRE: Go off the record for
14  a second.
15          (Pause in the proceedings)
16          THE UMPIRE: Back on the record.
17          Just for the record, during the
18  break the parties signed -- the parties
19  and the panel signed both the hold
20  harmless and a confidentiality
21  agreement.
22          Before we go on to brief
23  statements, what we'd like to do is to
24  go through this organizational meeting
25  and then adjourn that and then stay on
```

6

```
1           Proceedings - 3/28/06
2   the record for some questions in
3   relation to the security issue, and then
4   we'll go off that record and the panel
5   will meet, and, if necessary, discuss
6   security related to both matters since
7   from a principle viewpoint we believe
8   that the issues are the same.
9           That's what we'd like to do if
10  that's okay with you.
11          MS. JACOBSON: That's fine.
12          MR. HIGGINS: That's fine with us.
13          THE UMPIRE: Thank you.
14          So if we move on, obviously -- and
15  thank you, the panel would like to thank
16  the parties for the position statements
17  received, I think they were very clear,
18  as were the exhibits. If you'd like to
19  add anything to it, you should go ahead.
20          MS. JACOBSON: Okay.
21          At the outset -- I would like to
22  thank the panel for hearing this matter.
23          At the outset, I want to make
24  clear that although we've been referring
25  to this arbitration as the non-DIG
```

7

```
1           Proceedings - 3/28/06
2   arbitration, in reality it's really
3   three separate programs, NHE, ORS and
4   HPP, that are all governed by separate
5   reinsurance contracts. Commercial Risk
6   has failed to make payments under three
7   separate reinsurance agreements which
8   covered business written by three
9   program managers with three separate
10  sets of facts. What's notable, really,
11  about Commercial Risk's position
12  statement is what it doesn't say.
13  Although paying lip service to the
14  notion that it's going to satisfy its
15  obligations under the reinsurance
16  agreements, it hasn't done that.
17          Despite the fact that Commercial
18  Risk has been in and audited, it does
19  not share the audit with the panel or
20  with the claimant. What's plain is that
21  Commercial Risk really doesn't have a
22  position, they only intend to use this
23  arbitration proceeding as a means to go
24  fish.
25          We will show that Commercial Risk,
```

8

```
1           Proceedings - 3/28/06
2   contrary to their position statement,
3   was very involved in these three
4   programs, and that their underwriter
5   participated in joint audits with
6   Security of Hartford. Commercial Risk
7   was in large measure the risk bearer and
8   took that role very seriously. If
9   anyone is an ostrich--and I've taken
10  that from their position
11  statement--that's Commercial Risk now
12  and not Commercial Risk at the time.
13  These reinsurance agreements were all
14  terminated or expired by June 30th of
15  '02 and if, in fact, there were
16  problems, why does it take so long for
17  them to complain?
18          We've asked for prehearing
19  collateral. I don't know if the panel
20  would like me to address that now, but
21  as set forth in our papers we are
22  seeking security in connection with this
23  proceeding.
24          THE UMPIRE: Unless my
25  co-panelists have another decision, if
```

**Page 9**

Proceedings - 3/28/06

you're talking in a principle sense, keep going; if you want to get into details, why don't you leave that to the post-organizational meeting discussion I referred to earlier.

MS. JACOBSON: Okay. Well, in essence, our contention is that under the reinsurance contracts, each reinsurance contract, there is a provision for security that is unconditional, it's not conditioned on there not being any disputes. So irrespective of whether or not we are in an arbitration proceeding, Commercial Risk is required to post that as a contractual matter. We are seeking that security now, we're calling it prehearing security but, in essence, it's a contractual right which is unconditional, and if the panel would like, I can set aside the numbers discussion for later on.

THE UMPIRE: Please.

MS. JACOBSON: Thank you.

**Page 10**

Proceedings - 3/28/06

THE UMPIRE: Thank you.

MR. HIGGINS: We also would like to thank the panel for attention.

We agree there are three separate contracts, three separate contractual agreements, but we take serious issue with an implication that we're fishing here. We did take a limited audit, and that limited audit disclosed several irregularities, to put it mildly, in the underwriting. And those, although there isn't a formal report of this arbitration, we did share the conclusions in broad terms. As a matter of fact, a lot of it has to do with referrals and that sort of thing, and a statement was made by RSA that those referral documents and all the issues relating to the referral question would be delivered to us last year, and we're still waiting for them. So to suggest that we're fishing is, I think, not correct, and shouldn't be given any weight by the panel.

**Page 11**

Proceedings - 3/28/06

In terms of the contractual right to security, I think we can get into the details of it later. The only statement we made in support of it at this stage by Security is--I think there are too many "securitys" here, but by Security--is the contractual obligation. They, in fact, made three arguments; I don't know whether you want me to deal with those at this stage as a matter of principle. I'm happy to if that's the panel's wish.

THE UMPIRE: Go ahead.

MR. HIGGINS: To begin with, they've cited Section 13 -- was it?

MS. JACOBSON: 1213.

MR. HIGGINS: -- 1213 of the New York Insurance Law. This has never been used by an arbitration panel. It is clear as to why it's never been used by an arbitration panel because it only applies to court proceedings. All the cases cited are court proceedings, there's no case that's been cited where

**Page 12**

Proceedings - 3/28/06

the arbitration panel ordered the security under 1213 and then the court approved the arbitrators' act.

They're all cases where there was a court proceeding, whether it's a confirmation of an arbitration award or a motion to compel arbitration, but there, in every case, is a court proceeding and the judge orders the security to be put up. There's no connection there. And that is a clear -- clearly stated in Section 1213 because it refers to the proceeding in which the court or the court where the proceeding is pending, so you don't have an arbitration pending before a court, you may have aspects of it but not the arbitration before the court.

Secondly, it's clear that the monies are to be paid into the clerk of the court, and that would only apply to a court proceeding, not to an arbitration proceeding. So it's clear that -- and there's no support for this,

```
                                                    13
 1         Proceedings - 3/28/06
 2   it's clear that that section is utterly
 3   irrelevant to this proceeding.
 4         THE UMPIRE: Hold a second.
 5         (Discussion off the record)
 6         THE UMPIRE: I think it would
 7   probably be efficient if we ask
 8   questions as we go along, if that's okay
 9   with the panel.
10         MR. HIGGINS: That's fine.
11         MR. HABER: Would you mind looking
12   at Exhibit B of Security's reply brief,
13   please.
14         MS. JACOBSON: It's also in our --
15         MR. HIGGINS: The new one?
16         MR. LEWNER: Yes.
17         MR. HABER: The case is American
18   Centennial versus Seguros la Republica.
19         MR. HIGGINS: That's it.
20         And what's the question?
21         MR. HABER: Well, I'm looking --
22   your position, if I understand it
23   correctly, is 1213 does not apply to
24   arbitrations.
25         MR. HIGGINS: Right.
```

```
                                                    14
 1         Proceedings - 3/28/06
 2         MR. HABER: Second column of the
 3   first page of that says, and I'm reading
 4   in the second full paragraph, second to
 5   the last sentence, "The contention that
 6   the legislature did not intend 1213 to
 7   apply to reinsurance must be rejected.
 8   In addition, the language of the statute
 9   is clear that it applies broadly to any
10   proceeding, including an arbitration
11   proceeding. Accordingly, based on our,"
12   and then there's another citation to
13   1213(c)(1)," "Accordingly, based on our
14   review of this issue, we find no error
15   in the magistrate judge's recommendation
16   and, therefore adopt, that
17   recommendation in full."
18         Please explain how this case is
19   distinguished and supports your position
20   that 1213 doesn't apply to arbitration.
21         MR. HIGGINS: Well, it does
22   broadly, as this says, apply to
23   arbitrations in the sense that once it
24   gets to court, just the fact that an
25   underlying procedure is arbitration
```

```
                                                    15
 1         Proceedings - 3/28/06
 2   wouldn't alter the fact, but the judge
 3   here ordered the security. It hadn't
 4   been, it hadn't been -- the order hadn't
 5   been issued by an arbitration panel so
 6   we don't have a situation where the
 7   arbitration panel ordered it under 1213,
 8   so that -- well, number one, that issue
 9   would be dicta, but number two --
10         MR. HABER: Yeah?
11         MR. HIGGINS: -- number two, this
12   is an underlying procedure, proceeding,
13   this arbitration. And as I said, there
14   are cases where you had a confirmation
15   proceeding in court and before the court
16   would allow a response to the
17   confirmation proceeding, the court
18   ordered that this security be put up
19   under 1213, and there have been cases
20   where there's a motion to compel
21   arbitration, there's very few cases, but
22   motion to compel arbitration where the
23   court ordered the security to be put up
24   before it would allow the respondent to
25   put in a response or an answer,
```

```
                                                    16
 1         Proceedings - 3/28/06
 2   pleading, which is what this refers to,
 3   in the court.
 4         MR. HABER: Okay. Could you now
 5   go to Exhibit C, which is the next case,
 6   which is Northwestern National v. Kansa
 7   and I'm looking at the third page, first
 8   column under "Request for Bond," and
 9   this is the bond that Kansa is supposed
10   to post to security and the last two
11   sentences say, "Accordingly, the parties
12   are instructed to meet and attempt to
13   resolve the amount of the bond to be
14   posted by Kansa. If the parties are
15   unable to reach agreement within two
16   weeks from the date of this order, the
17   arbitration panel will then resolve the
18   issue."
19         How does that support your
20   position?
21         MR. HIGGINS: Well, not the issue
22   of whether there'd be security, just the
23   amount. So the court is ordering the
24   security under Section 1213, it isn't
25   assigning that job to the panel, which
```

17

```
1       Proceedings - 3/28/06
2   is what is being suggested by the
3   claimant.
4       MR. HABER: Are you --
5       MR. HIGGINS: All that the court
6   is assigning to the parties for
7   agreement or in default to the panel, is
8   the amount of the security.
9       MR. HABER: I'm trying to
10  understand, so your argument is that it
11  is only a judge who may order the
12  posting of security, not this panel?
13      MR. HIGGINS: Yes.
14      MR. HABER: And your authority for
15  that position -- do you have affirmative
16  authority or are you just saying you
17  disagree with any reading of the cases
18  other than your interpretation?
19      MR. HIGGINS: Well, I don't think
20  there is a disagreement with my
21  interpretation in terms of who ordered
22  the security. Now, there are --
23      MR. HABER: I'm going to go out --
24  your opposing counsel I think is.
25      MR. HIGGINS: That there's
```

18

```
1       Proceedings - 3/28/06
2   security, that there's authority for an
3   arbitration panel ordering security?
4       MR. HABER: You don't think
5   they've taken that position?
6       MR. HIGGINS: They have taken that
7   position, there's no authority for it.
8   And I don't think you can read these
9   cases as a matter of fact to interpret
10  them that the panel issued the 1213
11  order and not a court. In every case,
12  the court ordered the 1213.
13      MR. HABER: Okay.
14      MR. HIGGINS: And there is no
15  authority going the other way, simply
16  because the statute is clear.
17      MR. HABER: Okay.
18      THE UMPIRE: Let me see if I can
19  clarify that for my own mind.
20      It's your position that an
21  arbitration panel, per 1213, does not
22  have authority?
23      MR. HIGGINS: Exactly.
24      THE UMPIRE: Not an arbitration
25  panel doesn't have authority per se?
```

19

```
1       Proceedings - 3/28/06
2       MR. HIGGINS: We don't contest
3   that.
4       THE UMPIRE: Thank you.
5       MR. HIGGINS: There are three
6   grounds here, that's one of them.
7       The second ground is the ground
8   that there's a contractual obligation,
9   and that was dealt with briefly by
10  Ms. Jacobson. There's a number of
11  arguments against that. The primary
12  argument is that that's final relief,
13  and until we have -- until we have a
14  hearing here, the panel shouldn't be in
15  the business of enforcing one provision
16  of the contract and refusing to enforce
17  the other provisions of the contract.
18  We say it's equally clear that these
19  contracts only cover business which is
20  written in accordance with the
21  underwriting guidelines.
22      Now, we have to prove that and
23  we'd like an opportunity to prove that,
24  but to say that one provision is clear
25  and, you know, object to the other
```

20

```
1       Proceedings - 3/28/06
2   provision is splitting the contract, and
3   that's final relief. If we are ordered
4   to put up security at the end of the
5   case because the panel has determined
6   that it's part of the relief that
7   security should be granted, then that's
8   what we'll deal with at the time and
9   that's when we'll put up -- we're happy
10  to put up the security at that time. We
11  don't think that at this stage we should
12  be looking at one aspect of the contract
13  and not at the other aspect.
14      Secondly, the clause only applies
15  to situations where credit for
16  reinsurance is a problem. And there are
17  a number of reasons why we shouldn't be
18  thinking about prehearing security,
19  which presumably would be under the
20  control of the panel, as solving that
21  problem. There's no contractual
22  requirement that we put up security that
23  is in the possession -- or under the
24  control of the panel, for the simple
25  reason that it wouldn't solve the credit
```

21

Proceedings - 3/28/06
for reinsurance problem because if it's
not unconditional, then the state won't
accept it, it's got to be utterly
unconditional. So if the panel decides
that security is there and it can only
be paid over if the judgment provides
for that, which is the standard forms
for security under the ARIAS forms, then
that does Security no good.
   Secondly, on that point, we don't
believe that there is an obligation
under the contract to provide security
for the amount that's being sought.
Number one, we question the number,
because we question our obligation in
light of the defenses that we have
raised.
   Secondly, we question the number
based on the security that -- based on
the amount of letters of credit that
Security is showing on its Schedule F.
There is no penalty for this contract,
so if there's no penalty, then there's
no right to claim a right under the

22

Proceedings - 3/28/06
contract for a letter of credit which
would cure the penalty. The fact that a
parent put up letters of credit we would
suggest is not a proper way to secure
under Schedule F. So the fact that they
have chosen to do this, and it cures
their problem, is not something that we
brought along. The problem is cured?
So be it.
   The last item -- well, and also,
sorry, just to go back to that item, if
you look at the amounts claimed on the
schedule, number one, they keep
changing, and, number two, the schedule
is not understandable in terms of what
the security should be. It deals with
various items, premium items, claim
items, and, you know, there are negative
items on the funds held, there are
positive items on the amount of the
losses, Schedule F only deals with
losses, so we shouldn't -- you know, we
shouldn't be obligated to secure things
like return premium or, as they put it,

23

Proceedings - 3/28/06
overpayment of premium, it's just not
covered by the treaty. And I think if
you push it all out and give us a credit
for the $4 million letter of credit, I'm
not sure that we owe them anything, even
under their interpretation.
   The last argument that's made, and
we think it's libelous, is that
Commercial Risk doesn't have the
wherewithal to satisfy a $6 million
letter of credit. We think it's just
outrageous for a company like RSA to
make against Commercial Risk and
ultimately SCOR, to question the ability
of SCOR to satisfy a judgment. We trust
that that's an argument that's -- an
advocate, a lawyer would put forward and
not RSA, but it's kind of a sad
commentary when that sort of
bloody-minded attitude is put forth in
an arbitration. We have this much
security in these two big companies
going at each other for a paltry
$6 million, it's just, we think,

24

Proceedings - 3/28/06
outrageous.
   Question was made as to whether a
an award would be enforceable in France.
That's unsupported by the claimant under
French law. I'm not an expert on French
law but I do know that France is a
signatory of the U.N. Convention for the
Enforcement of Foreign Arbitration
Awards, so, number one, there wouldn't
be any problem going to France and
getting it upheld and getting an order
confirming the award. As it wouldn't be
in this country if we had an arbitration
award in France. There's an assumption
that civilized countries should
recognize their judgments and also
should recognize their arbitration
awards. So we think that that is also a
fairly outrageous statement to make on
that issue.
   And I think I had another point.
   Also, a point was made that
there's a case that's been filed in, I
think Supreme Court New York, for an

25

```
1       Proceedings - 3/28/06
2   additional 55 million.
3       MR. LEWNER: 49.
4       MS. JACOBSON: 48.
5       MR. HIGGINS: 48, sorry.
6       That's -- you know, I think that's
7   utterly improper for anyone to suggest
8   that that has any relevance here.
9   Number one, it's not SCOR France, the
10  parent company, it's SCOR U.S.
11      Secondly, I think what's being
12  asked is for the panel to not only judge
13  this case but to judge that case as to
14  whether there's any merit to that claim
15  either. We don't know what it's about.
16  I mean they claim they stopped paying
17  losses but, you know, who knows what
18  that dispute is about. It's in court,
19  it's not an arbitration, and the panel
20  here really has no ability to analyze
21  it, to figure out whether it has any
22  application here or whether it affects
23  the ability of the parent company or
24  could affect the ability of the parent
25  company to satisfy this judgment which
```

26

```
1       Proceedings - 3/28/06
2   in this case is going to be, if they get
3   everything they want, $6 million, maybe
4   plus some interest. So that's the
5   arguments we have on the security issue.
6       THE UMPIRE: Thanks.
7       Any more questions of John
8   before -- Michelle?
9       MS. JACOBSON: I believe that
10  Mr. Higgins has actually combined the
11  two security motions because a lot of
12  the references were actually to DIG and
13  I believe that we were here to discuss
14  the non-DIG programs, NHE, ORS and HPP.
15  However --
16      MR. HIGGINS: I was mistaken, I
17  thought we were discussing -- we were
18  still in the organizational meeting when
19  we were discussing security.
20      THE UMPIRE: Yes, we're still in
21  the organizational meeting.
22      MS. JACOBSON: Right.
23      THE UMPIRE: I understand that
24  there are perhaps some grayish and
25  blurry lines here when we're talking
```

27

```
1       Proceedings - 3/28/06
2   about security because we are going to
3   talk about security relative to both
4   contracts.
5       MS. JACOBSON: Okay, well, Mr. --
6       THE UMPIRE: I don't think that's
7   too much of a problem at the moment but
8   please go ahead.
9       MS. JACOBSON: Okay.
10      First of all, with respect to
11  Mr. Higgins' attempt to parse the cases
12  with respect to Section 1213, that it
13  was ordered by the court and not the
14  arbitration panel, I thoroughly disagree
15  with that, we've only cited two cases,
16  there are more cases.
17      If you turn to the actual statute
18  that we've appended to our reply brief
19  with respect to the DIG motion, you will
20  see that, we turn to Exhibit A, page 16
21  of 19, see under "Bond or Deposit" in
22  general there is a series of cases which
23  deal with Section 1213, the first of
24  which is dealing with an arbitration
25  panel's interim order for prejudgment
```

28

```
1       Proceedings - 3/28/06
2   security.
3       THE UMPIRE: Hold on, just a
4   second.
5       MS. JACOBSON: That's the thin
6   one.
7       THE UMPIRE: It's actually page 15
8   but at the top --
9       MS. JACOBSON: Page 15 but it does
10  say page 16 of 19 at the top.
11      THE UMPIRE: Okay.
12      MS. JACOBSON: If you look to the
13  very first entry, there it is dealing
14  with an arbitration panel's interim
15  order, it was obviously being reviewed
16  by the court on prejudgment security.
17      So I think it is clear that 1213
18  does, in fact, apply to proceedings,
19  it's not limited to litigations, but in
20  any event, if I heard Mr. Higgins
21  correctly, he does not debate that the
22  panel has the inherent authority to
23  issue such awards, even if one were to
24  credit his argument under Section 1213.
25      Mr. Higgins' statement -- I'd like
```

## Page 29

Proceedings - 3/28/06

to respond to Mr. Higgins' statements with respect to the contractual provision. He's indicated that, in essence, we're seeking final relief. I mean that's not the case at all. In both of our arbitration proceedings, we're -- certainly we were entitled under these provisions to completely draw down on whatever we had, and we haven't done so. We believe, however, that these amounts should be set aside in escrow, it's not akin to final relief, and we would -- we assert that the contract is clear that it does not limit itself to matters not in dispute; therefore, to the extent that we have reserved and we have paid losses, and that there is IBNR that we have set aside, then they should post those sums in an escrow amount per the terms of the contract.

Mr. Higgins has discussed the Schedule F. I think, frankly, that it's shocking that Commercial Risk did not

## Page 30

Proceedings - 3/28/06

inform the panel that, indeed, it had not posted the $29 million which appears under LOCs. They know they haven't posted that amount. In fact, there is 10.3 million that was as a result of Royal's parent's LOC and to the extent that Commercial Risk has contended that in some regard that's improper, the Delaware Insurance Department, which is Royal Indemnity's domicile, has blessed this very use of the parental LOC. It's contained in the notes of the annual statement of Royal Indemnity. So there is nothing wrong with it.

However, they should not be entitled to take credit for the parental LOC that's out there. Their statement that we solved the problem so that, therefore, they don't have to abide under their contractual obligations is frankly -- I find it absurd.

Now, they express shock and dismay over the fact that we said that they may not have the wherewithal to satisfy any

## Page 31

Proceedings - 3/28/06

award here, and they said that they feel it libelous. Well, to the extent that we know that Commercial Risk has frankly ceased paying on many millions of dollars worth of obligations, we have a problem with that. We don't think it's libelous to assert that maybe that they won't pay; their financial statements show otherwise. They are relying wholeheartedly on this guarantee that has been posted by SCOR? Well, you know, if you take a look at that guarantee, it's addressed to whom it may concern; that's not a contract that anyone can rely on, to whom it may concern.

And I would also indicate that if you look at that SCOR guarantee, one of them is dated July of '99. That's the date of the first DIG contract that we have. That parental guarantee is not slapped on to the back of the reinsurance contract, it is not our -- our reinsurance contract is with

## Page 32

Proceedings - 3/28/06

Commercial Risk, it's signed by Commercial Risk and it's Commercial Risk that we should look to to enforce any obligations under the reinsurance contract.

We, with all due respect, should not have to go off to France to litigate against the parent on a guarantee which is certainly -- I'm not even sure if it's a legal obligation under U.S. law or French law.

And, certainly, I don't think that Security Insurance Company of Hartford should have to engage in ancillary litigation in France to enforce something here and that certainly collateral should be posted.

MR. DIELMANN: I have a question. Mr. Higgins said -- stated that there are -- France is a signatory of the U.N. agreement for enforcing arbitration awards. Is this, indeed, correct, that you have to go to France if the panel, you know, gives you relief or can that

33

Proceedings - 3/28/06

1  
2  award be enforced in this country?
3      MS. JACOBSON: Well, SCOR, the
4  parent, is not a party to this
5  arbitration. So if this panel -- this
6  panel would have to somehow suck SCOR,
7  the parent, into this arbitration on an
8  alter ego theory.
9      MR. DIELMANN: But is that not
10 then a formality to have it confirmed in
11 France? I mean what you are implying it
12 seems to me that you basically have to
13 struggle to get it enforced in France
14 but if SCOR is a signatory, then surely
15 the subsidiary -- you would have to just
16 to get it confirmed or do I understand
17 this incorrectly?
18     MS. JACOBSON: No, I believe, with
19 all due respect, I think you have it
20 incorrectly. I mean here SCOR is not a
21 party to this arbitration; they would
22 not -- there would not be an award
23 entered against SCOR in this arbitration
24 unless they're brought in as a party.
25 Therefore, there would be no award to

34

Proceedings - 3/28/06

1  
2  enforce here or overseas against SCOR.
3  We would have to have an award against
4  Commercial Risk. If Commercial Risk
5  wouldn't pay, then we would be stuck
6  with that parental guarantee and have to
7  chase SCOR somewhere, either by
8  commencing arbitration against SCOR
9  somewhere or by litigating against SCOR
10 somewhere. That's the fear.
11     MR. HABER: Theo, isn't there a
12 simple solution. If SCOR voluntarily
13 wishes to submit to the jurisdiction of
14 this arbitration panel and be bound by
15 U.S. law and be subject to any judgment,
16 wouldn't that solve the problem?
17     MR. HIGGINS: That's something
18 that may well happen but I don't have
19 the authority, sitting here, to respond
20 to that, but I'm certainly willing to
21 respond to it in the next day or so.
22     THE UMPIRE: Let me make sure I
23 understand this, maybe I can --
24     MR. HIGGINS: I can assure you
25 that we didn't put that guarantee out as

35

Proceedings - 3/28/06

1  
2  something which is illusory.
3      MR. HABER: Well, not --
4      MR. HIGGINS: To whom it may
5  concern is the world. It was sent to
6  RSA, it was sent to all the cedents.
7      MS. JACOBSON: With all due
8  respect, no one in our organization
9  recalls having been brought -- provided
10 with that.
11     THE UMPIRE: I tell you what,
12 let's move on, I'm happy with
13 understanding where I think we are.
14     MR. DIELMANN: I haven't really
15 understood what your suggestion, Marty,
16 was.
17     MR. HABER: Well, my suggestion is
18 this, under American laws with regard to
19 personal jurisdiction, because SCOR, the
20 parent, is not a party here, they are
21 not bound by anything legal.
22     MR. DIELMANN: Okay.
23     MR. HABER: They have signed a
24 judgment, they have signed an
25 arbitration treaty, if you will, that

36

Proceedings - 3/28/06

1  
2  says in the event they lose an
3  arbitration in the United States and a
4  judgment is against the parent --
5      MR. DIELMANN: Right.
6      MR. HABER: -- that judgment may
7  be enforced in France, not a judgment
8  against their subsidiary.
9      MR. DIELMANN: Right.
10     MR. HABER: So your question, in
11 order to respond to your question
12 completely, they would have to be
13 subject to the jurisdiction of this
14 panel and they are not.
15     MR. DIELMANN: Okay.
16     MR. HABER: I mean no one here is
17 claiming that SCOR, the parent, is part
18 of this case.
19     MR. HIGGINS: No, we're not, but
20 it's certainly not clear that anyone
21 would have to go to France. SCOR's
22 doing business everywhere including
23 here.
24     THE UMPIRE: Let me say something
25 here for a second. As far as I

**Page 37**

Proceedings - 3/28/06
understand it from following Mr. Dielmann's question--I'll leave Mr. Haber's question out of it for the moment--in the event that this panel found in favor of Security of Hartford, that would be against Commercial Risk's both Bermuda and Vermont --
    MS. JACOBSON: That's right.
    THE UMPIRE: -- where relevant.
    If those companies -- and if there were no security, with a small "S," posted, Security of Hartford would look to Commercial Risk for satisfaction of that award. In the event that Commercial Risk failed to satisfy the award, for whatever reason, it's possible that Security could look to the guarantee from SCOR as relief. In order to satisfy that, it would need to write to SCOR and say kindly pay us X amount of dollars. If SCOR said, yes, end of problem; if SCOR said no, however, then I would imagine that Security of Hartford would need to file litigation

**Page 38**

Proceedings - 3/28/06
against SCOR, presumably in France, under the terms of that guarantee. Whether in France or the U.S., it would need to file litigation, I'm just assuming, but what I'm saying, it in France; I would need to fight that litigation in order to secure the award.
    Is that a clear understanding of that issue?
    MS. JACOBSON: That is correct.
    THE UMPIRE: As far as Mr. Haber's question --
    MR. HIGGINS: Well, could I just --
    THE UMPIRE: Go ahead.
    MR. HIGGINS: One caveat to what you just said. In the first instance, it would be up to Security – or, I'm sorry, Commercial Risk to determine whether they even satisfied the judgment. I mean this is something that only applies if there isn't enough assets, and there's been no proof that there isn't enough assets or that there

**Page 39**

Proceedings - 3/28/06
won't be enough assets. You have to get into the reserving of the company.
    THE UMPIRE: In the event that Commercial Risk paid the award that the panel had given, it will be end of story.
    MR. HIGGINS: Yes.
    THE UMPIRE: In the event that it did not pay, for whatever reason, whether it could, didn't want to or couldn't because it was bust, makes no difference.
    MR. HIGGINS: I'm sorry, it does make a difference on the first thing that you said, because you can enforce it against the company if they have the funds. It's entitled to be entered in a court and then enforced, entered as a judgment and then enforced if they don't want to pay. Now, if they're belly up, then that would trigger what you're --
    THE UMPIRE: Well, couldn't Security pursue both angles --
    MR. HIGGINS: Sure.

**Page 40**

Proceedings - 3/28/06
    THE UMPIRE: -- at the point in time, i.e., pursue Commercial Risk, let's assume that it's not in litigation or even if it is, it's against the receiver, and under the parental guarantee, the guarantee I don't think mentions the liquidation scenario, it's just a blanket guarantee, what it's worth is something else, I don't want to get into that issue, but as a matter of law, I think Security could pursue both if they so choose?
    MR. HIGGINS: If they believe that it's clear that Commercial Risk can't satisfy it, then they would be -- they would be free to, you know, to litigate under the guarantee and then pursue rights against Security presumably at the same time by filing a liquidation proceeding or however. But the guarantee is a standby, so, first, they'd have to pursue Security, which is normal, and if Security has sufficient funds --

---

**41**

Proceedings - 3/28/06

1  THE UMPIRE: You mean Commercial
2  Risk?
3  MR. HIGGINS: I'm sorry, they have
4  to pursue Commercial Risk, and if
5  Commercial Risk has sufficient funds,
6  then they'd be obligated to pay them.
7  THE UMPIRE: Thank you.
8  As far as Mr. Haber's question is
9  concerned, I would prefer that we didn't
10 raise the issue of bringing in any
11 parties yet until we've gone down
12 through stage one. I think that's a
13 little premature and I'd like to have
14 panel discussion on that first which we
15 could -- I think that's --
16 MR. HABER: That's perfectly fine
17 but I think when we deal with the
18 guarantee, and we're assuming facts not
19 in evidence, because it's not clear
20 under American law that this is a valid
21 guarantee, it might be under French law,
22 but we do not have an opinion of French
23 counsel that this is any sort of
24 enforceable guarantee because the first

---

**42**

Proceedings - 3/28/06

1  sentence says that "SCOR guarantees that
2  Commercial Risk Reinsurance Company,"
3  without determining which company,
4  "shall perform its claims obligations
5  when due." If I understand this case,
6  there are two Commercial Risk
7  reinsurance companies, correct?
8  MR. HIGGINS: Yes.
9  MR. HABER: Which one does this
10 guarantee apply to?
11 MR. HIGGINS: Both of them.
12 MR. HABER: It doesn't say that,
13 they're two separate legal entities, you
14 have not specifically identified -- I
15 don't mean you personally, John, I don't
16 mean it that way, but SCOR has not
17 specifically identified the party whose
18 obligations it is guaranteeing. In
19 America, under the rules of strictissimi
20 juris that voids this to begin with
21 because you don't have a party whose
22 actual performance is guaranteed without
23 having the party completely identified
24 and here the party isn't. I think the

---

**43**

Proceedings - 3/28/06

1  guarantee is questionable. It may be
2  perfectly valid under French law, I'm
3  not suggesting it's not, but there's
4  clearly no proof before the panel that
5  it is.
6  MR. HIGGINS: Well, that's just
7  one of them. The other one names both
8  companies.
9  MR. DIELMANN: May I just, you
10 know, just taking on what Mr. Haber
11 said, I mean, well, where is the
12 problem -- to clarify this, even to take
13 out the remotest possibility that SCOR
14 doesn't stand behind their subsidiary,
15 is that, you know, that there is a, a
16 specific guarantee, referring to the two
17 treaties and, if need be, to this
18 particular or the two arbitrations that
19 are currently pending, I mean I do not
20 know whether that is too specific but
21 surely I would say it would take away
22 even the doubts that obviously in the
23 claimant's mind that there may be a risk
24 that SCOR or Commercial Risk will

---

**44**

Proceedings - 3/28/06

1  talk -- walk away from any award being
2  given by the panel?
3  MR. HIGGINS: That is one thing I
4  indicated earlier we'd discuss -- what
5  you're suggesting is make it specific to
6  these contracts --
7  MR. DIELMANN: Yeah.
8  MR. HIGGINS: -- and have SCOR,
9  the parent --
10 MR. DIELMANN: Right.
11 MR. HIGGINS: -- state that the
12 guarantee covers that specifically.
13 MR. DIELMANN: Exactly.
14 MR. HABER: But there's something
15 else, the language in the guarantee says
16 that there's a guarantee that they shall
17 perform its payment obligations when
18 due. This is a judgment in an
19 arbitration we're looking to be
20 guaranteed, not the performance of a
21 claims obligation when due, because in
22 theory, and only in theory, if this
23 panel ruled in favor of Security of
24 Hartford, we would be ruling that a

## Page 45

Proceedings - 3/28/06
claims obligation -- a claims demand made X months ago or X years ago, whenever it was made, was due when made and wasn't paid.

This guarantee is unclear in a literal sense as to all of Commercial Risk's obligations. It's only talking about claims obligations when due. It could mean there's judgment--I'm not suggesting it doesn't--but it's -- at this point in time the language is so unclear as to require a court's interpretation. Not the kind of thing you want to bank on to enforce.

MR. HIGGINS: Well, I mean the suggestion is that we clarify that to --

MR. HABER: A brand --

MR. HIGGINS: -- to alleviate those concerns.

But, secondly, when you're dealing with guarantees, before you can pursue the parent, you have to enforce the obligation, to the extent you can, against the guaranteeing party.

## Page 46

Proceedings - 3/28/06

MR. HABER: It depends on the terms of the guarantee. Some are guarantees of payment, some are guarantees of performance. It depends on the guarantee you enter into and what the consideration is for the guarantee. It's a little difficult on the July 1 '99 guarantee to understand how that was consideration for the DIG contract since it was the same date.

The March 9, 2001 guarantee, at least I don't think the panel has seen any evidence as to what the genesis was for that document and what the consideration is.

I'm just saying there are a lot of open questions and as we all well know, if you give a lawyer a chance, they can make a thousand questions out of a one-question issue. And there are really a lot of questions here that are unanswered and I don't think the guarantee says precise -- and clearly, you could clarify it by SCOR issuing a

## Page 47

Proceedings - 3/28/06
document that says, "Without offset defense or counterclaim, we guarantee the full payment and performance of all debts owed under the two contracts." I'm not saying you agree to that language, I'm not suggesting that; all I'm saying is you could draft a document that was a lot tighter.

MR. HIGGINS: Yes, and that's what I'm going to discuss with the client.

MS. JACOBSON: And I have a comment to that.

We entered into these contracts with Commercial Risk. That is our contracting party. We are entitled to look to Commercial Risk, we're not -- we don't have to look to anyone else, because that's not -- no one else signed that contract; Commercial Risk signed that contract, Commercial Risk Vermont and Commercial Risk Bermuda, those are the folks that we are pursuing in this arbitration. Frankly, these are the only folks that we have a right to

## Page 48

Proceedings - 3/28/06
pursue in this arbitration and we are entitled to security from them. I don't want other guarantees or that we may pay, you know, the parent stands behind us, I don't think that that does the trick. That's not who we contracted with.

THE UMPIRE: I think it's probably -- now is probably a good time to cut off this particular line of discussion --

MS. JACOBSON: Yeah.

THE UMPIRE: -- (a) because I think we'll start going round again, and (b) I think from a procedural viewpoint what we discussed earlier on is the panel will discuss the issue. It may or may not become relevant.

MS. JACOBSON: Okay.

THE UMPIRE: If it does become relevant, we can revisit it and either make an order or ask the parties to comment some more but I think we've probably added sufficiently enough from

49

Proceedings - 3/28/06
the principle viewpoint other than my
co-panelist who obviously doesn't agree
with me.
    MR. DIELMANN: No, I do agree with
you.
    THE UMPIRE: Good, let's move on.
    MR. DIELMANN: No, again, I just
have a very specific question. Is that
correct or incorrect that, you know,
Commercial Risk Vermont can -- does have
under Article -- under the security
clause you can take credit or not, and
my question is, you know, does the
contractual obligation in respect of the
security requirement, does that also
refer to Commercial Risk Vermont or not?
    Because I think they only have
to -- have to -- they only, you know,
have to oblige if you can -- if, you
know, Security of Hartford can take
credit, my question is I'm not clear on
this point whether that's correct or
not.
    MS. JACOBSON: I believe that

50

Proceedings - 3/28/06
Commercial Risk Vermont is an admitted
company.
    MR. DIELMANN: Okay.
    MS. JACOBSON: Authorized,
authorized, I'm sorry.
    MR. DIELMANN: So as far as if
there's a security obligation under the
Article 14, as far as DIG is concerned
and other articles of a similar nature
is concerned, they wouldn't have to post
letters of credit; is that correct?
    MS. JACOBSON: That would be
correct under the security provisions in
the contracts, apart from common law and
statute -- that's correct.
    MR. DIELMANN: And I have another
question that refers to the net funds
held.
    Net funds held --
    THE UMPIRE: Theo, can we leave
that, I was going to ask you your first
question, you've asked it, but I want to
get into those details when we get into
the security discussion.

51

Proceedings - 3/28/06
    MR. DIELMANN: Okay, fine.
    THE UMPIRE: Maybe if we get back
to the organizational meeting here for a
moment at least.
    I was incorrect at the beginning
here, I moved too quickly, I should have
asked everybody in the room to identify
themselves, so as a break now it might
be a good idea to do that.
    I'll start here and then we'll
move round to the left.
    Obviously, David Thirkill, umpire.
    MR. HABER: Martin Haber,
party-appointed arbitrator for Security
of Hartford.
    MR. MEEHAN: James Meehan, I'm
general counsel for Royal & SunAlliance
USA and its affiliated insurance
companies.
    MR. LEFEBVRE: Andre Lefebvre,
financial risk officer for Royal &
SunAlliance USA.
    MR. LEWNER: Andrew Lewner, from
Stroock & Stroock & Lavan, for claimant.

52

Proceedings - 3/28/06
    MS. JACOBSON: I'm Michelle
Jacobson, from Stroock & Stroock &
Lavan, for the claimant.
    MR. HIGGINS: John Higgins,
D'Amato & Lynch, for the respondent.
    MS. de LACROIX: Joelle
de Lacroix, CRP.
    MR. DIELMANN: Theo Dielmann,
party-appointed arbitrator for
Commercial Risk Vermont and Bermuda.
    THE UMPIRE: Thank you.
    As far as prehearing motions are
concerned, obviously we have the motion
for security. Are there any other
prehearing motions that anybody wants to
raise at this juncture?
    MR. HIGGINS: Which one are we on?
    THE UMPIRE: We're on the
organizational meeting?
    MR. HIGGINS: Non-DIG.
    THE UMPIRE: Non-DIG.
    MR. HIGGINS: I think we should
discuss the consolidation issue. Should
I deal with that?

**Page 53**

Proceedings - 3/28/06
1  THE UMPIRE: Please.
2  MR. HIGGINS: We believe that
3  consolidation -- not consolidation in a
4  literal sense because we don't have or
5  the panel doesn't have the authority
6  under New York or Connecticut law to
7  order parties to consolidate different
8  contracts, so we're not asking for
9  consolidation in a literal sense. What
10 we're asking is for the panel to order
11 that the discovery or disclosure in the
12 hearings be held at the same time. I've
13 seen that in many cases but -- and
14 that's what we're suggesting.
15    Now, the objection to that, as far
16 as we know, from Security is that we're
17 on a very tight schedule in the DIG
18 arbitration and it will interfere with
19 the ability to complete the schedule and
20 it will cause problems timewise for us
21 to do that. And I think that if that's
22 the case, if that's -- if there's merit
23 to that argument, then we would be
24 willing to yield on that point so long

**Page 54**

Proceedings - 3/28/06
as we don't end up doing the same thing,
which is pushing this arbitration, the
non-DIG arbitration, along at the same
time as the other and, you know,
creating the same problem that's being
objected to.
   So what we would suggest, if the
panel wants to entertain it, is that we
have -- that we put this one off and
have it done after the DIG arbitration.
And that's perfectly acceptable to us.
   MS. JACOBSON: Okay. Well, we,
despite what Mr. Higgins is saying that
he's not seeking consolidation, I think,
in fact, it would be a de facto
consolidation, which is not required
either contractually, you know, in any
of the agreements, and we don't agree to
it and I think that's been made clear.
   We agree to consolidate NHE, ORS
and HPP--those were actually three
separate arbitrations--we agreed to
consolidate them into one, having --
leaving us with two arbitrations.

**Page 55**

Proceedings - 3/28/06
There are such disparate facts
with respect to each of those programs.
In one we have a set of three disparate
facts and DIG has its own set of facts.
We don't believe that there is that much
of a substantial overlap. I believe the
contention is violation of underwriting
guidelines. The guidelines are
different in all of the arbitrations.
   If what Mr. Higgins is suggesting
is to have the DIG arbitration in
December, as scheduled, and then have a
later date for the non-DIG, keeping them
separate, that's fine with us, and we
would propose an end-of-January hearing
date if that's acceptable to the panel,
just splitting them up, keeping them
separate.
   THE UMPIRE: Okay, let me make a
couple of points. The panel has already
chatted datewise at least, and while I
don't have the specific dates -- are you
okay?
   MS. JACOBSON: Yeah.

**Page 56**

Proceedings - 3/28/06
   THE UMPIRE: -- while I don't have
the specific dates, and we can come to
those in a second, the first date we
could offer you would be March anyway,
and, in effect, since we had already
reserved the whole -- the whole week in
December, I don't remember the exact
dates, but we reserved the whole week
and I think the impression that we
gained when we discussed this is we'd
need all of that time for the DIG
arbitration.
   MS. JACOBSON: That's right.
   THE UMPIRE: I mean just as a
matter of fact we want to be able to
go --
   MR. HABER: December 11th.
   THE UMPIRE: December 11th, thank
you, Marty.
   We wouldn't be able to go until
March anyway.
   Talking a little more generally,
and again I welcome any input from my
co-panelists here, since the panel has

57

Proceedings - 3/28/06
not heard from either of you relative to
discovery issues in relation to the DIG
contract, we assume one of two things,
either you're getting along famously or
you haven't chatted at all but in either
case, obviously there's no issues yet
before us on that. It would seem to me,
as a matter of logic, that if there's
auditors going in, just from an
efficiency viewpoint, one would imagine
that it would make sense for them to
sort of look at the two or three if that
was feasible but, again, if it is a
problem to either of you, please go
ahead and organize it as you think best
and come to us with any issues as they
arise.
    As far as dates are concerned --
what was that date again, Marty?
    MR. HABER: March 26th is my
earlier --
    THE UMPIRE: Okay, that's good.
I'm free -- are you free?
    MR. DIELMANN: Yes.

58

Proceedings - 3/28/06
    THE UMPIRE: Again, do you think
with the three that a week is
sufficient?
    MS. JACOBSON: I believe so.
    THE UMPIRE: So we could reserve
off -- if that was okay with you,
Mr. Higgins, also, the week of 26th of
March '07?
    MR. HIGGINS: Should be okay.
    THE UMPIRE: Is there anything
strange about that --
    MR. HABER: 26th is a Monday.
    THE UMPIRE: -- apart from it
being, the 29th being Mr. Haber's next
wedding anniversary after tomorrow?
    MS. JACOBSON: We were attempting
to figure out which week it was Good
Friday and I can't -- according to my
list it's wrong. It must be the 23rd.
    THE UMPIRE: The 23rd is Good
Friday?
    MS. JACOBSON: I was just trying
to figure it out but apparently the
schedule that I have of holidays has to

59

Proceedings - 3/28/06
be wrong because I have Easter Sunday
being on March 27th in 2007, which it
certainly isn't the case.
    MR. HABER: That's a Monday.
    THE UMPIRE: Let's put it this
way, let's reserve that week.
    MS. JACOBSON: Yes.
    THE UMPIRE: If it so transpires
there's a holiday at the end of it and
we need to go over to the following week
and come back, we'll do that but I think
that's important that we at least get it
on the calendar.
    MS. JACOBSON: I agree with you.
    MR. HABER: Unless you want to
pick the week of April 2nd and then be
sure?
    MR. HIGGINS: That's probably
better anyway because I get concerned
about the suggestion of January but once
this one, the DIG one is over, we're
going to, you know, we're going to have
to shift gears and have some time to
prepare papers on the other.

60

Proceedings - 3/28/06
    THE UMPIRE: I actually have no
problem if Mr. Dielmann doesn't with
either of those.
    MR. DIELMANN: No.
    THE UMPIRE: And I don't think
it's going to make that much difference.
    MS. JACOBSON: If my notes are
correct, Passover may be the following
week, which is April 2nd, so we would
want to do it the 26th.
    THE UMPIRE: Okay. Did you hear
that, Mr. Higgins?
    MS. de LACROIX: I'm trying to
look at his journal and it seems that
he's going to a seminar in April, but I
can't see anything -- I'm sorry.
    THE UMPIRE: That's okay.
Let's put in the week of the 26th
now and if it transpires that it's a big
issue either for Easter or Passover,
we'll revisit it.
    MR. HABER: So we're at the 26th?
    THE UMPIRE: 26th.
    MR. HABER: Okay, done.

61

1    Proceedings - 3/28/06
2    MR. DIELMANN: Yeah.
3    MR. HIGGINS: So the week of the
4    2nd, April?
5    THE UMPIRE: No, the 26th, there's
6    a question probably of Passover in that
7    week.
8    MR. LEWNER: Passover is the first
9    two days, April 2nd and April 3rd of
10   that year.
11   MS. JACOBSON: We're better off in
12   the March dates it appears.
13   THE UMPIRE: Okay, back to the
14   agenda, I think we're down -- could we
15   take it that the parties would like
16   similar procedural issues to that we
17   discussed and agreed on in the other
18   matter?
19   MR. HIGGINS: Yes.
20   MS. JACOBSON: Yes.
21   THE UMPIRE: And ex parte
22   communication in the same way, I think
23   we said at the filing of the initial
24   prehearing briefs?
25   MS. JACOBSON: Yes.

62

1    Proceedings - 3/28/06
2    MR. HIGGINS: Yes.
3    THE UMPIRE: Dates and locations
4    we've done.
5    MS. JACOBSON: Well, we'll offer
6    to hold -- I don't think we discussed
7    location but we'll offer our --
8    MR. HIGGINS: We can discuss that
9    much later. I prefer to avoid hotel
10   expenses and all the rest of that.
11   MS. JACOBSON: That's why we're
12   offering.
13   THE UMPIRE: The panel will not
14   insist on being in a hotel if the
15   parties can agree on a location.
16   MS. JACOBSON: Okay.
17   THE UMPIRE: And, again, I think
18   we're all agreed in New York --
19   MR. HIGGINS: Yes.
20   THE UMPIRE: -- as before.
21   Please correct my memory if it's
22   incorrect, but I don't think we actually
23   discussed the form of award, whether you
24   want a reasoned award or not in the
25   other matter, and I raise it now, it

63

1    Proceedings - 3/28/06
2    wasn't on the agenda here. If
3    necessary, we could revisit that one
4    officially but if unofficially if we
5    come to the same conclusion here, I
6    think it will be much more efficient.
7    MS. JACOBSON: We would request a
8    reasoned award.
9    MR. HIGGINS: What was that, I'm
10   sorry?
11   MS. JACOBSON: We request a
12   reasoned award.
13   MR. HIGGINS: We agree.
14   THE UMPIRE: Okay. I don't think
15   this particular panel is afraid of
16   writing written awards.
17   So if there's no other matters
18   before this particular organizational
19   meeting panel, we'd like to adjourn it.
20   Do you have any other matters?
21   MS. JACOBSON: I don't believe so.
22   MR. HIGGINS: We don't.
23   THE UMPIRE: So we're going --
24   we'll adjourn the organizational meeting
25   and take a 10-, 15-minute break?

64

1    Proceedings - 3/28/06
2    MR. HABER: 10 is fine.
3    THE UMPIRE: 10 is fine.
4    (Time noted: 11:12 a.m.)

```
                                                              65
 1
 2           C E R T I F I C A T E
 3
 4       I, ANDREW WALKER, a Registered
 5   Professional Reporter and Notary Public,
 6   do hereby certify:
 7       I reported the proceedings in the
 8   within-entitled matter, and that the
 9   within transcript is a true record of
10   such proceedings.
11       I further certify that I am not
12   related, by blood or marriage, to any of
13   the parties in this matter and that I am
14   in no way interested in the outcome of
15   this matter.
16       IN WITNESS WHEREOF, I have
17   hereunto set my hand this_____day
18   of_____, 2006.
19
20       _____
         ANDREW WALKER, RPR
21
22
23
24
25
```